1  JONATHAN L. SEGAL (State Bar No. 264238)
     jonathansegal@dwt.com
2  SAMANTHA LACHMAN (State Bar No. 331969)
     samlachman@dwt.com
3  DAVIS WRIGHT TREMAINE LLP
   865 South Figueroa Street, 24th Floor
4  Los Angeles, California  90017-2566
   Telephone:  (213) 633-6800
5  Fax:  (213) 633-6899

6  ABIGAIL EVERDELL (*Pro hac vice*)
     abigaileverdell@dwt.com
7  DAVIS WRIGHT TREMAINE LLP
   1251 Avenue of the Americas, 21st Floor
8  New York, NY 10020
   Telephone:  (212) 489-8230
9  Fax:  (212) 379-5244

10  Attorneys for Defendants
    ANDREW CALLAGHAN, CHANNEL 5 LLC,
11  EVAN GILBERT-KATZ, AND NICOLAS
    MOSHER
12

13                UNITED STATES DISTRICT COURT
14
               CENTRAL DISTRICT OF CALIFORNIA
15

16
17  WILLIAM JOINER, an individual,       Case No. 8:24-cv-01160-CBM-KS

18                Plaintiff,             **DECLARATION OF ABIGAIL
                                         EVERDELL IN SUPPORT OF
19       vs.                             CHANNEL 5 DEFENDANTS'
                                         SPECIAL MOTION TO STRIKE
20  ANDREW CALLAGHAN, an Individual;     PLAINTIFF'S COMPLAINT AND
    CHANNEL 5 LLC, a Washington          MOTION TO DISMISS
21  Limited Liability Company; EVAN      PLAINTIFF'S COMPLAINT;
    GILBERT-KATZ, an Individual;         EXHIBITS A-D**
22  NICOLAS MOSHER, an Individual;
    KELLY SCOTT JOHNSON, an             [Notice Of Motion And Channel 5
23  Individual; and DOES 1 through 200, Defendants' Motion to Dismiss
    Inclusive,                          (F.R.C.P. 12(b)(6)); Notice of Motion
24                                       and Special Motion to Strike (C.C.P. §
                  Defendant.            425.16); Request For Judicial Notice;
25                                       Notice Of Lodging Concurrently Filed]

26                                       Date:     October 15, 2024
                                         Time:     10:00 a.m.
27                                       Dept.:    8D

28                                       Action Filed:  May 30, 2024

I, Abigail Everdell, declare and state as follows:

1.    I have been admitted to this Court *pro hac vice*.  I am an attorney admitted to practice in the state of New York and the United States District Court for the Southern District of New York (among other federal courts).  I am counsel at the law firm of Davis Wright Tremaine LLP ("DWT"), and I am one of the attorneys representing defendants Andrew Callaghan, Channel 5 LLC, Evan Gilbert-Katz, and Nicolas Mosher (collectively "Channel 5 Defendants") in this matter.  The matters stated below are true of my own personal knowledge except those matters stated on information and belief, which I am informed and believe to be true.

2.    I have reviewed Plaintiff's Complaint in this matter, which references Channel 5 Defendants' documentary film "Dear Kelly," which premiered at a live screening on June 9, 2024 (the "Documentary"), *see* Compl. ¶¶ 1, 5, 8, 67-68, as well as the Tour & Movie Announcement video posted to YouTube on May 6, 2024 (the "Trailer").  *See* Compl. ¶¶ 69-73.

3.    In support of its concurrently-filed Special Motion to Strike Plaintiff's state law causes of action pursuant to California Code of Civil Procedure § 425.16 ("Anti-SLAPP Motion") and Motion to Dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion to Dismiss" or "MTD"), Channel 5 Defendants are separately filing with the Court a USB drive containing two video exhibits, Exhibits A and B.

4.    **Exhibit A** is a true and correct copy of the documentary film "Dear Kelly," which was screened in Atlanta, Georgia on June 9, 2024, as referenced in Paragraph 8 of the Complaint.

5.    **Exhibit B** is a true and correct copy of a May 6, 2024 "Tour & Movie Announcement" for the Documentary, as referenced in Paragraphs 69-73 of the Complaint.

6.      Channel 5 Defendants are providing copies of Exhibits A-B to counsel for Plaintiff.

7.      Attached as **Exhibit C** is a true and correct copy of Plaintiff's May 23, 2024 cease and desist letter to the State Theater in Portland, Maine.

8.      Attached as **Exhibit D** is a true and correct copy of my May 30, 2024 response to Plaintiff's counsel on behalf of Defendants Andrew Callaghan and Channel 5 LLC.

9.      On July 24, 2024, my colleague Sam Lachman emailed Plaintiff's counsel seeking to meet and confer pursuant to Local Rule 7-3 regarding the grounds for Channel 5 Defendants' Special Motion to Strike and Motion to Dismiss Plaintiff's Complaint.

10.     On July 26, 2024, pursuant to Local Rule 7-3, Ms. Lachman and I participated in a telephone conference with Plaintiff's attorneys.  During the meet-and-confer conversation, we explained the substance of Channel 5 Defendants' impending Anti-SLAPP Motion and Motion to Dismiss, including the arguments we planned to include in those motions.  We were unable to reach a resolution which would eliminate the necessity for these motions.

I declare under penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct, and that this declaration was executed this 2nd day of August 2024, at New York, New York.

                                        /s/ Abigail Everdell
                                        Abigail Everdell

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# EXHIBIT A

(USB Drive containing the documentary film "Dear Kelly" will be lodged with the Court)

# EXHIBIT B

(USB Drive containing the "Tour & Movie Announcement" YouTube video posted on May 6, 2024 will be lodged with the Court)

# EXHIBIT C

MEGHAN C. MURPHEY
Tel: (949) 464-4540
meghan@themurpheylawyers.com


**Murphey & Murphey**
A Professional Corporation

May 23, 2024

**VIA EMAIL [CBRANSON@MPMLAW.COM;
INFO@STATETHEATERPORTLAND.COM] AND OVERNIGHT COURIER**

Crobo LLC
c/o Christopher B. Branson
75 Pearl Street, #9785
Portland, Maine 04104-5085

**Re: Demand to Cease and Desist Upcoming Display of "Untitled Callaghan Film"**

Dear Crobo LLC:

We represent Mr. William Joiner, also known as Bill Joiner. All future communications with respect to Mr. Joiner shall be directed to us and only us. We write to you regarding the "Untitled Callaghan Film" advertised to be shown in your establishment, State Theater, on or about June 12, 2024, and for which sales of admissions have already occurred. Based upon promotion of the "Untitled Callaghan Film" thus far, the film violates multiple state and federal laws, and you are hereby on notice that any party complicit in its screening or promotion will be subject to liability therefor. We write in an effort to avoid naming your company in Mr. Joiner's intended lawsuit, which will include your company as a defendant should you ignore the demands set forth in this correspondence, and which is necessary to preserve the physical and emotional safety of our client and his family.

As set forth in detail below, the Callaghan film intends to highlight the actions of Kelly Johnson and his relentless personal vendetta against our client that has now reached dangerous proportions. Johnson is a disbarred lawyer who, as a result of his own unscrupulous actions during a real estate financing dispute, was ultimately evicted from his property. In addition to pursuing multiple unsuccessful lawsuits and appeals, Johnson engaged in numerous attacks against Mr. Joiner, including making multiple threats against his person and spreading a false narrative in his quest to harm Mr. Joiner, all of which forced Mr. Joiner to obtain a restraining order against Johnson. Johnson has widely publicized his vitriol towards Mr. Joiner, and Johnson has demonstrated his affinity for carrying firearms and immersing himself in public displays of aggression and violence. Indeed, because the Callaghan film will display many of the dangerous actions that Johnson has since taken against Mr. Joiner, and will do so in a volatile atmosphere, the display of that film is likely to lead to increased personal attacks and other forms of retribution against Mr. Joiner. Accordingly, all efforts must be made to halt the display of the film.

Christopher B. Branson
May 23, 2024
Page 2

Apparently, the film's director/producer, Andrew Callaghan, intends to attend each showing of the film and for the screenings to include a live show, with Q&A from the audience. Callaghan is plainly aware of the volatile nature of this subject matter and the likelihood of further harm to Mr. Joiner. The only rational purpose for this film screening, therefore, is to incite the audience and thereby turn their attacks towards Mr. Joiner. By way of example only, during Callaghan's live tour in 2022, the performers on stage (including Kelly Johnson), as well as the audience, can be seen repeatedly chanting "Fuck Bill Joiner," as if this is a rallying cry among Callaghan's supporters, all without any provocation by Mr. Joiner.[1] Moreover, the Callaghan film purports to include footage of one or more trespassers skulking around at Mr. Joiner's personal residence, which further increases the risk that supporters of Johnson or Callaghan (or both) will attempt to make contact with Mr. Joiner and/or his family. Should the Callaghan film be shown as advertised, the safety of Mr. Joiner and his family will be further endangered and Mr. Joiner's reputation will be further unjustifiably harmed.

Our client wishes to ensure you are provided all the information relating to the background of the Callaghan film, as well as the actions of Johnson and Callaghan themselves, and to put you on notice of the legal ramifications of proceeding with your scheduled film screening. To that end, you will find a lengthy history below, with the following sections being found as set forth here: Kelly Johnson's background (p. 3); Johnson's lengthy history with Bill Joiner (p. 6); Andrew Callaghan's background (p. 10); Callaghan's and Johnson's Coordinated Efforts (p. 12); California and Federal laws implicated by Callaghan's film (p. 16); and Formal Demand (p. 19).

