**MURPHEY & MURPHEY**
  A PROFESSIONAL CORPORATION
Meghan C. Murphey, (SBN 259487)
  meghan@themurpheylawyers.com
Matthew D. Murphey (SBN 194111)
  matt@themurpheylawyers.com
Dennis J. Canty (SBN 207978))
  dennis@themurpheylawyers.com
Kerry Moynihan (SBN 250571)
  kerry@themurpheylawyers.com
120 Vantis Drive, Suite 300
Aliso Viejo, California 92656
Tel: 949.464.4540 Fax: 562.375.6674

Attorneys for Plaintiff,
WILLIAM JOINER

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM JOINER, an Individual<br><br>Plaintiff,<br><br>v.<br><br>ANDREW CALLAGHAN, an Individual; CHANNEL 5 LLC, a Washington Limited Liability Company; EVAN GILBERT-KATZ, an Individual; NICOLAS MOSHER, an Individual; KELLY SCOTT JOHNSON, an Individual; and DOES 1 through 200, Inclusive,<br><br>Defendants. | CASE NO. 8:24-cv-01160-CBM-KS<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br><br>Date:      October 15, 2024<br>Time:     10:00 a.m.<br>Dept.:     8D<br><br>Action Filed:      May 30, 2024 |

# Table of Contents

I.    Legal Standard ................................................................................1

II.   Argument ......................................................................................2

      A.    Plaintiff Has Sufficiently Stated Claims Under the Wiretap Act
            (Claim 1), ECPA (Claim 2), and CIPA (Claim 5) .......................2

      B.    Claim 3 - Stalking Under Cal. Civil Code § 1708.7 ....................3

            1.    Plaintiff Has Sufficiently Alleged the Elements for
                  Stalking.................................................................3

            2.    Defendants' Activities Are Not Constitutionally Protected ........7

      C.    Plaintiff Has Adequately Stated Claim 4 for Harassment (§
            527.6) ...........................................................................11

      D.    Plaintiff's False Light Claim is Sufficiently Plead (Claim 10)............12

            1.    The Complaint Adequately Alleges False Statements ...............12

            2.    Defendants' False Statements Are Not Protected Opinion ........13

            3.    Defendants Are Not Protected by the Fair Report Privilege ......15

      E.    Intentional & Negligent Infliction of Emotional Distress (Nos. 7,
            8) ................................................................................16

            1.    Negligent Infliction of Emotional Distress.................................16

            2.    Intentional Infliction of Emotional Distress ...............................17

      F.    Invasion of Privacy & Intrusion Upon Seclusion (Claims 9 and
            11) ...............................................................................21

      G.    California Business and Professions Code § 17200 (Claim 12)..........23

      H.    Leave To Amend Should be Granted ..................................................24

III.  Conclusion ...................................................................................24

i

**Table of Authorities**

**Cases**

**Page(s)**

*A.A. Dietemann v. Time, Inc.*,
   449 F.2d 245 (9th Cir. 1971) ........................................................... 9

*Adams v. Johnson*,
   355 F.3d 1179 (9th Cir. 2004) ......................................................... 2

*Angie M. v. Sup. Ct.*,
   37 Cal.App.4th 1217 (1995) ........................................................ 18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................... 2

*Balisteri v. Pacifica Police Dept.*,
   901 F.2d 696 (9th Cir. 1988) ....................................................... 24

*Bell Atlantic Corp. v. Twombly*
   550 U.S. 544 (2007)......................................................................1

*Braun v. Chronicle*,
   52 Cal.App.4th 1036 (1997) ........................................................ 16

*Chavez v. Amerigas Propane, Inc., No. 12-07524*,
   2013 WL 25882 (C.D. Cal. Jan. 2, 2013) ................................... 18

*Complaint." Pittman v. Travelers Indem. Co.*,
   286 Fed.Appx. 449 (9th Cir. 2008) ............................................... 2

*Conley v. Gibson*,
   255 U.S. 41 (1957) ......................................................................... 2

*Davis v. Facebook, Inc.*,
   956 F.3d 589 (9th Cir. 2020) ......................................................... 4

*Dozier v. Maispace, Case No.: C051761PVT*,
   2007 U.S. Dist. LEXIS 14540 (N.D. Cal. 2007) ......................... 23

*Dun & Bradstreet v. Greenmoss Builders,*
    472 U.S. 749, 758 (1985) ................................................................ 8, 23

*Ewing v. Flora, Case No. 14cv2925AJB,*
    2015 U.S. Dist. LEXIS 194169 *10 (S.D. Cal. 2015) ................................. 3

*Fletcher v. Western Nat'l Life Ins. Co.,*
    10 Cal.App.3d 376 (1970) ........................................................... 18

*Friedman v. Merck & Co.,*
    107 Cal.App.4th 454 (2003) ................................................... 16, 17

*Gilligan v. Jamco Dev. Corp.,*
    108 F.3d 246 (9th Cir. 1997) ......................................................... 2

*Hawran v. Hixson,*
    209 Cal.App.4th 256 (2012) ........................................................ 15

*Hernandez v. Hillsides, Inc.,*
    47 Cal.4th 272 (2009) ............................................................... 21

*Hoffman v. Cap. Cities,*
    255 F.3d 1180 (9th Cir. 2011) ...................................................... 23

*Inc., Case No. 2002097,*
    2020 WL 4459122 (N.D. Cal. May 26, 2020) ........................................ 12

*Kasky v. Nike, Inc.,*
    27 Cal.4th 939 (2002) ............................................................... 23

*Lorenzo v. U.S.,*
    No. 09-1803, 2010 WL 11508278 (S.D. Cal. Oct. 21, 2010) ..................... 16

*Martinez-Serrano v. I.N.S.,*
    94 F.3d 1256 (9th Cir. 1996) ......................................................... 4

*Milkovich v. Lorain Journal Co.,*
    497 U.S. 1 (1990) .................................................................... 13

*Mireskandari v. Daily Mail and Gen. Trust PLC, No. 12-02943,*
    2013 WL 12114762 (C.D. Cal. Oct. 8, 2013) .............................. 13,14,15

iii

*NovelPoster v. Javitch Canfield Group*,
    140 F. Supp. 3d 938 (N. D. Cal. 2014) ........................................................ 3

*Petrosyan v. Hurstedt*,
    2014 WL 12967310 (C.D. Cal. Nov. 6, 2014) ........................................... 21

*Pyankovska v. Abid*,
    65 F.4th 1067 (9th Cir. 2023) ..................................................................... 3

*Sarver v. Chartier*,
    813 F.3d 891 (9th Cir. 2016) ..................................................................... 23

*Shulman v. Group W Prods. Inc.*,
    18 Cal.4th 200 (1998) ............................................................................... 21