Based upon this brief summary, and as more fully set forth below, we, on behalf of Mr. Joiner, hereby demand that your establishment:

1) **Immediately** cease sales of tickets and/or other manner(s) of admission to the "Untitled Callaghan Film", and cease such sales in perpetuity;

2) **Immediately** cease all advertisement(s) and any other manner of bringing attention to the "Untitled Callaghan Film", and cease such advertisement(s) in perpetuity;

3) **Immediately** notify Callaghan and all other individuals and/or entities in active concert with him that any showing(s) and/or broadcast(s) of the "Untitled Callaghan Film" are immediately cancelled and that the "Untitled Callaghan Film" will not be shown in your establishment; and

---

[1] https://www.youtube.com/watch?v=IRPteb43nNo *Fuck Bill Joiner Channel 5 LIVE w/ Kelly Johnson and friends*, last accessed May 23, 2024, at 1:50-3:36.

Christopher B. Branson
May 23, 2024
Page 3

4) Provide us with written confirmation **no later than May 30, 2024**, of your compliance with items 1-3 above and confirming that the "Untitled Callaghan Film" will not be shown or broadcast in your establishment at any time.


I.    **KELLY SCOTT JOHNSON**

Kelly Scott Johnson ("Johnson") is a disbarred California lawyer who also goes by the names "SoCal Kelly" and "Kelly J. Patriot."  Johnson is well-known as a right-wing extremist and conspiracy theorist, who has publicly announced "Kobe Bryant was assassinated by the Clintons," that the Democrat party controls "the banking" and the Vatican, and that the COVID-19 vaccines contain pieces of metal and "creepy crawlers" that will cause kids to grow up with tails and animal hair.[2]  Johnson attended the January 6, 2021 attempted insurrection in Washington, D.C., and images of his attendance at the Capitol riot have since been published by Andrew Callaghan through, among other avenues, Callaghan's YouTube channel known as Channel 5.[3]  Johnson has also been seen in multiple videos since January 6, 2021 brandishing a .357 magnum handgun, and has stated on camera that he owns an assault rifle that he keeps in his car.[4]  To be clear, Mr. Joiner does not seek in any way to restrict Johnson's constitutional rights to express his opinions.  Rather, Mr. Joiner demands the respect for and preservation of his and his family's safety and seeks to prevent any further harm to his personal reputation and business interests.

a.    Johnson's Tortured History with The California State Bar

Johnson was admitted to practice law in California in 1988.[5]  He was first brought up on disciplinary charges by the California State Bar on November 25, 2013.[6]  In factual and legal findings to which Johnson stipulated, the State Bar found that Johnson engaged twenty-one

---

[2] See  https://www.youtube.com/watch?v=QMswepvHBAA, *White Lives Matter Rally*, last accessed May 23, 2024, at 0:25-0:35, 1:32-1:39, 4:29-4:33; see also https://youtu.be/B9v6q5YzbGA?feature=shared&t=313,  *Hollywood Antivax Rally*, last accessed May 23, 2024, at 5:14-5:58.

[3] See https://youtu.be/9-8kL04Tvfs?feature=shared&t=578, *Q Shaman Comes Home*, last accessed May 23, 2024, at 9:38-9:52.

[4] See https://youtu.be/9-8kL04Tvfs?feature=shared&t=578, *Q Shaman Comes Home*, at 0:01-1:20; see also https://www.youtube.com/watch?v=GCyPsE7AlA8 *Kelly J Patriot Gets Kicked Out of Super Bowl 57*, last accessed May 23, 2024, at 0:05-0:50

[5] See https://apps.calbar.ca.gov/attorney/Licensee/Detail/134520, last accessed May 23, 2024.

[6]  See https://apps.calbar.ca.gov/attorney/Licensee/Detail/134520.

Christopher B. Branson
May 23, 2024
Page 4

counts of professional misconduct involving seven different client matters, including, among other things, that Johnson: 1) failed to report to the state bar the imposition of monetary sanctions against him, in violation of California law; 2) disobeyed and violated the Superior Court's order requiring him to forbear from filing further documents in the same case in which he was monetarily sanctioned; 3) failed to return a client's file to the client despite numerous demands from the client and her new counsel; 4) failed to perform services for his client despite being paid in advance therefor; 5) failed and refused to refund to the client unearned advanced fees; 6) failed to provide an accounting to his client for fees he withheld from his client after his client terminated his services; 7) deposited his client's advanced fees in a bank account other than his client trust account; 8) filed a lawsuit on behalf of his client, and thereafter, talked his client into purchasing Johnson's wife a new vehicle and making monthly payments on the vehicle in exchange for provision of legal services, but thereafter Johnson failed to perform those legal services, which resulted in dismissal of the client's lawsuit, all to his client's harm.[7] Johnson further stipulated in that matter "that his misconduct caused serious client harm and involved multiple acts of misconduct and that he failed to make restitution for the unearned fees he failed to refund."[8]

    In yet another case, Johnson was referred to the disciplinary panel of the United States Bankruptcy Court, Central District of California.[9]  In that case, Johnson represented a debtor in an individual bankruptcy proceeding.  During his representation, Johnson advised his client that certain proceeds from the client's sale of his residence were not part of the bankruptcy estate, and that Johnson was in need of a "loan" that the client could provide to him.[10]  Johnson ultimately misled his client into loaning him a total of $22,500.[11]  After determining that the proceeds from the sale of the client's home were not disclosed in the bankruptcy petition filed by Johnson on behalf of his client, the bankruptcy court issued an order to show cause why Johnson's client should not be held in contempt of court.  Johnson advised his client that he did not have to appear in court on the date the court scheduled the hearing on this order to show

---

[7] See https://apps.calbar.ca.gov/courtDocs/13-O-11690-2.pdf, last accessed May 23, 2024 at p. 10-13; see also https://apps.calbar.ca.gov/courtDocs/16-N-12537-3.pdf, last accessed May 23, 2024, at p. 2-3.

[8] See https://apps.calbar.ca.gov/courtDocs/16-N-12537-3.pdf at p. 3.

[9]  See https://apps.calbar.ca.gov/courtDocs/13-O-11690-2.pdf at p. 13.

[10] See https://apps.calbar.ca.gov/courtDocs/13-O-11690-2.pdf at p. 13-16; see also "Memorandum Decision Suspending Kelly S. Johnson From Practicing Law In This Court, And Imposing Additional Sanctions," found at https://www.cacb.uscourts.gov/sites/cacb/files/documents/attorney-discipline/MemorandumofDecision_KellySJohnson.pdf, last accessed May 23, 2024.

[11] See https://apps.calbar.ca.gov/courtDocs/13-O-11690-2.pdf at p. 13-16; see also https://www.cacb.uscourts.gov/sites/cacb/files/documents/attorney-discipline/MemorandumofDecision_KellySJohnson.pdf.

Christopher B. Branson
May 23, 2024
Page 5

cause, resulting in Johnson's client being held in contempt of court.  Later in the proceedings, Johnson's client informed the bankruptcy court of all of the foregoing facts.[12]

     After learning these facts, the bankruptcy judge, who according to Johnson's client was "disgusted" with Johnson,[13] found Johnson in contempt and in addition to referring him to the disciplinary panel, imposed monetary sanctions against him in the amount of $15,000.[14]  Johnson was suspended by the State Bar for two years and required to comply with certain conditions to be reinstated after serving that suspension.  Those conditions included, among other things, the requirement that Johnson pay the sanctions imposed by the bankruptcy court and repay the "loans" from his client.[15]

     According to the court records, Johnson never repaid his client nor paid the ordered monetary sanctions, nor complied with other conditions imposed on him to avoid disbarment.  Accordingly, after the expiration of the time period the State Bar imposed on him to comply with these conditions, the California Supreme Court ordered Johnson's disbarment.[16]

     b.   Johnson's Post-Disbarment Shakedown Attempts of the Dallas Cowboys

     According to well-publicized news reports, in 2019, Johnson sought another unscrupulous business opportunity involving his son, Kyle Johnson, who had been employed as a security guard for the Electric Daisy Carnival at Las Vegas Motor Speedway.[17]  For reasons that are unclear, Kyle Johnson apparently was knocked to the ground by Dallas Cowboy Ezekiel Elliott as he left a festival held at the speedway.  Kyle Johnson admitted that Mr. Elliott returned to the place he knocked Kyle Johnson down and apologized to him, and the pair apparently then

---

[12] See https://apps.calbar.ca.gov/courtDocs/13-O-11690-2.pdf at p. 13-17; see also https://www.cacb.uscourts.gov/sites/cacb/files/documents/attorney-discipline/MemorandumofDecision_KellySJohnson.pdf.

[13] See https://www.avvo.com/attorneys/92656-ca-kelly-johnson-383379.html, under "Comments," entry of January 16, 2024, last accessed May 23, 2024.

[14] See https://apps.calbar.ca.gov/courtDocs/13-O-11690-2.pdf at p. 13-17; see also https://www.cacb.uscourts.gov/sites/cacb/files/documents/attorney-discipline/MemorandumofDecision_KellySJohnson.pdf.

[15] See https://apps.calbar.ca.gov/courtDocs/13-O-11690-2.pdf at p. 4-6; see also https://www.cacb.uscourts.gov/sites/cacb/files/documents/attorney-discipline/MemorandumofDecision_KellySJohnson.pdf.