*Simmons v. Bauer Media Group USA, LLC*,
    50 Cal.App.5th 1037 (2020) ................................................................. 9,10

*Sleep Hill Labs., Inc v. Moore*,
    Case No. 18-373, 2018 WL 1242182 (N.D. Cal. Mar. 8, 2018) ........ 8,19,20

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ................................................................................... 8

*United States v. Cassel*
    408 F.3d 622 (9th Cir. 2005) ...................................................................12

*Weinberg v. Feisel*,
    110 Cal.App.4th 1122 (2003) ................................................................... 20

*Wiretap Act. Deteresa v. ABC*,
    121 F.3d 460. (9th Cir. 1997) ..................................................................... 4

*Wolfson v. Lewis*
    924 F. Supp. 1413 (E.D. Penn. 1996) ......................................................... 9

**Statutes**

18 U.S.C. § 2510 ........................................................................................... 3

18 U.S.C. § 2520 ........................................................................................... 3

Cal. Business and Professions Code § 17200 ........................................... 22, 23

OPPOSITION TO MOTION TO DISMISS

Cal. Civil Code § 1714  ......................................................  16

Cal. Civil Code § 1708.7  ..............................................  4,5,6,7

Cal. Civil Code § 1714  ......................................................  16

Cal. Code of Civ. P. § 527.6.............................................11

Cal. Penal Code Section 632  ......................................  21, 22

**Rules**
Fed R. Civ. P. 12  ..........................................................  2, 20

**Other**
Rest. 2d, Torts, Section 46 com. d., pp. 72-73  ................  18

1

2    **I.    LEGAL STANDARD**

3         Motions to dismiss under Rule 12(b)(6) "are viewed with disfavor and are

4    rarely granted." *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997).

5    The Court must take all factual allegations as true (*id*. at 248), and Plaintiff "is

6    entitled to all reasonable inferences from the facts alleged in the Complaint."

7    *Pittman v. Travelers Indem. Co*., 286 Fed.Appx. 449, 450 (9th Cir. 2008), citing

8    *Usher v. Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

9         A motion to dismiss must be denied "unless it appears *beyond doubt* that the

10   plaintiff can prove no set of facts…which would entitle him to relief" on any theory.

11   *Conley v. Gibson*, 255 U.S. 41, 45-46 (1957); *see also Adams v. Johnson*, 355 F.3d

12   1179, 1183 (9th Cir. 2004). "A well-pleaded complaint may proceed even if it

13   strikes a savvy judge that actual proof of those facts is improbable, and that a

14   recovery is very remote and unlikely." *Bell Atlantic Corp. v. Twombly*, 550 U.S.

15   544, 556 (2007).

16        Plaintiff must plead "enough facts to state a claim to relief that is plausible on

17   its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the

18   plaintiff pleads factual content that allows the court to draw the reasonable inference

19   that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.

20   662, 678 (2009) (citing *Twombly*, at 556). "The plausibility standard is not akin to a

21   'probability requirement,' but it asks for more than a sheer possibility that a

22   defendant has acted unlawfully." *Id*. The complaint need not contain "detailed factual

23   allegations," one simply must plead "enough facts to raise a reasonable expectation

24   that discovery will reveal evidence of" the necessary claims or elements. *Twombly*,

25   556; *Iqbal*, at 678.

26

27

28

## II.    ARGUMENT

### A.    Plaintiff Has Sufficiently Stated Claims Under the Wiretap Act (Claim 1), ECPA (Claim 2), and CIPA (Claim 5)

Defendants claim, without reference to any legal authority, that Plaintiff's claim fails "because his pleadings do not identify any confidential conversation that was intercepted." MTD, 8:8-9. The reason Defendants provide no authority for this proposition is because there is none. The law is actually against Defendants' claim. *See Ewing v. Flora*, Case No. 14cv2925AJB, 2015 U.S. Dist. LEXIS 194169 *10 (S.D. Cal. 2015) ("Although Plaintiff does not state in detail the nature of the conversations, such specificity regarding the alleged confidential communication is not necessary."). Defendants demand pleading of specifics of conversations recorded by Plaintiffs while Callaghan and Johnson trespassed on private property (shown in Exh. B at time stamp 08:13-08:24) in ghillie suits with a camera capable of recording both audio and video images at the rear of Mr. Joiner's property and used it. The contents of these intercepted communications are barred from introduction by statute. *Pyankovska v. Abid*, 65 F.4th 1067, 1074 (9th Cir. 2023) ("'no part of the contents of [any illegally intercepted] communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court'," citing 18 U.S.C. § 2515.) Thus, Defendants are wrong that the "contents" of the intercepted communications must be pleaded, and their motion on this ground fails.

Under the Wiretap Act, "[a] civil cause of action is available to 'any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this [law].' 18 U.S.C. § 2520(a). The statute defines 'intercept' as 'the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device.' 18 U.S.C. § 2510(4). 'Such acquisition occurs when the contents of a wire communication are captured or redirected in any way.'" *NovelPoster v. Javitch*

*Canfield Group*, 140 F. Supp. 3d 938, 951 (N. D. Cal. 2014), citing *Noel v. Hall*, 568 F.3d 743, 749 (9th Cir. 2009) (citation omitted).

Plaintiff's Complaint at paragraphs 5, 90, 104 and 105 all address the elements of a civil claim under § 2520(a). It is a reasonable inference from these allegations and Defendants' Exh. B that Callaghan's and Johnson's use of a camera that is capable of recording both video and audio, while trespassing behind Mr. Joiner's property, that they used the camera and video and audio recorded not only the house but the persons talking in the interior. Plaintiff also includes an Invasion of Privacy claim (Claim 5), which the Ninth Circuit has recognized may provide the necessary underlying tort to satisfy the Wiretap Act. *Deteresa v. ABC*, 121 F.3d 460, 467 n.4. (9th Cir. 1997); *see also Davis v. Facebook, Inc*., 956 F.3d 589, 598 (9th Cir. 2020) ("Thus, these statutory provisions [Wiretap Act, SCA, and CIPA] codify a substantive right to privacy, the violation of which gives rise to a concrete injury sufficient to confer standing.")

Since Defendants admit that a CIPA claim is analyzed identically to a Wiretap Claim, the Motion as to Claims 1 and 5 must be denied. Defendants also moved to dismiss Claim 2, but provide no argument thereon, and thus, have abandoned it. *See Martinez-Serrano v. I.N.S.*, 94 F.3d 1256, 1259 (9th Cir. 1996) ("Issues raised in a brief that are not supported by argument are deemed abandoned.")