[16] See https://apps.calbar.ca.gov/courtDocs/16-N-12537-3.pdf, last accessed May 23, 2024.

[17] See https://bleacherreport.com/articles/2850101-tmz-kyle-johnson-tried-to-extort-ezekiel-elliott-for-500k-autographs-and-more, last accessed May 23, 2024

Christopher B. Branson
May 23, 2024
Page 6

took a picture together.[18]  Kelly Johnson was thereafter brought into the matter on his son's behalf.  Kelly Johnson demanded a public apology from Elliott; payment of $500,000 to Kyle Johnson; a payment of $25,000 to a junior college that Kyle Johnson had attended; a press conference with Kyle Johnson and Elliott; signed jerseys from Elliott and his teammates Amari Cooper and Dak Prescott; free tickets to Cowboys games and Ohio State football games; a meet-and-greet with Cowboys' owner Jerry Jones; and other demands.[19]  When informed by Elliott's attorneys that Kelly Johnson's demands amounted to extortion, and that Kelly Johnson's demand had been turned over to the police as evidence of extortion, Kelly Johnson and his son apparently let the matter drop.[20]

## II.    JOHNSON'S LENGTHY HISTORY WITH BILL JOINER

### a.    Mr. Joiner's Loan to Johnson

Mr. Joiner had the unmitigated misfortune of being contacted by Johnson in 2007. Johnson came to Mr. Joiner searching for a second loan on his residence (the "Property"), which at the time appraised for $1,750,000.  Johnson's credit score and assets were substantially below what was needed to obtain traditional financing.  Nevertheless, Mr. Joiner, through his family trust, provided a loan in the amount of $150,000 ("Loan"), with a monthly payment of $1,500, based on Johnson's written loan application claiming that he had an income of no less than $25,000 per month. Later, through the litigation process, it was discovered that Johnson lied about his income as well.

Johnson defaulted on the Loan starting in 2011.  As a result, Mr. Joiner recorded a Notice of Default against the Property on June 16, 2011, after Johnson failed to make payments on his mortgage for six months.  Due to Mr. Joiner's efforts to reach a workout with Johnson through multiple forbearance agreements, a Notice of Trustee's Sale was not published until April 9, 2014, after Johnson once again failed to make payments on the Loan as agreed.  In order to stop the foreclosure sale, Johnson's then-wife, Shannon Johnson, filed two successive bankruptcy

---

[18] See https://bleacherreport.com/articles/2850101-tmz-kyle-johnson-tried-to-extort-ezekiel-elliott-for-500k-autographs-and-more; see also https://www.latimes.com/sports/la-sp-ezekiel-elliott-security-guard-sincere-apology-20190529-story.html; see also https://sports.yahoo.com/dallas-cowboys-running-back-ezekiel-elliott-charges-las-vegas-incident-extortion-contract-dispute-181434339.html

[19] See https://bleacherreport.com/articles/2850101-tmz-kyle-johnson-tried-to-extort-ezekiel-elliott-for-500k-autographs-and-more

[20] See https://bleacherreport.com/articles/2850101-tmz-kyle-johnson-tried-to-extort-ezekiel-elliott-for-500k-autographs-and-more, and see "NFL Notebook: Security guard presses charges against Elliott" https://www.reuters.com/article/idUSKCN1U901Y/, last accessed May 23, 2024; see also "Report: Security guard wanted $500,000, jerseys, more after Las Vegas incident with Ezekiel Elliott" https://sports.yahoo.com/dallas-cowboys-running-back-ezekiel-elliott-charges-las-vegas-incident-extortion-contract-dispute-181434339.html, last accessed May 23, 2024.

Christopher B. Branson
May 23, 2024
Page 7

cases on the eve of scheduled foreclosure dates.  The Bankruptcy Court found that the successive bankruptcy filings "were part of a scheme to hinder, delay, or defraud creditors" and granted Mr. Joiner relief from stay.  The Property was then scheduled for a trustee's sale on March 20, 2015.

      b.   Johnson and Mr. Joiner Execute a Settlement and Release Agreement

On March 18, 2015, Mr. Joiner and the Johnsons reached a settlement and release agreement ("Settlement Agreement"), whereby Mr. Joiner agreed to extend the foreclosure sale date, and Kelly Johnson agreed that the foreclosure was not improper in any respect.  In the Settlement Agreement, the Johnsons admitted their defaults under the Loan and acknowledged the amounts owed.  The parties further agreed that unless Johnson reinstated the Loan on or before June 8, 2015, Mr. Joiner would have the right to proceed with the foreclosure sale under the pending Notice of Trustee's Sale on June 9, 2015.  Johnson did not reinstate the Loan.

      c.   The Foreclosure Sale and Unlawful Detainer Action

As agreed in the Settlement Agreement, and in accordance with California non-judicial foreclosure requirements, Mr. Joiner foreclosed on the Property on June 9, 2015.  After the Johnsons refused to vacate the Property, on June 25, 2015, Mr. Joiner commenced unlawful detainer proceedings against the Johnsons in Orange County Superior Court ("OCSC"), Case No. 30-2015-00795549-CL-UD-HNB ("UD Action").  The court in the UD Action granted Mr. Joiner's motion for summary judgment and entered judgment in favor on Mr. Joiner on September 22, 2015 ("UD Judgment").

      d.   Johnson's Multiple Failed Appeals in the UD Action

Johnson immediately appealed the UD Judgment to the Appellate Division of the OCSC, Case No. 30-2015-00812401-CL-UD-CJC (the "First UD Appeal").  Johnson then sought and was granted a stay of enforcement of the UD Judgment pending appeal, on the condition that he make monthly payments of the reasonable rental value for the home.  After Johnson failed to make the required payments, the court in the UD Action lifted the stay and ordered final lockout to occur no earlier than October 15, 2016.  Johnson appealed that order as well, commencing Case No. 30-2016-00881714 ("Second UD Appeal").  To prevent eviction, however, Johnson filed for bankruptcy protection, forcing Joiner to obtain relief from stay to proceed.  Thereafter, in December 2016, Johnson applied once again for an order staying the eviction pending his appeals.  On January 4, 2017, the court in the UD Action granted a stay of eviction until January 29, 2017, but stated in the order that no further stays would be granted.  Johnson appealed that order as well, commencing Case No. 30-2017-00898514 ("Third UD Appeal").

After extensive briefing and oral argument, the appellate division of the Orange County Superior Court issued an opinion in the First UD Appeal on November 6, 2017, affirming the UD Judgment in full.  The Second UD Appeal was dismissed as moot and the Third UD Appeal was dismissed for Johnson's failure to prosecute the case.

Christopher B. Branson
May 23, 2024
Page 8

  e. <u>Plaintiff's Relentless Litigation and Delay Tactics</u>

    i. *Wrongful Foreclosure Action*

   On June 8, 2015, the day before the foreclosure sale, Johnson filed an unlimited civil action in OCSC against Mr. Joiner, among others (the "Wrongful Foreclosure Action"), making many of the same allegations he made in the UD Action and continues to make to this day. After years of dragging out the litigation, Johnson dismissed the Wrongful Foreclosure Action without prejudice. Johnson's request for dismissal was filed on the last business day before the February, 2019 trial was to commence, and on the eve of the court's consideration of Joiner's motion for terminating sanctions and motion in limine seeking to bar relitigation of the issues decided in the UD Judgment. Despite that the court found that Johnson "engaged in a pattern of improper delay," the court allowed Johnson to dismiss the Wrongful Foreclosure Action without prejudice.

    ii. *Unfair Competition Action*

   Johnson filed a second action in OCSC in 2016, Case No. 30-2016-00870569 ("Unfair Competition Action"), in which he named not only Joiner but his wife and his attorneys as well. Just as in this case, Plaintiff alleged Joiner and his attorneys had engaged in unfair competition, including allegations that can be found verbatim in many of the other actions and pleadings filed by Johnson. Judgment was also entered in the Unfair Competition Action in favor of Joiner and his counsel, and against Johnson, in March 2017.

    iii. *Third Bankruptcy Filing and Related Adversary Proceeding*

   After the court in the UD Action lifted the stay of enforcement in September 2016, the Johnsons filed bankruptcy for a third time, on the eve of the October 15, 2016 lockout, in order to block their eviction and remain in the home rent-free. The Trust moved for and obtained relief from stay to proceed with eviction in December 2016. Johnson appealed the relief from stay order to the United States District Court for the Central District of California ("Relief From Stay Appeal"), and his appeal was denied in an order issued November 15, 2017.

   In an adversary proceeding in the third bankruptcy case, after the Johnsons disregarded multiple court orders, the bankruptcy court struck their answer and entered their default, noting that "[n]oncompliance with these Court orders occurred because of neglect, obstinacy and anger at [Joiner]…." The Court further found: "What occurred here, in a very brief summary, is the flouting and disregard of four separate and very explicit oral and written warnings given by the Court coupled with material noncompliance with the Court's Scheduling Order and Third Warning and Continuance Order and Fourth Warning over a period of about three months."