**B.**   **Claim 3 - Stalking Under Cal. Civil Code § 1708.7**

1.   Plaintiff Has Sufficiently Alleged the Elements for Stalking

A claim under Section 1708.7 for civil stalking requires that plaintiff allege: (i) that defendant(s) engaged in a pattern of conduct the intent of which was to follow, alarm, or harass the plaintiff; (ii) as a result of that pattern of conduct, the plaintiff reasonably feared for his safety or the safety of an immediate family member, or that he suffered substantial emotional distress that a reasonable person would also have suffered under the circumstances; (iii) defendant, as part of the

1    pattern of conduct, made a credible threat[1] with the intent to place plaintiff in

2    reasonable fear for his safety or the safety of an immediate family member, and iv)

3    on at least one occasion, plaintiff clearly and definitively demanded that defendant

4    cease and abate his pattern of conduct and the defendant persisted in his pattern of

5    conduct.[2] Cal. Civ. Code § 1708.7. Plaintiff has sufficiently alleged these elements.

6         First, the Complaint explicitly outlines a pattern of conduct by Defendant

7    Johnson over many years, which necessitated a restraining order to address the years

8    of threats and harassment, and that pattern of conduct was then joined and continued

9    by the C5 Defendants. *See* Compl., ¶¶ 56-59. As stated by the Appellate Court, Mr.

10   Johnson's "hostile behavior," which included posting flyers at Joiner's community

11   accusing Joiner of stealing his home, accessing Mr. Joiner's private community

12   without permission, and attempting to look over the gates and into the house and

13   videoing Joiner's back fence, "would cause a reasonable person to suffer substantial

14   emotional distress." Compl., ¶ 59. As alleged in the Complaint, beginning in or

15   about April 2021, the Callaghan and Johnson then engaged in a coordinated effort to

16   follow, alarm or harass Mr. Joiner, including, as Mr. Callaghan admitted, going "to

17   psychotic lengths to identify and find [Mr. Joiner]," noting, "We'll get him. It's a

18   work in progress." Compl., ¶ 83.

19        Johnson and the C5 Defendants' pattern of conduct included, among other

20   things, "travel[ing]…to California to surveille Mr. Joiner at his home and place of

21   business," "surreptitiously trespass[ing] on private property and video and audio

22   record[ing] Mr. Joiner, the exterior of his residence and parts of the interior of that

23   residence" (recordings "that are collectively intended to harass and intimidate Mr.

24   _____

25   [1] A "credible threat" is defined in 1708.7(b)(2).

26   [2] Alternatively, Plaintiff may establish that the Defendants violated a restraining
     order. See PRJN, Exh. 8; and see Defendants Exh. B, at time stamp 50:48. The
27   restraining order against Johnson was in effect until 2020, so on January 2, 2019,
     which is reflected in Exh. B, demonstrates that Johnson violated the restraining
28   order, and Callaghan aided and abetted such violation. See Compl., at ¶¶ 3, 56-59.

Joiner, his spouse and his minor children), "gain[ing] access under false pretenses to Mr. Joiner's place of business, which is restricted by key card access," and "trespass[ing] on Mr. Joiner's place of business while again surreptitiously recording video and audio of an employee..." Compl., ¶¶ 6, 10, 12-13, 67, 68.

Johnson and the C5 Defendants' pattern of conduct also included following, alarming and harassing Mr. Joiner by going to the community where Mr. Joiner resides, holding up signs with false statements ("Bill Joiner Stole Our Home"), and identifying to the general public the community where Mr. Joiner resides. Compl. ¶ 71. But they did not stop there. Johnson and the C5 Defendants were "wearing ghillie suits, skulking in property behind Mr. Joiner's residence and videoing the dwelling and those inside of it," wearing the "ghillie suit…on private property that adjoins Mr. Joiner's property and residence," "camouflaged themselves in ghillie suits, trespassed and infiltrated private property, crept to an area that provided a clear view of the residence, and lurked in the bushes while making [video and audio] recordings," and publicly posted a photograph of Callaghan and Johnson "wearing these ghillie suits with the caption indicating that the two were on a 'daring mission for revenge.'" Compl., ¶¶ 5, 68, 168. Defendants' conduct (intentionally and foreseeably) led to additional individuals "stalking his residence from the rear of the property and using binoculars to observe the residence before sunrise." *Id.* at ¶ 89.

In the TMA, the C5 Defendants explicitly stated that they had been working on a "secret project" for years, "all in the name of locating and confronting the arch nemesis" of Johnson (i.e., Mr. Joiner). *Id.* at ¶ 69. This so-called "project" (initially called "Finding Bill Joiner") included dissemination of video footage of Johnson brandishing a firearm and railing unfettered against Mr. Joiner repeating assertions that were indisputably found to be false, stating he "owns an assault rifle that he keeps in his car," thereby "providing a platform to make [Johnson's] threats a reality, and to incite further aggression against Mr. Joiner and his family." *Id.* at ¶¶ 24, 69-70, 74, 78-80, 88. Notably, at no point in the TMA do the C5 Defendants

dispel any of the false claims and allegations against Mr. Joiner. Instead, the C5 Defendants encouraged and promoted Johnson's false narrative. At showings of the C5 Defendants' purported film, the audience was "chanting repeatedly in unison and with enthusiasm, 'Fuck Bill Joiner!'" as Johnson then appears and joins the chant, and on at least one occasion, Callaghan himself shouts "Fuck Bill Joiner!" at which point the crowd repeats the chants in response. *Id.* at ¶¶ 7, 80, 82, 83. Accordingly, the allegations in the Complaint sufficiently plead that the Defendants engaged in a pattern of conduct the intent of which was to follow, alarm, or harass Plaintiff.

As to the second element, the Complaint sufficiently alleges that Mr. Joiner reasonably feared for his safety or the safety of an immediately family member, and that he suffered substantial emotional distress that a reasonable person would also have suffered under the same circumstances. Compl., ¶¶ 59, 116-117. In fact, the California Court of Appeals has already recognized that such behavior would cause any reasonable person to suffer substantial emotional distress. Compl., ¶ 59. Much of Johnson's behavior which served as the basis for a restraining order is the same behavior being continued by Johnson and the C5 Defendants. *See id.* (stating Joiner was going to get what he deserves and regret what he'd done (¶¶ 5, 7, 80, 82); posting flyers with derogatory statements (¶¶ 71, 78, 80), falsely accusing Mr. Joiner of crimes and of stealing Johnson's home ((¶¶ 70, 71, 78, 80, 83), accessing Joiner's private community without permission (¶¶ 5, 6, 71, 72), and videoing and attempting to look into Mr. Joiner's house after dark (¶ 5, 10, 12-13, 68, 71, 168)). The footage posted by the C5 Defendants conspicuously included Johnson brandishing firearms and stating that he keeps an assault rifle in his car. *Id.* ¶¶ 24, 70. Moreover, the Defendants' behavior has also caused (and foreseeably so) other third-parties to attempt to stalk, harass, and "find" Mr. Joiner and his family, which has contributed to and exacerbated Plaintiff's emotional distress. *Id.,* ¶ 89.