   The bankruptcy court thereafter entered a non-dischargeable judgment against the Johnsons in the amount of $364,424.11. Johnson unsuccessfully appealed that judgment to the

Christopher B. Branson
May 23, 2024
Page 9

District Court.  Despite his unmitigated right to do so, Mr. Joiner has never taken any steps to attempt to enforce that judgment.

        f.   <u>Johnson Is Finally Evicted and the Property Sold</u>

After the bankruptcy court granted relief from stay, the Johnsons filed numerous additional *ex parte* applications to stay enforcement of the UD Judgment, and the court in the UD Action allowed the Johnsons additional time to vacate the Property.  The court ultimately ordered a final lockout date of February 1, 2017, and after years of delay tactics and use of the Property legally belonging to Joiner, the Johnsons were finally evicted by the sheriff and Mr. Joiner was able to gain possession of the Property.  More than a year later, Joiner sold the Property to unrelated purchasers, Michael and Diana Gross, who were reportedly harassed by Johnson at the Property soon thereafter.

        g.   <u>Joiner Obtains a Restraining Order against Johnson and Johnson Unsuccessfully Appeals.</u>

After enduring years of threats and harassment by Johnson, Mr. Joiner sought and obtained a restraining order against Johnson on October 17, 2017.  Mr. Joiner detailed in his declarations the numerous threats he had received from Johnson over the course of years, Johnson's activity in posting derogatory flyers about Joiner all over Joiner's community, Johnson's attempts to contact his children, and the video footage from his security cameras that showed Johnson peering into his home at 1:30 a.m., among other things.  Joiner's counsel also submitted a declaration demonstrating further threats and harassment by Johnson, including Johnson's email statements that Joiner "is going down and going down hard" and "will then be heading into his next ½ million in attorney's fees and costs…with no end in sight…."  Based on these declarations, and the testimony of Mr. Joiner at the hearing, the court entered a Civil Harassment Restraining Order requiring Johnson to remain at least 500 feet away from Mr. Joiner and his family.

Johnson appealed the entry of the restraining order against him in Case No. G055764 ("Restraining Order Appeal"), and the Court of Appeals issued an unpublished decision affirming the restraining order in full.  The appellate court noted in its decision:

> Johnson's hostile behavior would cause a reasonable person to suffer substantial emotional distress. Johnson started with e-mails to Joiner and Joiner's counsel, accusing Joiner of fraud and perjury. In his e-mails, he stated Joiner was going to get "all that he deserves" and regret what he had done to Johnson's family. He posted flyers with derogatory statements about Joiner, accusing him of being a financial predator, recording fraudulent documents, violating state and federal laws, and trying to steal Johnson's home. On two occasions, he accessed Joiner's private community without permission and posted these flyers. In one instance, he came onto Joiner's property and was seen on video surveillance walking up to and around Joiner's house, attempting to look over the gates

Christopher B. Branson
May 23, 2024
Page 10

and into the house in the middle of the night. Even after the temporary restraining order was issued, Johnson returned to Joiner's home and videoed Joiner's back fence, pausing at the access points. . . . The totality of Johnson's conduct would cause a reasonable person nontrivial distress and mental anguish that should not have to be endured.[21]

    h. <u>Johnson Files Another Lawsuit against Joiner and Others and Is Declared a Vexatious Litigant</u>

On June 10, 2019, Johnson filed another lawsuit against Joiner in OCSC, Case No. 30-2019-01075365-CU-BT-CJC ("2019 Case"), repeating the same allegations contained in his previous lawsuits, and this time including the purchasers of the Property, Michael and Diana Gross, in addition to Joiner's attorneys. As a gesture of goodwill, Joiner agreed to cover all legal expenses for the Grosses, and his counsel filed demurrers on behalf of all parties, which resulted in dismissal of the action. Joiner also filed a motion for an order declaring Johnson to be a vexatious litigant and for a pre-filing order requiring that Johnson seek permission of the presiding judge before instituting any court proceedings in the State of California. Joiner's motion was granted in its entirety.[22]

    i. <u>Despite Having Been Declared a Vexatious Litigant, Johnson Files Three Unsuccessful Appeals without Permission of the Presiding Judge and Another Lawsuit in the Name of His Daughter</u>

Following the court's finding that Johnson is a vexatious litigant, Johnson commenced three separate appeals from orders entered in the 2019 Case, all of which were summarily dismissed.

On May 19, 2022, Johnson once again sued Mr. Joiner, again alleging fraud and wrongful foreclosure, among other things, but this time Johnson used his daughter Kaylee Johnson as the named Plaintiff. The court found that the use of his daughter's name as plaintiff was a ruse to attempt to evade the vexatious litigant filing and dismissed the lawsuit based on the vexatious litigant pre-filing order.

## III.   <u>ANDREW CALLAGHAN</u>

Andrew Callaghan claims to be a documentarian who started YouTube's Channel 5 and directed the HBO documentary known as *This Place Rules*. Callaghan resides in Phoenix,

---

[21] See *Joiner v. Johnson*, Case No. G055764, 2019 Cal. App. Unpub. LEXIS 7607 at *13 (Nov. 18, 2019), also found at: https://casetext.com/case/joiner-v-johnson-5

[22] *Johnson v. Joiner*, Orange County Superior Court Case No. 30-2019-01075365-CU-BT-CJC, 2020 Cal. Super. LEXIS 66003 at *1 (Sept. 9, 2020).

Christopher B. Branson
May 23, 2024
Page 11


Arizona and is a principal/member of three entities, including Andrew Callaghan LLC, Social Studies, LLC, and Channel 5, LLC.

According to published accounts, Callaghan has been publicly accused of sexual assault and misconduct by numerous women.  The first of his alleged victims to go public is a person named Caroline Elise.[23]  Elise alleges that sometime in 2020, Callaghan requested to stay with Elise at her home due to a falling out with one of his crew members.  While staying at her home, Elise alleges that Callaghan pressured her into sexual activities after wearing down her will that resulted in her "do[ing] things [she] wasn't proud of."[24]  Callaghan seemingly never denied the sexual assault, instead apologizing to Elise and claiming that he would "unpack his behavior" through therapy.[25]  Callaghan apparently also admitted in a lengthy message to Elise that "prior partners" of his in New Orleans and Nashville had contacted him since reading Elise's posts and made similar claims regarding Callaghan's predatory behavior.[26]

Subsequently, another of Callaghan's victims came forward after reading Elise's public message and claimed that she had been sexually assaulted by Callaghan.[27]  Again, there is no indication Callaghan denied these allegations.  Rather, he supplied emendations of his behavior based on ignorance, alcoholism, and a need to join a twelve-step program.[28]

Shortly after these public allegations of sexual assault against Callaghan, Callaghan has indicated he went into a months-long period of hiding in his motorhome "alone in the Mojave Desert."[29]  Callaghan also reportedly lost his business relationship with the producer of Callaghan's HBO special, Tim Heidecker and Abso Lutely Productions.[30]

---

[23] See https://www.npr.org/2023/01/20/1149748975/a-full-guide-to-the-sexual-misconduct-allegations-against-youtuber-andrew-callag, last accessed May 23, 2024.

[24] See https://www.npr.org/2023/01/20/1149748975/a-full-guide-to-the-sexual-misconduct-allegations-against-youtuber-andrew-callag.

[25] See https://www.npr.org/2023/01/20/1149748975/a-full-guide-to-the-sexual-misconduct-allegations-against-youtuber-andrew-callag.

[26] See https://www.npr.org/2023/01/20/1149748975/a-full-guide-to-the-sexual-misconduct-allegations-against-youtuber-andrew-callag.

[27] See https://www.npr.org/2023/01/20/1149748975/a-full-guide-to-the-sexual-misconduct-allegations-against-youtuber-andrew-callag.

[28] See https://www.npr.org/2023/01/20/1149748975/a-full-guide-to-the-sexual-misconduct-allegations-against-youtuber-andrew-callag.

[29] See https://youtu.be/9-8kL04Tvfs?si=sDSOpF3Bah7rSw5c at 0:37, last accessed May 23, 2024.

[30] See https://www.cracked.com/article_36593_tim-heidecker-cuts-ties-with-andrew-callaghan-of-channel-5.html.

Christopher B. Branson
May 23, 2024
Page 12

Callaghan traveled from his residence in Arizona to California and other states to create the video recordings that are collectively intended, in the video production your company is planning to broadcast, to harass and intimidate Mr. Joiner, his spouse and his minor children. Callaghan traveled from Arizona to California to surveille Mr. Joiner at his home and his place of business. Callaghan is now attempting to rebuild his reputation through his attack on our client with the assistance of Mr. Johnson, a/k/a "Kelly J. Patriot."

## IV.    **COORDINATED CONDUCT BY JOHNSON AND CALLAGHAN**

On May 6, 2024, Callaghan and Channel 5 released a video entitled "Tour & Movie Announcement," announcing the impending release of a new documentary stemming from a "secret project" Callaghan has been working on for years, dedicated to "locating and confronting the arch nemesis" of an interview subject he reveals later in the video.[31]  The video later reveals the interview subject to be Kelly Johnson, and the "arch nemesis" for which Callaghan and Johnson hunted to be Bill Joiner.[32]  Callaghan allows Johnson to rail unfettered against Mr. Joiner, repeating the same unfounded assertions Johnson alleged in each of his legal pleadings, all of which were found to be unsupported by every court that has touched this controversy. Johnson holds up a sign at multiple points in the video stating in bold letters "Bill Joiner Stole Our Home" and Johnson proceeds to provide the name of the city and community in which Joiner lives.  Also seen in the "Tour & Movie Announcement" video are Johnson and Callaghan crawling through the bushes outside of Joiner's home dressed in ghillie suits to camouflage with the bushes,[33] as shown in this still shot taken from the "Tour & Movie Announcement" video:



---

[31] https://www.youtube.com/watch?v=H6w1Z8K66EU, *Tour & Movie Announcement*, last accessed May 23, 2024, at 0:50-1:24.