As to the third element, the Complaint sufficiently alleges Defendants have made a credible threat to the safety of Mr. Joiner and his family members, including

his minor children, through Defendants' actions, such as publicly posting the videos described in the Complaint, stating they are on a mission for revenge, are going to "psychotic lengths" to find and confront Mr. Joiner, and that it is still a "work in progress" and he'll "get him," and depicting among other things, Johnson's threats, ownership and brandishing of firearms, trespassing on and staking out Mr. Joiner's home during the night in ghillie suits, staking out Mr. Joiner's place of business, identifying for viewers the location of Mr. Joiner's residence, and stating the film would be entitled "Finding Bill Joiner". In doing so, Defendants are seemingly encouraging their followers to do just that – find Mr. Joiner, and "get him."

Finally, Plaintiff has clearly and definitively demanded that the Defendants cease and abate their pattern of conduct in writing (See Everdell Decl., Exh. C), but the Defendants have persisted. Defendants' counsel sent a letter not only refusing to acknowledge the threat, but also indicating that they intended to (and did) continue showing the film, and threatening to sue Mr. Joiner if the venues decided not to show the film. Compl., ¶¶ 91-102.

2.    Defendants' Activities Are Not Constitutionally Protected

Notably, the Motion does not address any of the individual elements of the claim, alleging only that the C5 Defendants are immune from liability because their "course of conduct" amounts to "constitutionally protected activity." Defendants cite *Tichinin v. City of Morgan Hill* as support. Yet, Defendants leave out a key qualifying phrase in the Court's holding, italicized below, which highlights the factual distinction between *Tichinin* and the instant case:

> the right of free speech protects not only the actual expression of one's views, thoughts, opinions and information *concerning improper or unlawful conduct **by public officials*** but also non-expressive conduct that intrinsically facilitates one's ability to exercise the right of free speech, including lawful efforts to gather evidence and information ***about public officials concerning allegedly improper or unlawful conduct***.

"It is speech on 'matters of public concern' that is 'at the heart of the First Amendment's protection.'" *Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749, 758 (1985)

> "[N]ot all speech is of equal First Amendment importance," however, and where matters of purely private significance are at issue, First Amendment protections are often less rigorous. [citation omitted] That is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest: "[T]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas"; and the 'threat of liability' does not pose the risk of a 'reaction of self-censorship' [by the press] on matters of public import.

*Snyder v. Phelps*, 562 U.S. 443, 452 (2011), *citing Dun & Bradstreet*, 472 U.S. 749, 758-60 (1985). The Supreme Court reasoned the First Amendment does not require States to abandon their "interest in compensating private individuals for injury to their reputation…the individual's right to the protection of his own good name 'reflects no more than our basic concept of the essential dignity and worth of every human being..." *Id.* at 758. It concluded, "the role of the Constitution in regulating state libel law is far more limited when the concerns that activated *New York Times* and *Gertz* are absent." *Id.* at 759.

In the instant case, Mr. Joiner is not only <u>not</u> a public figure or public official (as was the case in *Tichinin* and the supporting cases discussed therein), but he has indisputably done nothing improper or unlawful. Nor is the history of the loan and foreclosure proceedings between Mr. Joiner and Johnson, or Johnson's ongoing vendetta against Mr. Joiner a matter of public concern. As stated by the California Appellate Court:

> First, 'public interest' does not equate with mere curiosity. Second, a matter of public interest should be something of concern to a substantial number of people. Thus, a matter of concern to the [defendants] and a relatively small, specific audience is not a matter of public interest. Third, there should be some degree of closeness between the challenged [activity] and the asserted public interest; the assertion of a broad and amorphous public interest is not sufficient. Fourth, the focus of the [defendants'] conduct should be the

8

> public interest rather than a mere effort 'to gather ammunition for another
> round of [private] controversy…' Finally, [defendants] cannot, by their own
> conduct, create their own defense by making the claimant a public figure.'
> A person cannot turn otherwise private information into a matter of public
> interest simply by communicating it to a large number of people.

*Sleep Hill Labs., Inc v. Moore*, Case No. 18-373, 2018 WL 1242182, at *5 (N.D.
Cal. Mar. 8, 2018), *citing Weinberg v. Feisel,*110 Cal.App.4th 1122, 1132 (2003).

Mr. Joiner is a private citizen who has been harassed and pursued by Johnson
for years, only to now have that pursuit be joined by the C5 Defendants relentlessly
and "to psychotic lengths." As alleged, even if the C5 Defendants' initial interest in
Johnson and Mr. Joiner somehow began as reporting, at some point the C5
Defendants clearly crossed the line, they adopted Johnson's personal crusade and
vendetta against Mr. Joiner as their own, and they engaged in conduct that is
unlawful and outside the bounds of any First Amendment rights. Compl., ¶¶ 5-7, 69-
72, 74-88. As set forth in the Complaint, Defendants "staked out" Mr. Joiner's
corporate office, trespassed to conduct surreptitious surveillance of Mr. Joiner's
private home in a private, gated community, repeatedly disseminated false
statements about Mr. Joiner's foreclosure of Mr. Johnson's home, and provided a
platform for Johnson to make his threats against Mr. Joiner a reality. *See, generally,*
Compl. And according to Mr. Callaghan himself, this pursuit to find Mr. Joiner is
still "a work in progress." Compl., ¶ 83.

Indeed, this case is more akin to *Wolfson v. Lewis*, cited by the Ninth Circuit
in *Tichinin*, in which the District Court noted the right to gather news is not
absolute and that First Amendment does not shield the press from torts and crimes
committed in the pursuit of a story. *Wolfson,* 924 F. Supp. 1413 (E.D. Penn. 1996);
*see also A.A. Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971) ("The First
Amendment is not a license to trespass, to steal, or to intrude by electronic means
into the precincts of another's home or office. It does not become such a license
simply because the person subjected to the intrusion is *reasonably suspected* of

9

committing a crime")[3] (emphasis added); *Simmons v. Bauer Media Group USA, LLC,* 50 Cal.App.5th 1037, 1046-47 (2020) (the assertedly protected speech was illegal as a matter of law and outside the protections of the First Amendment).

The *Wolfson* Court found a reasonable likelihood of success where television reporters engaged in a course of conduct which included "an intentional, lengthy and persistent course of conduct" (over a one-week period) that involved the use of video and sound equipment to conduct surreptitious surveillance of the plaintiffs and their families from vantage points around their private residences. The Court found a jury could reasonably determine that the conduct was not related to a legitimate newsgathering purpose, but was instead "to try to obtain entertaining background for their TV expose concerning the high salaries paid to executives at U.S. Healthcare." *Wolfson*, at 1432. "A reasonable jury would likely conclude that it is difficult to understand how hounding, harassing, and ambushing [plaintiffs] would advance the newsworthy goal of exposing the high salaries...or how such conduct would advance the fundamental policies underlying the First Amendment" *Id.*, at 1433.