[32] https://www.youtube.com/watch?v=H6w1Z8K66EU, *Tour & Movie Announcement*, at 5:35-7:00.

[33] https://www.youtube.com/watch?v=H6w1Z8K66EU, *Tour & Movie Announcement*, at 1:21-1:24; 8:13-8:24.

Christopher B. Branson
May 23, 2024
Page 13

Callaghan is also shown inside Joiner's office, with footage of areas in the office that are accessible only with an authorized key card.[34]  The latter half of the video is dedicated to Callaghan's announcement of a North American Tour, in which the untitled documentary will be shown in theaters in 38 different locations, accompanied by live Q&A with Callaghan at the screening.  According to third parties that attended Callaghan's Channel 5 live show tour in November and December 2022, a preview of the upcoming allegedly untitled documentary was shown to the live audience, and it was revealed that the film was to be titled "Finding Bill Joiner."[35]

       After a friend contacted Mr. Joiner and told him about the Tour & Movie Announcement video the friend just happened upon, our investigation began.  Further online research revealed that Callaghan and Johnson have had an ongoing personal and professional relationship since at least April 11, 2021, when Callaghan claims to have met Johnson at a White Lives Matter Rally that Callaghan filmed and later released footage from on Channel 5.[36]  From that time forward, Johnson takes on the name Kelly J. Patriot and appears in several Channel 5 videos, including "Hollywood Antivax Rally"[37] and "Q Shaman Comes Home," in which it is claimed that Johnson arranged for Callaghan to have the first interview with Jacob Chansley, aka the Q-Anon Shaman, after Chansley's release from prison.[38]  This claim is belied, however, by another of Callaghan's Channel 5 videos, "Q Shaman Prison Interview," in which Callaghan states to Chansley while he is still in prison: "I have this friend named Kelly [Johnson] who I was telling you about that we're making a documentary on and yeah, I kind of want you to meet him." [39]  It is clear that Callaghan had a relationship with Chansley before he left prison and before Chansley was introduced to Johnson.

---

[34] https://www.youtube.com/watch?v=H6w1Z8K66EU, *Tour & Movie Announcement*, at 1:14-1:20.

[35] See https://www.michigandaily.com/arts/digital-culture/channel-5s-andrew-callaghan-brings-genuine-journalism-and-jest-to-the-royal-oak-music-theater/; see also https://www.reddit.com/r/lostmedia/comments/11lxer2/channel_5_unreleased_movie_follow_up_to_this/?rdt=64417

[36] See  https://www.youtube.com/watch?v=QMswepvHBAA, *White Lives Matter Rally*, last accessed May 23, 2024.

[37] https://www.youtube.com/watch?v=B9v6q5YzbGA, *Hollywood Antivax Rally,* last accessed May 23, 2024, at 4:33.

[38] https://youtu.be/9-8kL04Tvfs?si=72j-HzY8rtJKdirx, *Q Shaman Comes Home*, last accessed May 23, 2024, at 0:36-2:04.

[39] https://youtu.be/Xwdkng6ZGp8?si=T9HLApuIXBTCZX9o, *Q Shaman Prison Interview*, last accessed May 23, 2024, at 43:50-44:10.

Christopher B. Branson
May 23, 2024
Page 14

In Callaghan's video of the White Lives Matter Rally in April 2021, Johnson is shown spouting the same unfounded claims he alleged in multiple courts, asserting that Bill Joiner "stole" his home and ruined his life by "falsifying a trustee's deed" and committing multiple violations of law, all of which was decisively rejected by every court that analyzed the issues. Since that time, Johnson and his obsession with Mr. Joiner, who Johnson scapegoats as having destroyed his life, has garnered substantial attention and internet traffic from viewers of Channel 5. Comments on Callaghan's "White Lives Matter Rally" video seek to vilify Mr. Joiner, and attendees at a previous live show put on by Callaghan are shown enthusiastically chanting "Fuck Bill Joiner" for a lengthy segment of the show, and it is revealed that Kelly Johnson is actually one of the performers on the stage, as he joins in with the crowd chants.[40]

While it at first appeared that Callaghan was simply reporting on the story of Kelly Johnson, it is clear that at some point the two became close and Callaghan has taken on Johnson's crusade against Mr. Joiner as his own. Callaghan himself is shown reciting the same mantra at a show in Portland in November, 2022, promising the crowd that he will return "after we get that home back from Bill Joiner, we're gonna FUCK BILL JOINER!!"[41] The crowd then chants in response: "Fuck Bill Joiner!!" Callaghan goes on: "Nobody should steal a home, it's not right." An audience member then asks a clarifying question, and in response, Callaghan states: "We know some things about Bill Joiner, that's for sure. [H]e didn't actually steal the home if that's what you're asking, but he gave an unfair loan. I think. We'll figure more out in time. We've staked out his corporate office, we've gone to psychotic lengths to identify and find him but uh yeah, no Bill yet. We'll get him. It's a work in progress."[42]

Later in the same live segment, Callaghan confirmed his inability to separate himself from his work:

> **Audience member**: "As y'all are getting more and more popular, do you find it harder to stay like in character, is that line getting blurred?"
> **Callaghan**: "I think the line between character and me is the one that's getting blurred, you know what I mean? I'm just becoming the guy, you know, but whereas before I was like 'Suit Man / Regular Guy,' now it's all just one blend. It's why I don't wear the suit anymore and why the mic is so small. So yeah, it

---

[40] https://www.youtube.com/watch?v=IRPteb43nNo *Fuck Bill Joiner Channel 5 LIVE w/ Kelly Johnson and friends*, last accessed May 23, 2024, at 1:50-3:36.

[41] https://www.youtube.com/watch?v=EaqgFaWHDi0, *Channel 5 Live + Sidam + Unkle Pill + Andrew Callaghan Q&A in Portland, Oregon 2022*, last accessed May 23, 2024, at 19:00-20:30.

[42] https://www.youtube.com/watch?v=EaqgFaWHDi0, *Channel 5 Live + Sidam + Unkle Pill + Andrew Callaghan Q&A in Portland, Oregon 2022*, at 19:00-20:30.

Christopher B. Branson
May 23, 2024
Page 15

was hard for a bit and then you just become that guy.  You become a magnet for
people you necessarily wouldn't want to talk to in a previous life."[43]

In December 2021, Callaghan was quoted as saying:

This one guy that we document a lot is named Kelly Johnson, aka SoCal Kelly,
aka Kelly J Patriot. He was at January 6th, and he's the most hardcore Trump
soldier there is. He fell down the rabbit hole because he took a predatory loan
from a shitty mortgage company prior to the 2008 financial crisis. I'm sure there
are people who are just fucked in the head. But a lot of these people, they did get
done wrong by someone."[44]

Callaghan has even had Johnson act in a promotion video he released to advertise his Channel 5
merchandise.[45]  In another Channel 5 video, entitled "Patriotism, Tattoos, and being a Shaman,"
Callaghan states in the video description "Special thank you to Bert and Kelly J. Patriot for
making this possibly [sic] – they're great people and excellent sources. Check them
out:  https://Forbiddentruthpodcast.com https://t.me/forbiddentruth."[46]

The close connection between Callaghan and Johnson is great cause for concern, given
Callaghan's substantial YouTube and social media audience, his apparent willingness to stalk
Mr. Joiner and trespass on private property in search of him, and his intent to release a film
dedicated almost entirely to Johnson's crusade to destroy Mr. Joiner without cause.  Johnson
once promised in various emails to Mr. Joiner: "you are going down and the only question is
when and how hard," "I hope [Joiner] is happy as he will pay dearly for what he has wrongfully
put our family through," and "you will pay in a big way Bill .... I guarantee it!"  Callaghan has
now provided Johnson the platform to make his threats a reality, and to incite further aggression
against Mr. Joiner and his family.  They both must be stopped.

---

[43] https://www.youtube.com/watch?v=EaqgFaWHDi0, *Channel 5 Live + Sidam + Unkle Pill + Andrew
Callaghan Q&A in Portland, Oregon 2022*, at 22:00-22:34.

[44] https://www.interviewmagazine.com/culture/search-history-andrew-callaghan-is-the-journalist-the-
internet-deserves, *Andrew Callaghan Is the Journalist the Internet Deserves,* last accessed May 23, 2024

[45] https://youtu.be/gBAhsapqGBM?si=D9NO58_Xxyw4n6rQ, *Cowboy Merch*, last accessed May 23,
2024

[46] https://www.youtube.com/watch?v=UaFjFERtIss, last accessed May 23, 2024.