Similarly, here, the course of conduct undertaken by Defendants has no legitimate newsworthy purpose (and one is never articulated in the Motion). Even if the C5 Defendants started out with such a purpose, it long ago fell by the wayside. Compl., ¶¶ 81-87. The Defendants' harassing behavior in their purported "search for Mr. Joiner," is not only nefarious as to Mr. Joiner and his family, but in no way advances any (unspecified) newsgathering or newsworthy goal, and certainly does not advance the policies of the First Amendment. In addition to the above allegations, Callaghan is on record: i) promising that "after we get that home back from Bill Joiner, we're gonna FUCK BILL JOINER!," and continually chanting the phrase with the crowd (¶ 82); ii) stating "Nobody should steal a home, it's not right," falsely suggesting that Mr. Joiner did so (¶ 83); iii) discussing his inability to separate

---

[3] Here, there is no reasonable suspicion that Mr. Joiner has committed any crime.

himself from his work (¶ 84); iv) providing a forum for Johnson to continue to spread his false statements about Mr. Joiner despite knowing such statements were false (¶ 69-70)[4]; v) posting video of Johnson ranting his false claims, brandishing firearms and stating he owns an assault rifle (¶¶ 24, 70); vi) publicizing the location of Mr. Joiner's home (¶ 71); and vii) stating Johnson (who he knows to be making false statements) is "great people" and an "excellent source" (¶¶ 87-88).

Nor have the Defendants' actions which they seek to shield been "lawful," as the Complaint alleges such actions included unlawful stalking and harassment, as described herein. Moreover, the alleged course of conduct could be deemed by a reasonable jury to pose a "true threat" – "one where a reasonable person would foresee that the listener will believe he will be subjected to physical violence upon his person, is unprotected by the first amendment." *United States v. Cassel,* 408 F.3d 622, 629 (9th Cir. 2005) (finding defendant need not intend to carry out that threat).

**C.     Plaintiff Has Adequately Stated Claim 4 for Harassment (§ 527.6)**

Code of Civ. P. Section 527.6 entitles plaintiff to an injunction when he has alleged he has suffered harassment, defined as "a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose." A plaintiff must also allege that the course of conduct by defendants would cause a reasonable person to suffer substantial emotional distress, and did in fact cause plaintiff substantial emotional distress. Here, both elements are sufficiently pled.

As set forth in Section B.1. above, and as detailed throughout the Complaint, Johnson and the C5 Defendants undertook a course of conduct directed at Mr. Joiner that seriously alarms, annoys or harasses Mr. Joiner. The C5 Defendants' suggestion that the only conduct at issue here is their filming "from outside Plaintiff's gated

---

[4] At no point does the TMA disclaim Johnson's statements as false.

community and outside the door of his company's empty office suit" is not only false, it contradicts the accepted allegations set forth in the Complaint and discussed above. Motion, 12:13-16; Compl., ¶¶ 10, 68, 87. Not only was the Defendants' conduct alarming, annoying and harassing, such conduct, and the totality thereof, created a credible threat of violence against Mr. Joiner, including causing others to stalk, harass, trespass and surveille from private property behind Mr. Joiner's residence.

Now, Defendants try to avoid the consequences of their actions by claiming their conduct is "constitutionally protected speech." Despite the "robust protections afforded by the First Amendment, a district court still possesses 'the inherent power to issue an injunction against' " harassment. *Jeffrey Katz Chiropractic, Inc. v. iBeat, Inc.*, Case No. 2002097, 2020 WL 4459122, at *3 (N.D. Cal. May 26, 2020) (Section 527.6 provides an exception to the First Amendment's general prohibition against prior restraint on speech). Moreover, for the reasons discussed at length herein, the harassing course of conduct does not qualify as constitutionally protected. *See* Section B.2., above.

Finally, the Defendants' course of conduct does not serve any legitimate purpose. There was no ongoing legal dispute between Johnson and Mr. Joiner; it had been resolved years ago. Nor have Defendants offered any legitimate purpose behind their conduct, which includes posting videos with knowingly false statements, chanting expletives directed at Mr. Joiner (and posting videos of it), posting videos of Johnson brandishing firearms, trespassing and stalking Mr. Joiner at his private community, residence, and business, and publicizing not only Mr. Joiner's identity but also the location of his residence. These actions were taken to harass, coerce and intimidate Mr. Joiner and his family. Accordingly, the allegations are sufficient to support a harassment claim under Section 527.6.

**D.    Plaintiff's False Light Claim is Sufficiently Plead (Claim 10)**

1.    The Complaint Adequately Alleges False Statements

Defendants first assert Claim 10 fails because Plaintiff has not identified "the specific allegedly false statements at issue." This is certainly a selective reading. In fact, Defendants' false statements are alleged throughout the Complaint, and include statements in the published videos such as making "the same unfounded claims [Johnson] alleged in multiple courts, asserting that Bill Joiner 'stole' his home and ruined his life by 'falsifying a trustee's deed' and committing multiple violations of law," as well as public statements made by Callaghan, separate from the TMA and Callaghan Film, that "Nobody should steal a home, it's not right" and "after we get that home back from Bill Joiner…" (suggesting Mr. Joiner obtained the home unlawfully), that Mr. Joiner "gave an unfair loan. I think," and that Johnson "took a predatory loan from a shitty mortgage company prior to the 2008 financial crisis…" and got "done wrong" by Joiner. Compl., ¶¶ 59,[5] 70-71, 78, 82-83, 85. Notably, both the TMA and White Lives Matter videos published include Johnson's tirade of false accusations against Mr. Joiner, and yet, failed to dispel any of these known false statements. Instead, the C5 Defendants spent the rest of the video promoting their "tour." Compl. ¶70-73.[6]  The statements are sufficient to state a claim. Should the Court deem otherwise, leave should be granted to provide added specificity.

2.    Defendants' False Statements Are Not Protected Opinion

_____

[5] As set forth in Paragraph 59, in these court pleadings, Johnson accused Joiner of being a financial predator, recording fraudulent documents, violating state and federal laws, and trying to steal Johnson's home. *See also* ¶¶ 45, 47-48, and 63, regarding lawsuits alleging claims of wrongful foreclosure, unfair competition, and fraud.

[6] The TMA (Defendants' Exh. B) includes numerous other false and defamatory statements, including Mr. Joiner is "hiding," "he screws people, he definitely screwed me," "this guy's stealing homes," "violated 10 or 15 code sections." The word foreclosure is never even mentioned. Similar false statements are made in the White Lives Matter Video, including that Joiner falsified a trustee's deed with false representations, stole Johnson's home, "destroyed [his] family," "separated and devastated [his] family," and "destroyed [his] twenty-five-year business."