Christopher B. Branson
May 23, 2024
Page 16

### V.    CALIFORNIA AND FEDERAL LAWS IMPLICATED BY THE CALLAGHAN FILM

From what we have seen of the Callaghan film footage thus far, Messrs. Johnson and Callaghan have committed multiple violations of both California and federal law, which we detail below for your edification. As we also detail below, were you to broadcast the "Untitled Callaghan Film" (aka "Finding Bill Joiner"), your company would likely be liable for several, if not all, of the below violations of law, to wit:

    a.  Stalking

California Civil Code § 1708.7 (civil stalking) prohibits persons from "engag[ing] in a pattern of conduct the intent of which was to follow, alarm, place under surveillance, or harass the plaintiff." Similarly, Title 18 U.S.C 2261A prohibits persons who travel in interstate commerce with the intent to commit harassment, intimidation or placement under surveillance from engaging is such conduct. As identified above, there is video evidence of Johnson and Callaghan engaging in activity meant to harass, intimidate and surveille Mr. Joiner and his family, not only in their residence but also at Mr. Joiner's place of business.

    b.  Trespass

California Penal Code section 602 prohibits any person from entering or remaining upon someone else's property without permission. This prohibition applies equally to residential and commercial land. *See Planned Parenthood Fedn. of Am, Inc. v. Center for Medical Progress*, 402 F.Supp.3d 615, 673-678 (N. D. Cal. 2019).

    c.  Federal Wiretap Act, Title 18 U.S.C. § 2511, and California Penal Code § 631

The preview shows what appear to be stealth recordings of Mr. Joiner's home and place of business, and likely includes communication with his staff.[47] The federal Wiretap Act prohibits persons from intercepting, endeavoring to intercept any wire, oral or electronic communication. It also prohibits anyone from using the product of the unlawful interception of communications. Similarly, California Penal Code § 631 prohibits recordings of persons and/or their statements without prior consent. Penal Code §632 prohibits persons from using unlawful recordings of others without prior consent. Were you to broadcast the film, your company would be in violation of the Wiretap Act and California law by using the recordings Callaghan and Johnson made of Mr. Joiner's home and place of business. Moreover, broadcasting the surreptitious recordings made by Callaghan and Johnson would also likely violate the Racketeer Influenced and Corrupt Organization (RICO) Act, 18 U.S.C. § 1962(c) and (d); *see also Planned Parenthood Fedn. of Am, Inc. v. Center for Medical Progress*, 402 F.Supp.3d 615, 647-653 (N. D. Cal. 2019). Moreover, as set forth below, were you to broadcast the Callaghan film, your

---

[47] https://www.youtube.com/watch?v=H6w1Z8K66EU, *Tour & Movie Announcement*, last accessed May 23, 2024, at 1:13-1:19.

Christopher B. Branson
May 23, 2024
Page 17

company will also incur liability under these statutes for violation of California's Unfair Competition Law as an aider and abettor of Johnson's and Callaghan's unlawful activities.

     d.  <u>Invasion of Privacy</u>

     As shown in the Callaghan video, Johnson and Callaghan video recorded from land so close to our client's residence that they had an unobstructed view of the property.[48]  Indeed, the vantage point was so well chosen that the interior of our client's residence, where his wife and children reside with him, can readily be seen.  The surreptitious videoing of our client's residence was and is an invasion of our client's and his family's rights to privacy.  *See Mezger v. Bick*, 66 Cal.App.5th 76, 86 (2021) ("The elements of a common law invasion of privacy claim are intrusion into a private place, conversation, or matter, in a manner highly offensive to a reasonable person.").  As set forth below, were you to broadcast the Callaghan film, your company will also incur liability under this law for violation of California's Unfair Competition Law as an aider and abettor of Johnson's and Callaghan's unlawful activities.

     e.  <u>Invasion of Privacy – False Light</u>

     The Callaghan video, with its claims that our client engaged in violations of law and "stole Johnson's home" is replete with falsehoods that have already been considered and rejected by both federal and state courts in California. "False light is a species of invasion of privacy, based on publicity that places a plaintiff before the public in a false light that would be highly offensive to a reasonable person, and where the defendant knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed." *Mitchell v. Twin Galaxies, LLC*, 70 Cal. App. 5th 207, 218 (2021), citing *Jackson v. Mayweather*, 10 Cal.App.5th 1240, 1264 (2017), and *Balla v. Hall*, 59 Cal.App.5th 652, 687 (2021).  Again, as set forth below, were you to broadcast the Callaghan film, your company will also incur liability under this law for violation of California's Unfair Competition Law as an aider and abettor of Johnson's and Callaghan's unlawful activities.

     f.  <u>Intrusion upon seclusion</u>

     The Callaghan video shows not only that Johnson and Callaghan surreptitiously videoed our client's residence, but also shows that at least Callaghan accessed our client's place of business, likely by deception.  This is also a violation of law.  To state a claim for intrusion upon seclusion under California common law, a plaintiff must plead that a defendant (1) "intentionally intrude[d] into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy[,]" and that "(2) occur[red] in a manner highly offensive to a reasonable person." *In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589, 601 (9th Cir. 2020) (quoting *Hernandez v. Hillsides, Inc*., 47 Cal. 4th 272, 286 (2009) (alterations in original)).  As set forth below, were you to broadcast the Callaghan film, your company will also incur liability

---

[48] https://www.youtube.com/watch?v=H6w1Z8K66EU, *Tour & Movie Announcement*, at 8:13-8:24.

Christopher B. Branson
May 23, 2024
Page 18

under these statutes for violation of California's Unfair Competition Law as an aider and abettor of Johnson's and Callaghan's unlawful activities.

g.   Intentional Infliction of Emotional Distress

Johnson's and Callaghan's surreptitious entry and video recording of our client's residence and place business, in light of all the surrounding history and circumstance, have inflicted and will inflict severe emotional distress not only on our client, but his family members as well.  *See Conley v. Roman Catholic Archbishop of San Francisco*, 85 Cal.App.4th 1126, 1133 (2000) ("The elements of a prima facie case of intentional infliction of emotional distress . . . [include] suffering of severe or extreme emotional distress by the plaintiff; and . . . the plaintiff's emotional distress is actually and proximately the result of defendant's outrageous conduct.")  As set forth below, were you to broadcast the Callaghan film, your company will also incur liability under this law for at least violation of California's Unfair Competition Law as an aider and abettor of Johnson's and Callaghan's unlawful activities.

h.   Negligent Infliction of Emotional Distress

Were a court to find your broadcast of the Callaghan video merely negligent, broadcasting the video would still impose liability on your company.  The elements of negligent infliction of emotional distress are:  Legal duty to use due care; breach of such legal duty; damage or injury; and cause of the resulting damage or injury. *Bogard v. Employers Casualty Co.* (1985) 164 Cal. App. 3d 602, 618.  As set forth below, were you to broadcast the Callaghan film, your company will also incur liability under this law for at least violation of California's Unfair Competition Law as an aider and abettor of Johnson's and Callaghan's unlawful activities.

i.   Defamation

As demonstrated, the claims of Johnson and Callaghan that our client engaged in any wrongdoing have been adjudicated by both federal and state courts in California, and none of those courts found that our client had engaged in any wrongdoing.  The statements accusing our client of having engaged in unlawful activity are therefore defamatory.  The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage. *See Jackson v. Mayweather*, 10 Cal.App.5th 1240, 1259 (2017).  As set forth below, were you to broadcast the Callaghan film, your company will also incur liability at least under this law for violation of California's Unfair Competition Law as an aider and abettor of Johnson's and Callaghan's unlawful activities.

j.   California Business and Professions Code 17200

The violations of federal and California statutes by Johnson and Callaghan, also violates California's Unfair Competition Law, Business and Professions Code section 17200, et seq. ("UCL").  California's UCL "borrow[s] violations of other laws" and treats them as unlawful

Christopher B. Branson
May 23, 2024
Page 19

business practices "independently actionable under section 17200." *Farmers Ins. Exch. v. Superior Court*, 2 Cal. 4th 377, 383 (1992) (internal quotation marks omitted). "Violation of almost any federal, state, or local law may serve as the basis for a [UCL] claim." *Frengel v. McLaren Auto., Inc.*, 2022 U.S. Dist. LEXIS 159604, *6 (S.D. Cal.), citing *Plascencia v. Lending 1st Mortg.*, 583 F. Supp. 2d 1090, 1098 (N.D. Cal. 2008). Should you proceed with any broadcast of the Callaghan film, as set forth below, your company also will incur liability at least under California's UCL through aiding and abetting liability. The UCL provides courts with broad injunctive powers that include mandatory injunctions as well as disgorgement of monies that your company will make from broadcasting the Callaghan video if you were to in fact broadcast it.

### k. Aiding and Abetting Liability

Now that you have been provided this correspondence and have **actual knowledge** of the unlawful activities of Johnson and Callaghan, as well as the false accusations made against our client in the Callaghan video, should you publish the video, your company will incur aiding and abetting liability for all of Johnson's and Callaghan's illegal activity that is depicted in the Callaghan video, and all attendant public opprobrium to which our client and his family will be exposed. *See Casey v. U.S. Bank Nat. Assn.*, 127 Cal.App.4th 1138, 1144 (2005) ("California has adopted the common law rule for subjecting a defendant to liability for aiding and abetting a tort. Liability may … be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." Internal quotation marks and citations omitted.)

### l. Civil Conspiracy Liability

Similarly, should you broadcast the Callaghan video, in light of your actual knowledge of the facts surrounding this matter, your company may also be charged with liability for the torts and statutory violations explained in this correspondence through a civil conspiracy among you, Johnson and Callaghan. *See Applied Equipment Corp. v. Litton Saudi Arabia Ltd*., 7 Cal.4th 503, 511 (1994). Doing so may also render your company's officers and directors personally liable for the damages inflicted upon our client and his family. *See Schwartz v. Pillsbury, Inc*., 969 F.2d 840, 843-844 (9th Cir. 1992) (directors and officers of corporate entity may be personally liable for conspiracy to injure third parties through the corporation).