Defendants next argue the claim must fail because their statements[7] are "protected opinion." An "opinion," however, is not protected if it declares or implies a false assertion of fact. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-20 (1990); *Mireskandari v. Daily Mail and Gen. Trust PLC,* No. 12-02943, 2013 WL 12114762, at *22 (C.D. Cal. Oct. 8, 2013). In this case, as discussed by this Court in *Mireskandari*, a "reasonable [viewer] would understand that the statement[s] implied that plaintiff" falsified legal documents, was a predatory lender, or otherwise violated the law in taking Johnson's home. *Id.* Though, whether or not Joiner acted legally or falsified documents are facts that are susceptible of being proved true or false – and were in fact resolved in Mr. Joiner's favor by all of the Court's that considered the claims. And yet, at no point in either the White Lives Matter Video or the TMA do Defendants disclaim or dispel Johnson's false claims (presumably, they concluded the film would not have the same "entertainment value" or draw if they had done so).

As for the Callaghan Film, the C5 Defendants assert that there are "unmistakable indications" that the statements therein would not be taken as fact, as it "goes on to refute Johnson's views," calls them absurd, and includes an interview with an attorney who says Johnson is "cherry picking the fact…" However, Callaghan calls the allegation that Joiner "stole" Johnson's home "absurd" only in the context of purportedly writing an email to Mr. Joiner to solicit a meeting or interview – a scene that does not come until more than 46 minutes into the Film. The statement referenced at 59:11 (Motion, 15:18-19) was made by Johnson's wife, Shannon, not Callaghan. Nor does Callaghan's "interview" with an attorney occur until more than 54 minutes into the Film (which is only 84 minutes long), and they

---

[7] While the Motion frames it as "Johnson's statements," the false statements include both Johnson's falsities that are then repeated and broadcast by the C5 Defendants, and false statements by Callaghan.

discuss the loan from Mr. Joiner for only thirty seconds (Ex. A, 54:54-55:24[8]), while the remainder of the conversation relates to Johnson's disbarment and his vexatious litigant status. Given the totality of circumstances, that the statements about Mr. Joiner are false, and "because the publication could be deemed 'misleading' even if the court accepts defendants' version of the facts," the court should deny the Motion because Plaintiff has "demonstrated a probability that he could prevail on his false light claim." *Id.* at *23.

### 3. Defendants Are Not Protected by the Fair Report Privilege

To fall under the "fair report privilege," a publication or broadcast must be a fair and true report in, or a communication to [] a public journal of (A) a judicial, (B) legislative, or (C) other public proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued."

In this case, the privilege is inapplicable because Defendants, in their White Lives Matter Video, TMA, and the Callaghan Film, "do[] not report on, or even purport to report on, an official proceeding or a verified charge." *Mireskandari v. Daily Mail,* 2013 WL 12114762, at *21. Defendants' false statements, identified in Section B.1. above, cannot reasonably be determined to convey "the 'substance,' 'gist,' or 'sting' of the proceedings."[9] *Id.* at *21; *see also Hawran v. Hixson*, 209 Cal.App.4th 256, 281-82 (2012) (press release not a "report about the SEC proceeding or about statements made in the course of that proceeding"). In fact, the

---

[8] While this "interview" in Defendants' lodged version of the Film is relied on by Defendants, the majority of the conversation regarding Mr. Joiner and the loan was not included in the version of the Film shown in at least one other location. Plaintiff does not consent to the admission of Ex. B, but addresses it here out of caution.

[9] Contrary to Defendants' assertion, the question is not whether the statements in the videos are consistent with the statements made in the official proceeding (Motion, 16:22-24), but whether the videos are a report about the proceedings and the statements made there. They are not.

---

15

TMA and the White Lives Matter video make no mention at all of an "official proceeding," and instead publicize only Johnson's false statements, specifically name Mr. Joiner, and identify the community in which he lives (and yet, does not name Johnson in the TMA). "Because the essential basis for application of the 'fair report' privilege *(i.e. a report on an official proceeding)* is not present here…, the court cannot conclude that plaintiff has failed to [state a false light claim] because the publication he challenges is privileged." *Mireskandari v. Daily Mail,* at *21.

Similarly, the Callaghan Film is not published "for the purpose of 'explaining the basis and background of an official proceeding," such that the statements therein are not subject to the privilege. *Braun v. Chronicle*, 52 Cal.App.4th 1036, 1050 (1997). The film does not even mention the parties' litigation until almost an hour into the footage – at which point Callaghan spends less thirty second speaking with a lawyer. The lawyer mentions Johnson "filed a few other lawsuits," but by no means does the film delve into or explain the happenings or allegations (i.e. the substance or gist) in the foreclosure proceeding or other lawsuits. As with the TMA, without a basis of a report on an official proceeding, the privilege cannot apply.

## E. <u>Intentional & Negligent Infliction of Emotional Distress (Nos. 7, 8)</u>

### 1. <u>Negligent Infliction of Emotional Distress</u>

Defendants assert that the Complaint fails to allege Defendants owed a duty, but it provides: "Defendants and each of them were and are under duties to not expose Mr. Joiner to damages and/or future damages that have resulted and will result as a consequence of Defendants' unlawful actions." Motion, 17:20-21; Compl., ¶ 147.

The requisite duty may be imposed by law, assumed by the defendant, or exist by virtue of a special relationship. *Friedman v. Merck & Co.*, 107 Cal.App.4th 454, 465 (2003). Pursuant to Cal. Civil Code § 1714(a), "[e]veryone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person..." Cal. Civ. Code § 1714; *Lorenzo v. U.S.*, No. 09-1803, 2010 WL

11508278, at *4 (S.D. Cal. Oct. 21, 2010); *Friedman v. Merck & Co.*, 107 Cal.App.4th at 465, citing *Rowland v. Christian*, 69 Cal.2d 108, 112 (1968) ("In this state, the general rule is that all persons have a duty to use ordinary care to prevent others from being injured as the result of their conduct.").

The Court may look to a number of factors in determining whether a departure from this general rule is appropriate, including the foreseeability of harm, the degree of certainty that the plaintiff suffered injury, the connection between the defendant's conduct and the injury, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the burden to the defendant and consequences to the community of imposing a duty to exercise care. *Friedman*, 107 Cal.App.4th at 465, (citing *Rowland*, at 113). The foreseeability of harm "plays a very significant role in this calculus." *Friedman*, at 465.

> [A] court's task – in determining duty – is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may be appropriately imposed… To support a duty, foreseeability of harm must be reasonable... and sufficiently likely to arise from a given act... What is 'sufficiently likely' means what is 'likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.