### VI.    **DEMAND**

As stated above, on behalf of Mr. Joiner, we hereby demand that your company:

1) **Immediately** cease sales of tickets and/or other manner(s) of admission to the Callaghan film, and cease such sales in perpetuity;

Christopher B. Branson
May 23, 2024
Page 20

2) **Immediately** cease all advertisement(s) and any other manner of bringing attention to the Callaghan film, and cease such advertisement(s) in perpetuity;

3) **Immediately** notify Johnson, Callaghan and all other individuals and/or entities in active concert with them that any showing(s) and/or broadcast(s) of the Callaghan film are immediately cancelled and that the Callaghan film will not be shown in your establishment; and,

4) Provide us with written confirmation **no later than May 30, 2024**, of your compliance with items 1-3 above and confirming that the Callaghan film will not be shown or broadcast in your establishment at any time.

Should you fully comply with these demands, our client will have no cause to pursue legal action against your company for its complicity in the actions of Johnson and Callaghan.

Should you refuse to comply with these demands and fail to comply with them, continue to sell tickets or other form(s) of admission to the Callaghan film, and/or continue to promote such film and showings thereof in your establishment, our client has authorized us to proceed against your company to seek all available relief under law, including provisional and permanent injunctive relief, as well as monetary damages, including punitive damages.

We look forward to your complete cooperation.

Sincerely,

**MURPHEY & MURPHEY, A.P.C**

Meghan C. Murphey

# EXHIBIT D



21st Floor
1251 Avenue of the Americas
New York, NY 10020-1104

**Abigail B. Everdell**
212 603 6468 tel
212 379-5244 fax

abigaileverdell@dwt.com

May 30, 2024

<u>**Via Email**</u>
Meghan C. Murphey
Murphey & Murphey PC
120 Vantis Drive, Suite 300
Aliso Viejo, California 92656

Re:    <u>**Channel 5 / Untitled Callaghan Film**</u>

Dear Ms. Murphy:

I represent Channel 5 LLC and Andrew Callaghan. I write regarding letters we understand you have sent on behalf of William Joiner to venues scheduled to screen Channel 5's "Untitled Callaghan Film"[1] (the "Film") as well as the ticketing platform selling tickets to these screenings, threatening these venues and platforms (together, the "Venues") with legal action and demanding they (1) cease selling tickets to screenings of the Film, (2) cease advertising or promoting the Film, and (3) cancel all showings of the Film.

Your letters demonstrate a misapprehension of the Film's content and message as well as of the legal remedies available to Mr. Joiner, as explained further below. Moreover, while my clients (and consequently the Venues) have engaged in no tortious conduct, your attempt to interfere with Channel 5's contracts with the Venues exposes your client to liability. After you have had an opportunity to review the below, I suggest we schedule a time to discuss these issues.

I.    <u>**The Film**</u>

While the Film has not yet been finalized, I believe it will be helpful to provide some context on how the project arose and what the Film will convey:

Mr. Callaghan, originally through his series *All Gas No Brakes* and subsequently through Channel 5 with Andrew Callaghan, creates works of journalism inflected with humor. He is known for attending conventions, concerts, protests, and other fringe events, conducting revealing interviews with attendees, and editing those interviews into shortform videos which

---

[1] The Film will not be titled "Finding Bill Joiner." While a final title has not yet been decided, your client's name is not included in any current working title.

Anchorage    New York    Seattle
Bellevue    Portland    Shanghai
Los Angeles    San Francisco    Washington, D.C.

www.dwt.com

May 30, 2024
Page 2

present his subjects in an honest but surrealist and often humorous manner.  Mr. Callaghan also creates feature documentaries in the same vein.  His documentary about the events of January 6, 2021, *This Place Rules*, premiered on HBO in December 2022.  The Film is Mr. Callaghan's second feature documentary.

The concept for the Film originated in 2021, when Mr. Callaghan attended a White Lives Matter rally in Huntington Beach, California and interviewed Kelly Johnson.  Mr. Johnson espoused right-wing conspiratorial beliefs about countless issues, and also demonstrated an intense obsession with the idea that his home had been "stolen" by a man named Bill Joiner.  Mr. Callaghan became interested in how Mr. Johnson had adopted these irrational beliefs and behaviors, in particular because Mr. Johnson seemed to exemplify Mr. Callaghan's theory that the origin of radicalization is often a deep and destabilizing personal loss.  Mr. Callaghan began spending more time with Mr. Johnson, as well as his family members, in order to understand the personal loss he believed had driven Mr. Johnson's radicalization, namely, the loss of his home.

In the Film, Mr. Callaghan probes Mr. Johnson's vendetta against Mr. Joiner, reviewing legal documents and consulting sources, ultimately revealing that Mr. Johnson's professional and financial troubles began well before he encountered Mr. Joiner, and that these troubles—not Mr. Joiner—were the reason Mr. Johnson lost his home.  In the course of creating the Film, Mr. Callaghan ultimately helped Mr. Johnson come to the realization that his obsession with Mr. Joiner is misplaced and damaging.  In other words, the Film does *not* adopt or encourage Mr. Johnson's beliefs about Mr. Joiner.  In fact, the Film does the opposite.

Notably, Mr. Callaghan made numerous efforts to contact Mr. Joiner in the course of the Film, hoping to allow your client a chance to speak for himself and explain his background with Mr. Johnson.  Mr. Callaghan even went to Mr. Joiner's office in an attempt to contact him (he did *not*, as your letter suggests, trespass, but merely entered a common area open to the public before leaving).  Your client did not respond to any of these outreach attempts.  In light of this, we are troubled that rather than contacting Mr. Callaghan directly, your client has chosen to threaten the Venues.  If your client had engaged with Mr. Callaghan, he would have realized that Mr. Callaghan's has no intention of placing your client in an inaccurate light or inciting any "attacks" against him.  To the contrary, Mr. Callaghan's goal is to shine a light on how people obsessed with conspiracy theories and personal boogeyman may be driven by an inability to come to terms with instability and loss in their own lives.

Your letter also raises concerns based on videos recorded at Mr. Callaghan's live events in 2022.  Ltr. at 14.  The chants shown in these videos were not sincerely directed at Mr. Joiner, but reflected the audience's affection for a unique character—Mr. Johnson—who figured in some of Mr. Callaghan's prior videos.  In this context, Mr. Callaghan's statement recorded in one video that "Nobody should steal a home, it's not right," is obviously a tongue-in-cheek joke.[2]

---

[2] California courts acknowledge that these kinds of joking comments are not reasonably understood as factual statements and therefore cannot give rise to liability.  *See, e.g.*, *Couch v. San Juan Unified Sch. Dist.*, 33 Cal. App. 4th 1491, 1496 (1995) (statements in student-created multiple choice "test" published in high school newspaper

May 30, 2024
Page 3

Indeed, as your letter acknowledges Mr. Callaghan told an audience member right after this that
"[Bill Joiner] didn't actually steal the home if that's what you're asking." *Id*. Your letter's
earlier quotation of Mr. Callaghan from 2021 similarly misses the mark. Mr. Callaghan made
these comments several *years* ago, when he was still in the process of investigating Mr.
Johnson's claims. *Id*. at 15. These off-the-cuff statements from years ago are not reflective of
the Film's final narrative.

## II.    <u>Your Client's Legal Claims</u>

Your letter has asserted numerous claims against the Venues, on the theory that by
publicly showing a First Amendment-protected film a venue or ticketing platform is somehow
liable for the acts of individuals appearing in the film. No court would accept such a theory.
Indeed, "it would be quite remarkable to hold that speech by a law-abiding possessor of
information can be suppressed in order to deter conduct by a non-law-abiding third party." *See
Bartnicki v. Vopper*, 532 U.S. 514, 529–30 (2001) (holding a publisher could not be liable for
possessing or publishing information obtained by a third party in violation of federal wiretap
laws). But more fundamentally, Mr. Callaghan did not break any laws in creating the Film, nor
does the Film itself violate any laws. The Venues cannot be held liable where there is no
predicate wrongdoing.

The claims you have asserted in your letter include the following, none of which has any
hope for success under the circumstances:

### a.    **Stalking**

Your letter cites California Civil Code § 1708.7 and Title 18 U.S.C 2261A, suggesting
that "there is video evidence of Johnson and Callaghan engaging in activity meant to harass,
intimidate and surveille Mr. Joiner and his family, not only in their residence but also at Mr.
Joiner's place of business." Ltr. at 16. First, Mr. Callaghan did not engage in any such behavior.
In the course of creating the Film, Mr. Callaghan on one occasion pantomimed "surveillance"
with Mr. Johnson dressed in ghillie suits, but the reality was hardly cause for concern: Mr.
Callaghan and Mr. Johnson were at the time on a public hiking trail, looking at the borders of the
large gated neighborhood in which Mr. Joiner lives (not at Mr. Joiner's house specifically, to Mr.
Callaghan's knowledge) and from a significant distance rendering footage of the homes blurry
and indistinct. They could not see, much less surveil, any person inside a home or indeed within
the community. The purpose of this endeavor was to help Mr. Johnson unpack his obsession, not
to harass, intimidate, or upset Mr. Joiner in any way. Nor can Mr. Joiner assert a stalking claim
based upon the Film itself, even if it adopted Mr. Johnson's views (which, again, it does not).