*Id.* at 466 (citations omitted).

In this case, it was reasonably foreseeable that the category of conduct alleged, including publishing on the internet and in various theaters videos containing false and threatening statements, as well as identifying information, would cause the kind of substantial emotional distress Mr. Joiner and his family are alleged to have suffered. It is entirely appropriate under the circumstances that a duty may be imposed by law. However, to the extent the Court deems the allegations as to duty insufficient, Plaintiff respectfully requests leave be granted to amend the complaint.

2.    <u>Intentional Infliction of Emotional Distress</u>

Plaintiff's claim for IIED is sufficiently pled, as the allegations in the Complaint, all of which must be taken as true, assert i) outrageous conduct by the Defendants, ii) the Defendants' intention to cause or reckless disregard of the probability of causing emotional distress, iii) severe emotional distress, and iv) actual and proximate causation of the emotional distress.[10]

While a claim for IIED does not extend to "trivialities," the actions alleged, taken as true, are anything but trivial. A reasonable jury could conclude that "a recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" (Rest. 2d, Torts, Section 46 com. d., pp. 72-73); *Angie M. v. Sup. Ct.*, 37 Cal.App.4th 1217, 1226 (1995) ("Whether...alleged behavior is sufficiently extreme as to constitute 'outrageous' behavior is properly determined by the fact finder after trial" or possibly summary judgment); *Chavez v. Amerigas Propane, Inc.*, No. 12-07524, 2013 WL 25882, at *5 (C.D. Cal. Jan. 2, 2013). Accordingly, dismissal of such a claim on this ground is improper.

The element of severe emotional distress is also sufficiently alleged. "[I]n this context, 'severe' means substantial or enduring as distinguished from trivial or transitory. Severe emotional distress means, then, emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." *Fletcher v. Western Nat'l Life Ins. Co.*, 10 Cal.App.3d 376, 397 (1970). "The intensity and duration of the distress are factors to be considered in determining its severity." *Id.* It "may consist of any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry." *Id.* at 396 (testimony gave "rise to the inference" of substantial emotional distress and that a "jury could reasonably infer that plaintiff's worry and anxiety persisted for many months following defendant's

---

[10] The Motion does not dispute the second and fourth elements.

OPPOSITION TO MOTION TO DISMISS

letter…, during their continued recalcitrance").

The effects of Defendants' conduct on Plaintiff and his family are alleged throughout the Complaint. Plaintiff has been forced to endure Johnson's threats, harassment, baseless litigation, and public defamation **for more than a decade**, and now Johnson has collaborated with the C5 Defendants to continue his vendetta and bring his threats, stalking, harassment, and defamation to a public stage. *See, generally,* Compl., ¶¶ 2-8, 10, 17, 24, 40-64, 69-75, 78-83, 87-89; *see also* ¶ 59 (the Appellate Court found Johnson's conduct alone sufficient to cause substantial emotional distress that a reasonable person should not have to endure). Since learning of the TMA and that the film was teased as "Finding Bill Joiner," and viewing the various videos, Mr. Joiner has continued to suffer severe emotional distress over Defendants' admittedly continuing crusade to "get him," the videos that seek to vilify and scapegoat Mr. Joiner (still available online) and depict crowds chant expletives at him, and the film's impending national release (¶¶ 127-28).

Not only have Johnson and the C5 Defendants trespassed upon Mr. Joiner's private property to audio and video record, but the C5 Defendants' actions (including posting the TMA and initially titling the project "Finding Bill Joiner") have also caused third-parties, on at least two occasions, to stalk Mr. Joiner at his residence. Compl., ¶ 89. The Complaint explicitly alleges that Defendants' course of conduct has caused Mr. Joiner to "fear for his safety and the safety of his immediate family members," which includes minor children. Compl., ¶¶ 115-118, 127-128. These actions, which have occurred over a lengthy period and have caused Plaintiff to fear for the safety of his children, can certainly be deemed by a reasonable juror to constitute or infer "emotional distress of such substantial quantity or enduring quality that no reasonable man…should be expected to endure..."

Finally, Defendants attempt to rely on their "freedom of speech" in defending these claims, asserting such claims are barred when they concern "a subject of legitimate news interest" or "matters of public concern." Motion, 18:2-8, 13-16. Yet,

Defendants have failed to articulate exactly what is of "public interest" or public concern. A private dispute between Messrs. Joiner and Johnson is not a matter of public concern or of legitimate news interest. *See* Section B.2; *Sleep Hill Labs., Inc v. Moore*, *supra,* 2018 WL 1242182, at *5. In fact, there is no dispute that Mr. Joiner's actions were lawful and were adjudicated as such by various Courts. Nor does stating that the C5 Defendants run an "internet media company," calling themselves "journalists," or calling the Callaghan Film a "documentary" make the C5 Defendants' actions here "newsgathering" or transform Mr. Joiner or his dispute with Johnson into something that is a matter of public interest or concern.

Regardless, as in *Wolfson*, a reasonable jury could conclude that the actions alleged (stalking, harassing, etc.) could not reasonably advance (some unspecified) newsworthy goal or advance the policies underlying the First Amendment. *Wolfson*, at 1433. How is publicizing Mr. Joiner's real name and place of residence, attempting to locate and confront Mr. Joiner, trespassing and filming his community, residence (after dark) and place of business, and chanting expletives directed at Mr. Joiner to public audiences, possibly related to some legitimate newsworthy purpose or even the underlying story of Mr. Johnson? The foreclosure of Johnson's home is not "of concern to a substantial number of people," nor does publicizing the story make it a matter of public concern. *See Sleep Hill Labs., Inc*, 2018 WL 1242182, at *5; *Weinberg v. Feisel,* 110 Cal.App.4th at 1132. Indeed, the C5 Defendants have gone beyond any legitimate purpose, and joined Johnson's stalking and harassing Plaintiff in an attempt to "gather ammunition" for this private controversy. *Id.*

Separately, as to the argument that the claims fail because they are based on protected opinion (17:7-14), the argument fails for two reasons. First, the false statements are not protected opinion for the reasons set forth in Section D, above. And second, the claims as alleged are not so limited, and are based upon a broader course of conduct described above. The Motion must be denied.

### F.    <u>Invasion of Privacy & Intrusion Upon Seclusion (Claims 9 and 11)</u>

First, Defendants' Motion to dismiss Claims 9 and 11 improperly argues that the facts alleged in the Complaint are "speculative fiction." Motion, 20:9. Such argument is improper and ignores the standards governing Rule 12, i.e. accept all allegations as true and weigh all inferences in favor of Plaintiff. Defendants also include an improper assertion regarding the footage Defendants "did record," while at the same time refusing to engage in discovery or turn over *all* recorded footage. These allegations outside the pleadings must be disregarded by the Court.