---

stating that plaintiff, a school security officer, was a "narc" who "actually committed murder" and who "sells primo
drugs, cheap too!" were protected opinion because reasonably understood to be a "joke"); *San Francisco Bay
Guardian, Inc. v. Superior Ct.*, 17 Cal. App. 4th 655, 660-62 (1993) (April Fool's Day edition of newspaper that
included fake letter to the editor suggesting that landlord gave his tenants electroshock therapy was "obviously and
unambiguously a parody").

May 30, 2024
Page 4

California Civil Code § 1708.7 explicitly excludes "[c]onstitutionally protected activity," including speech, from liability under its stalking law.  *See also Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 745 (9th Cir. 2021) (in case where defendants "hired protestors, organized leafletting, hired a van to drive around Los Angeles with a message on its side, and published emails online to "openly and vigorously [ ] mak[e] the public aware" of their views of [plaintiff's] business practices, this was constitutionally protected activity exempted from California Civil Code § 1708.7).  *See also United States v. Cassidy*, 814 F. Supp. 2d 574, 583 (D. Md. 2011) (online speech that "inflicted substantial emotional distress" was nonetheless protected by the First Amendment and not actionable under federal anti-stalking laws).

### b. Trespass

Any trespass claim by Mr. Joiner would fail for the same reasons:  Mr. Callaghan did not trespass upon Mr. Joiner's personal or business property in the course of making the Film.  Instead, he filmed from public property or common areas open to the public.

### c. Federal Wiretap Act, Title 18 U.S.C. § 2511, and California Penal Code § 631

Mr. Callaghan did not surreptitiously record any wire, oral, or electronic communications at Mr. Joiner's home or place of business in the course of making the Film, and did not otherwise violate any state or federal wiretap laws.  Your claims to the contrary are pure and baseless conjecture.  But regardless, a venue could not be held liable for wiretap violations for merely screening the Film.  *Bartnicki*, 532 U.S. at 529–30.

Nor could Mr. Callaghan or a venue possibly be held liable under federal racketeering (RICO) laws by virtue of the content of a First Amendment-protected work.  *See Kimm v. Lee*, 2005 WL 89386, at *5 (S.D.N.Y. Jan. 13, 2005) (allegations of mail and wire fraud which "consist[ed] solely of the alleged transmission of false information to 'destroy [plaintiffs] professional name and reputation'" could not constitute RICO predicate acts.).

### d. Invasion of Privacy – False Light

Preliminarily, your client's asserted false light claim is equivalent to a defamation claim and would fail for the same reasons as the latter claim (*see infra*). *Eisenberg v. Alameda Newspapers, Inc*. (1999) 74 Cal.App.4th 1359, 1385, n.13 ("[w]hen a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets the same requirements as the defamation cause of action.").  Moreover, the Film does not place Mr. Joiner in a false light.  It does not adopt Mr. Johnson's allegations that Mr. Joiner "stole [his] home," but reports the true facts that Mr. Joiner extended Mr. Johnson a loan secured by his home, that Mr. Johnson defaulted, and that Mr. Joiner then foreclosed on Mr. Johnson's home.  Indeed, your letter itself concedes these facts.

### e.  Invasion of Privacy – Intrusion Upon Seclusion

As noted above, your client has no privacy claim because Mr. Callaghan did not intrude into your client's privacy.  He did not record the interior of Mr. Joiner's home or any of Mr. Joiner's personal private space, nor did he enter Mr. Joiner's office.  Instead, Mr. Callaghan filmed from public places, and entered a public common area at your client's office building through an open door.  Your claims to the contrary are misplaced, if not knowingly exaggerated.

### f.  Intentional or Negligent Infliction of Emotional Distress

As your letter acknowledges, claims for negligent or intentional infliction of emotional distress require "outrageous" conduct by a defendant.  Courts, including the U.S. Supreme Court have uniformly rejected claims that First Amendment-protected activity related to matters of public concern meets this threshold, regardless of how upsetting that conduct may be.  *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 459 (2011) (protest outside the funeral of the plaintiff's son, a marine killed in the line of duty, reading, for example, "Thank God for IEDs," "Thank God for Dead Soldiers," and "God Hates You" were not actionable under a theory of intentional infliction of emotional distress because the "overall thrust" and "dominant theme" of the demonstration "spoke to broader public issues" *Id*. at 454.).  Here, Mr. Callaghan's conduct was further to a journalistic project concerning the spread of radicalization and conspiracy theories in the United States, as well as the role of economic instability and loss in this trend, indisputably matters of public concern.  There is no possible claim for negligent or intentional infliction of emotional distress in these circumstances.

### g.  Defamation

Your letter also asserts claims for defamation, misconstruing both the content of the Film (which you have not seen) and the law.  As explained herein, the Film does not accuse your client of wrongdoing.  To the extent it includes Mr. Johnson explaining his version of events, this must be considered in the context of the Film as a whole, and the Film makes amply clear to the viewer that Mr. Johnson is a flawed narrator who is expressing his opinion not true facts.  *Koch v. Goldway,* 817 F.2d 507, 509 (9th Cir. 1987) ("the context of a statement may control whether words were understood in a defamatory sense"); *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1157 (9th Cir. 2021) (same).  The Film also reports the "truth" behind how Mr. Johnson lost his house, and shows him coming to terms with his misplaced blame of Mr. Joiner.  Indeed, even without this full clarifying context, a reader would not understand Mr. Johnson's claims about Bill Joiner to constitute factual assertions.  Moreover, Mr. Johnson and Mr. Joiner's disputes have been litigated extensively, and my clients are absolutely privileged from liability in reporting fairly on those legal proceedings pursuant to California's fair report privilege.  *Jennings v. Telegram-Trib. Co*., 164 Cal. App. 3d 119, 128 (Ct. App. 1985).

May 30, 2024
Page 6

### h.  Secondary Liability of Venues

Your attempts to threaten the Venues with secondary liability are premised upon alleged tortious acts that never occurred, and an imagined version of the Film that does not exist.  The claims you assert are specious, and would be doomed to fail.

First, a claim under California Business and Professions Code § 17200 must be predicated upon an "unlawful, unfair, or fraudulent business act or practice."  *Id.*  Here, my clients did not engage in any such practice, nor does the Film constitute commercial speech. *See McKenna v. Sony Pictures Ent., Inc.*, 2023 WL 2007687, at *5 (Cal. Ct. App. Feb. 15, 2023), *reh'g denied* (Mar. 6, 2023), *review denied* (Apr. 26, 2023), *cert. denied*, 144 S. Ct. 288 (2023) (California unfair competition law claims against filmmaker "fail because defendants' pertinent filmmaking decisions are protected by the First Amendment").  Thus there is no predicate unlawful act on which to base a theory of aiding and abetting liability.

Second, the Venues cannot be liable for aiding and abetting.  This form of liability "necessarily requires a defendant to reach a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act." *Howard v. Superior Court* 2 Cal.App.4th 745, 749 (1992). The Venues scheduled to screen the Film fall far short of meeting this standard.  Indeed, even if Mr. Callaghan had trespassed or committed some other minor violation in the course of creating the Film (which, again, *he did not*), the Venues cannot be held liable for aiding and abetting that conduct by virtue of showing the Film, since it concerns a matter of public interest and the Venues had no part in any imagined wrongdoing. *Bartnicki*, 532 U.S. at 529–30.

Likewise, civil conspiracy liability requires an agreement among multiple individuals "to a common plan or design to commit a tortious act" and "a wrongful act committed pursuant to the agreement." *City of Indus. v. City of Fillmore*, 198 Cal. App. 4th 191, 212 (2011), *as modified* (Aug. 24, 2011).  No such agreement, or wrongful act, exists here.

### III.   <u>Mr. Joiner's Liability</u>

Your client's decision to threaten venues on the basis of mischaracterized facts and legal theories itself exposes him to liability for tortious interference with Channel 5's contractual relationships with these venues.  *See Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55, 960 P.2d 513, 530 (1998), *as modified* (Sept. 23, 1998) (a claim for tortious interference with contract requires "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage").  Your client is plainly aware of my client's contractual relationships with the Venues, and has sent his threatening letters citing inaccurate facts and baseless legal claims in an intentional attempt to cause the Venues to stop performance of their

May 30, 2024
Page 7

obligations under those contracts.  To the extent your client is successful in his efforts to induce the Venues to violate their contracts, he will be liable for the financial consequences.

Moreover, should you take the unwise step of filing any claims against Mr. Callaghan or Channel 5 arising from the Film, the action would fall squarely within the scope of California Code of Civil Procedure § 425.16 (the "anti-SLAPP statute"), which provides a mechanism for the early dismissal of claims arising from the exercise of constitutionally protected speech.  The anti-SLAPP statute provides for a **mandatory** award of attorneys' fees and costs to prevailing defendants, *see* C.C.P. § 425.16(c), and we are confident that any claims your client asserts would be swiftly dismissed and he would be found responsible for paying my clients' legal fees.

*       *       *

In sum, your client has no claim against Mr. Callaghan, Channel 5, or any of the Venues scheduled to show the Film or sell tickets to screenings.  We advise you to promptly withdraw your threats to the Venues and wait to consider *the actual Film*, rather than issuing threats based on overblown and utterly inaccurate speculation about it.  We are confident that that a review of the Film itself will assuage your client's concerns.

This letter is sent without waiver of my clients' rights, defenses, privileges, remedies, or claims, all of which are expressly reserved.

Sincerely

Abigail B. Everdell
Davis Wright Tremaine LLP

4872-9479-8018v.1 0050033-004503