Plaintiff can and has alleged a claim for intrusion upon seclusion, namely i) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person. *Shulman v. Group W Prods. Inc.*, 18 Cal.4th 200, 231-32 (1998). "To prove an actionable intrusion, the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surrounding…the plaintiff" and that plaintiff had a "reasonable expectation of seclusion or solitude in the place…" *Id.* at 232. Common law invasion of privacy requires one to plead i) a legally protected privacy interest, ii) a reasonable expectation of privacy, and iii) the intrusion is so serious as to constitute an egregious breach of the social norms such that the breach is highly offensive. *Hernandez v. Hillsides, Inc.*, 47 Cal.4th 272, 286 (2009); *Petrosyan v. Hurstedt*, 2014 WL 12967310, at *5 (C.D. Cal. Nov. 6, 2014) (there is a higher and significant expectation of privacy in one's home).

In this case, Mr. Joiner lives in a private residence with perimeter fencing along that back of the property, and that residence is located within a private, guarded and gated community. Compl., ¶¶ 1, 10, 59, 68, 71, 87, 90. His business "has a secured entrance that can only be opened by a key card system, or by a release function…by only authorized employees." Compl., ¶¶ 6, 90, 166. Mr. Joiner had and has a subjective and objectively reasonable expectation of privacy and seclusion in these locations.

As in *Shulman*, the "press" is not immunized from liability for torts or crimes committed "in an effort to gather news." *Shulman*, 18 Cal.4th at 236-37. Courts may consider "the extent to which the intrusion was, under the circumstances justified by the *legitimate motive of gathering the news*." *Id.* (emphasis added). However, the California Supreme Court went on to conclude that "the decisional law reflects a general rule of *nonprotection*: the press in its newsgathering activities enjoys no immunity or exemption from generally applicable laws" like the intrusion tort and Penal Code Section 632. *Id.* at 238-239 (emphasis original). "[N]o constitutional precedent or principle of which we are aware gives a reporter general license to intrude in an objectively offensive manner into private places, conversations or matters merely because the reporter thinks he or she may thereby find something that will warrant publication or broadcast."

This is not a case where Defendants filmed Mr. Joiner in public or filmed his home from a public street.[11] Rather, the manner in which Defendants intruded upon Mr. Joiner's privacy was highly offensive. The C5 Defendants, accompanied by Johnson, went to extreme and "psychotic lengths" (¶ 84). They "camouflaged themselves in ghillie suits, trespassed and infiltrated private property, crept into an area that provided a clear view of the residence, and lurked in the bushes while making the [audio and video] recordings." *See* Compl., ¶ 5, 10, 68, 168. The C5 Defendants also "video and audio recorded Mr. Joiner and others [including an employee] within his…place of business, after having "gained access [to it] under false pretenses." Compl., ¶¶ 6, 10, 90, 166. Defendants then published Mr. Joiner's name and the name of the private community where he lives. A reasonable person could and would likely conclude that trespassing and lurking behind one's home in ghillie suits after dark, and staking out and gaining unauthorized access to and

---

[11] Defendants' reliance on *Mark v. Seattle Times* is inapposite, as the opinion is by the Washington Supreme Court, applying Washington law, regarding defamation.

1   filming one's place of business and employee(s), is highly offensive.

2       Moreover, the C5 Defendants, have failed to articulate any justification

3   whatsoever for any subject of legitimate news interest or matter of public concern.

4   *See* Section B.2. In this case, a reasonable jury could find Defendants' actions

5   constituted an intrusion that was and is highly offensive to a reasonable person. *See*

6   *id.* at 237.

7       **G.**   **California Business and Professions Code § 17200 (Claim 12)**

8       Defendants argue that the claim is barred by the First Amendment because i)

9   this is not commercial speech and does not propose a commercial transaction, and ii)

10  there is no alleged business act. That is not so. The TMA is clearly a promotion of

11  Defendants' tour and encourages audiences to purchase tickets to the various

12  screenings of the Callaghan Film. Moreover, it is undisputed Defendants are using

13  the Channel 5 business, including the YouTube videos and TMA, to make money,

14  and have in fact made money in the nationwide showings of the film.

15      Regardless, "[c]ommercial speech that is false or misleading is afforded no

16  First Amendment protection at all." *Hoffman v. Cap. Cities*, 255 F.3d 1180, 1184

17  (9th Cir. 2011). In fact, untruthful speech, "commercial or otherwise, has never been

18  protected for its own sake." *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 953, 957 (2002)

19  (also concluding statements may be commercial notwithstanding the fact they also

20  discuss important public issues); *Dun & Bradstreet,* 472 U.S. at 762 (speech

21  concerning no public issue and is wholly false and clearly damaging warrants no

22  protection).

23      Defendants' reliance on *Sarver* is inapposite. There, the Circuit Court, in

24  making a conclusory statement (without any analysis) that *The Hurt Locker* was not

25  proposing a commercial transaction, was considering a claim for misappropriation of

26  the right of publicity for a film in which the subject was portrayed as "heroic," rather

27  than in a false light, a provably false way, or in a way that would be offensive to a

28  reasonable person. *Sarver v. Chartier*, 813 F.3d 891, 906-907 (9th Cir. 2016). So too

was the *Dora* Court. Defendants' argument regarding the merits of the false light claim is addressed in Section D, herein.

Finally, as to economic injury, Plaintiff is entitled to disgorgement of profits from Defendants under section 17200. "Section 17200 allows only disgorgement of profits, neither compensatory nor punitive damages are recoverable. *Dozier v. Maispace*, Case No.: C051761PVT, 2007 U.S. Dist. LEXIS 14540, *30-31 (N.D. Cal. 2007).

### H.    Leave To Amend Should be Granted

Moreover, in view of the Court's favor to decide cases on the merits rather than on the sufficiency of the pleadings, courts liberally apply the amendment rules to "afford plaintiff's [sic] at least one opportunity to cure pleading deficiencies before dismissing a case." *See Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 701 (9th Cir. 1988) (the standard for granting leave is generous). Courts generally do not dismiss technically deficient complaints; instead, a plaintiff should be given an opportunity to amend. Id. ("[L]eave to amend should be granted if it appears at all possible that the plaintiff can correct the defect."). Thus, if the Court finds the allegations in the Complaint are insufficient to state a claim, Plaintiff respectfully requests leave be granted to amend those claims.

### III.    CONCLUSION

Defendants' Motion fails logically and legally.  Based on the foregoing, Plaintiff requests the Court deny it.

Dated:  September 24, 2024                MURPHEY & MURPHEY, A.P.C.


                                    By:  ___*/s/ Meghan C. Murphey*___
                                         Meghan C. Murphey
                                         Kerry Moynihan
                                         Attorneys for Plaintiff William Joiner