**MURPHEY & MURPHEY**
A Professional Corporation
Meghan C. Murphey (SBN 259487)
meghan@themurpheylawyers.com
Matthew D. Murphey (SBN 194111)
matt@themurpheylawyers.com
Dennis J. Canty (SBN 207978)
dennis@themurpheylawyers.com
Kerry Moynihan (SBN 250571)
kerry@themurpheylawyers.com
120 Vantis Drive, Suite 300
Aliso Viejo, California 92656
Tel:  949.464.4540 Fax:  562.375.6674

Attorneys for Plaintiff,
WILLIAM JOINER

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM JOINER, an Individual,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW CALLAGHAN, an Individual; CHANNEL 5 LLC, a Washington Limited Liability Company; EVAN GILBERT-KATZ, an Individual; NICOLAS MOSHER, an Individual; KELLY SCOTT JOHNSON, an Individual; and DOES 1 through 200, Inclusive,<br><br>Defendants. | Case No.  8:24-cv-01160-CBM-KS<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1)  VIOLATION OF THE FEDERAL WIRETAP ACT [18 U.S.C. §§ 2511, 2520];**<br><br>**(2)  VIOLATION OF THE FEDERAL ELECTRONIC COMMUNICATIONS PRIVACY ACT [18 U.S.C. §§ 2510, 2520];**<br><br>**(3)  VIOLATION OF CALIFORNIA CIVIL CODE § 1708.7 (CIVIL STALKING);**<br><br>**(4)  VIOLATION OF CALIFORNIA CODE OF CIVIL PROCEDURE § 527.6 (HARASSMENT);**<br><br>**(5)  VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (PENAL CODE §§ 632, 637.2);** |

- 1 -

FIRST AMENDED COMPLAINT

**(6) DEFAMATION;**

**(7) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**

**(8) NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**(9) COMMON LAW INVASION OF PRIVACY;**

**(10) INVASION OF PRIVACY – FALSE LIGHT;**

**(11) INTRUSION UPON SECLUSION;**

**(12) VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 17200, *et seq.***

**[DEMAND FOR JURY TRIAL]**

For his complaint against defendants, and each of them, Plaintiff William Joiner alleges as follows:

INTRODUCTION

1.     This action is brought by a private individual (Plaintiff William Joiner, also known as "Bill Joiner") who has had his, his spouse's, and his children's health and personal safety put in grave and entirely unnecessary jeopardy. The defendants in this case spent at least two years stalking, surveilling, video recording, and audio recording Mr. Joiner, his family, his home residence, and his place of business, and created a film that they broadcasted at more than 38 theaters nationwide, as well as in Canada, and which is being sold for download to the public on a website owned and/or controlled by defendants. The film is based upon the false, non-sensical and mentally disturbed "story" of Defendant Kelly Scott Johnson, also known as "Kelly J. Patriot."

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

- 2 -

FIRST AMENDED COMPLAINT

2.    Johnson is a disbarred California lawyer who has more than a decade of experience bringing frivolous and vexatious litigation against Mr. Joiner.  Johnson has also made numerous personal threats against Mr. Joiner in emails sent over several years, including without limitation:

(a)    "Mr. Joiner needs to be careful what he wishes for.  As I also mentioned and as Mr. Joiner should be aware by now, he picked the wrong fight and the wrong person to fight with."

(b)    "On a related note, I wanted to mention and remind you that you are going to regret what you are doing and what you have done to my family for the rest of your life."

(c)    "Similarly, the longer you continue to try to steal my family's home, the more you are going to regret it and the more you will pay."

(d)    "I hope Mr. Joiner is happy and that he gets all that he is after .... and all that he deserves as I intend to make sure of that."

(e)    "I hope [Joiner] is happy as he will pay dearly for what he has wrongfully put our family through."

(f)    "I am surprised that Bill Joiner continues to jeopardize his livelihood and personal freedom by continuing to try to steal our family home through verifiable fraudulent recorded documents ... he will have his day and so will your firm."

(g)    "How can Mr. Joiner sleep at night having to constantly look over his shoulder ... not a good way to live your life as the Lord is also taking inventory of what is going on here. You are all warned."

(h)    "You will pay in a big way Bill .... I guarantee it!"

(i)    "I wanted to make sure that you saw my message below as your attorneys have claimed that you are scared….and you should be. You should be very concerned about the many repercussions you are facing for what you have done.  We have nothing to lose….how about you Bill??"

Murphey &
Murphey
A Professional
Corporation

FIRST AMENDED COMPLAINT

(j)     "As before, you are going down and the only question is when and how hard."

(k)     "[Joiner] will pay a price and it is just a matter of time."

(l)     Mr. Joiner will be "heading into his next ½ million in attorney's fees and costs…with no end in sight…"

(m)     To Mr. Joiner's counsel: "although you may be so-called 'going away', ... you are really not 'going away'… (ie. although you and Penelope might be sometime soon) as this case, my well-founded claims and the 'Truth' will follow you for the rest of your days on this earth, and until there is Justice! Hallelujah!"

(n)     To Mr. Joiner's counsel: "Overall, and just like your poor client, you can run, you can try to insulate yourself, but you can't hide, as I (and the OC Sheriff's Department/Process Servers) will also find you at your 'new firm' in order to serve the next lawsuit against your criminal client and his accomplices ...."

3.     For more than ten years, Johnson stalked and threatened Mr. Joiner. Johnson intensified his actions to the point that Mr. Joiner was required to obtain a civil restraining order against Johnson.  That order subsequently terminated in 2020.

4.     The lengthy history of Johnson's civil claims and defenses has been adjudicated by numerous courts in California, both state and federal, at trial and appellate levels.  Having lost all of this litigation, and after the Superior Court of California declared Johnson a vexatious litigant, Johnson has been barred from filing lawsuits against Mr. Joiner.  Nevertheless, Johnson teamed up with the other defendants in this action to do something more sinister and dangerous to Mr. Joiner and his family.

5.     Callaghan and Channel 5, LLC have consumed the false narratives fed to them by Johnson and created a motion picture with imminent plans to broadcast it nationwide.  Although promoted as an untitled film, Callaghan has previously stated publicly that the film is titled "Finding Bill Joiner" (in this Complaint, Plaintiff refers to the film as "the Callaghan Film").  In the Callaghan Film, Johnson and Callaghan are depicted wearing, among other things, ghillie suits, skulking in property behind Mr.

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

- 4 -

FIRST AMENDED COMPLAINT

Joiner's residence and videoing the dwelling and those inside of it.  Callaghan has publicly posted at least one photograph of himself with Johnson wearing these ghillie suits with the caption indicating that the two were on a "daring mission for revenge."

6.    The "preview" for the film also shows what appears to be Callaghan having gained access under false pretenses to Mr. Joiner's place of business, which is restricted by key card access.  All of the video and audio recordings of the film were made without Mr. Joiner's or his family's knowledge and without their consent.

7.    Also publicly available on YouTube are recorded videos of (i) a theater in Los Angeles, California, filled with individuals who attended Callaghan's previous live show previewing one of his films, chanting repeatedly in unison and with enthusiasm "Fuck Bill Joiner!" as Kelly Johnson is revealed on stage and joins the chant; and (ii) a theater in Portland, Oregon, also filled with Callaghan's fans, in which Callaghan himself shouts "Fuck Bill Joiner!" and the crowd again repeats the chants in response.

8.    The Callaghan Film presents a clear and present danger to Mr. Joiner and his family, has already damaged Mr. Joiner, and will gravely damage him and his family even further unless defendants are enjoined and restrained by this Court immediately.  It has already been shown publicly in at least 40 venues in North America and has been purchased from defendants' website by more than 38,000 people.  Callaghan has publicly stated that he is shopping the film to third-party streaming platforms such as Netflix, Hulu, and HBO, and attempting to have the Callaghan Film shown on such a platform.

PARTIES

9.    Plaintiff William Joiner, also known as "Bill Joiner" ("Mr. Joiner") is an individual who resides with his family in the County of Orange, State of California.

10.    Defendant Andrew Callaghan ("Callaghan") is an individual and a resident of Phoenix, Arizona.  At various times mentioned in this Complaint, Callaghan traveled from Arizona to Orange County, California to do many of the acts alleged herein, including (without limitation) surreptitiously trespass on private property and video and audio record Mr. Joiner, the exterior of his residence and parts of the interior of that

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

residence, as well as to trespass on Mr. Joiner's place of business while again surreptitiously recording video and audio of an employee of Mr. Joiner's company.

11.    Defendant Channel 5 LLC ("Channel 5") is a Washington limited liability company that has a place of business in Los Angeles, California.  Callaghan is the managing member of Channel 5.

12.    Defendant Evan Gilbert-Katz ("Gilbert-Katz") is an individual who, on information and belief, is a resident of the City of Los Angeles.  Gilbert-Katz is an agent, employee, officer, director, member and/or shareholder in Channel 5, and on information and belief, operated at least the cameras and sound equipment to make the unauthorized video and audio recordings herein alleged.

13.    Defendant Nicolas Mosher ("Mosher", and together with Callaghan, Channel 5, Gilbert-Katz, and DOES 61-101, the "Channel 5 Defendants") is an individual who, on information and belief, is a resident of the City of Los Angeles.  Mosher is an agent, employee, officer, director, member and/or shareholder of Channel 5.  On information and belief, Mosher operated at least the cameras and sound equipment to make the unauthorized video and audio recordings herein alleged.

14.    Defendant Kelly Scott Johnson is an individual with a currently unknown place of residence. Prior to being disbarred by the California Supreme Court, Johnson was a resident of Orange County, California.  The acts alleged herein that were carried out by Johnson also occurred in part within Orange County, California.

15.    The true names and capacities of defendants DOES 1 through 200, inclusive, whether individual, entity, partnership, association or otherwise, are presently unknown to Plaintiff, who therefore sues said defendants by such fictitious names.  Each fictitiously named defendant is responsible in some manner for the events alleged herein and is liable to Plaintiff for the damages he incurred.  Plaintiff will amend this Complaint to show the true names and capacities of each Doe defendant when the same has been ascertained.

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

FIRST AMENDED COMPLAINT

16.     Whenever reference is made in this Complaint to any act of any defendant(s), that allegation shall mean that each defendant acted individually and jointly with the other defendants. Any allegation about acts of any entity or juridical person means that the entity or juridical person acted as alleged through its officers, directors, members, employees, agents, brokers, and/or representatives while each was acting within the actual or ostensible scope of their authority.  The exact terms and conditions of the agency, representation, or employment relationship(s) are presently unknown to Plaintiff, but when such information is ascertained, Plaintiff will seek leave of Court to amend this Complaint accordingly.

17.     Plaintiff is further informed and believes that each defendant knew or realized that the other defendants were engaging in or planned to engage in the violations of law alleged in this Complaint.  Knowing or realizing that the other defendants were engaging in or planned to engage in the unlawful conduct alleged in this Complaint, each defendant nevertheless facilitated the commission of those unlawful acts.  Each defendant intended to encourage and did encourage, ratify, facilitate or assist in the commission of the unlawful acts alleged in this Complaint, and thereby aided and abetted the other defendants in the unlawful conduct.

18.     Upon information and belief, Plaintiff alleges that at all relevant times, defendants have engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this Complaint.  This conspiracy, common enterprise, and common course of conduct is/are continuing.  Plaintiff will amend this Complaint to more fully allege the scope and facts involving the conspiracy and common enterprise among the defendants.

JURISDICTION AND VENUE

19.     This Court exercises subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1331, as this Complaint presents at least two federal questions pursuant to the federal Wiretap Act and Federal Electronic Communications Privacy Act.  This Court exercises supplemental jurisdiction over the pendant state law claims pursuant to 28

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

FIRST AMENDED COMPLAINT

U.S.C. § 1367, as the state law claims are so related to the federal claims over which this Court expresses original jurisdiction that they form part of the same controversies alleged herein under Article III of the U.S. Constitution.

20.     This Court exercises personal jurisdiction over the parties to this action because the acts complained of in this Complaint occurred within Orange County, California, and the unlawful conduct engaged in by defendants were purposely aimed at Mr. Joiner, who resides within this judicial district.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), as the acts, omissions, and other occurrences alleged in this complaint all or almost all occurred within or emanated from Orange County, California.

FACTS COMMON TO ALL CAUSES OF ACTION

DEFENDANT KELLY SCOTT JOHNSON

22.     Johnson is well-known as a right-wing extremist and conspiracy theorist, who has publicly announced "Kobe Bryant was assassinated by the Clintons," that the Democrat party controls "the banking" and the Vatican, and that the COVID-19 vaccines contain pieces of metal and "creepy crawlers" that will cause kids to grow up with tails and animal hair.

23.     Johnson attended the January 6, 2021 attempted insurrection in Washington, D.C., and images of his attendance at the Capitol riot have since been published by Andrew Callaghan through, among other avenues, Callaghan's YouTube channel known as Channel 5.

24.     Johnson has also been seen in multiple videos since January 6, 2021 brandishing a .357 magnum handgun, and has stated on camera that he owns an assault rifle that he keeps in his car.

*a.     Johnson's Tortured History with The California State Bar*

25.     Johnson was admitted to practice law in California in 1988.  He was first brought up on disciplinary charges by the California State Bar on November 25, 2013.

MURPHEY & MURPHEY
A PROFESSIONAL CORPORATION

26.     In factual and legal findings to which Johnson stipulated, the State Bar found that Johnson engaged in twenty-one counts of professional misconduct involving seven different client matters, each of which Johnson stipulated caused "serious client harm and involved multiple acts of misconduct and that he failed to make restitution for the unearned fees he failed to refund."

27.     In yet another case, Johnson was referred to the disciplinary panel of the United States Bankruptcy Court, Central District of California.  In that case, Johnson represented a debtor in an individual bankruptcy proceeding.

28.     During his representation, Johnson advised his client that certain proceeds from the client's sale of his residence were not part of the bankruptcy estate, and that Johnson was in need of a "loan" that the client could provide to him.   Johnson ultimately misled his client into "loaning" him a total of $22,500.

29.     After determining that the proceeds from the sale of the client's home were not disclosed in the bankruptcy petition filed by Johnson on behalf of his client, the bankruptcy court issued an order to show cause why Johnson's client should not be held in contempt of court. Johnson advised his client that he did not have to appear in court on the date the court scheduled the hearing on this order to show cause, resulting in Johnson's client being held in contempt of court. Later in the proceedings, Johnson's client informed the bankruptcy court of all the foregoing facts.

30.     After learning these facts, the bankruptcy judge, who according to Johnson's client was "disgusted" with Johnson, found Johnson in contempt and in addition to referring him to the disciplinary panel, imposed monetary sanctions against him in the amount of $15,000.

31.     Johnson was suspended by the State Bar for two years and required to comply with certain conditions to be reinstated after serving that suspension.  Those conditions included, among other things, the requirement that Johnson pay the sanctions imposed by the bankruptcy court and repay the "loans" from his client.

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

- 9 -

FIRST AMENDED COMPLAINT

32. According to the court records, Johnson never repaid his client nor paid the ordered monetary sanctions, nor complied with other conditions imposed on him to avoid disbarment. Accordingly, after the expiration of the time period the State Bar imposed on him to comply with these conditions, the California Supreme Court ordered Johnson's disbarment.

JOHNSON'S LENGTHY HISTORY WITH BILL JOINER

a. *Mr. Joiner's Loan to Johnson*

33. Mr. Joiner had the unmitigated misfortune of being contacted by Johnson in 2007. Johnson came to Mr. Joiner searching for a second loan on his residence (the "Property"), which at the time appraised for $1,750,000, because he was unable to obtain traditional financing.

34. Mr. Joiner, through his family trust, provided a loan in the amount of $150,000 ("Loan"), with a monthly payment of $1,500, based on Johnson's written loan application claiming that he had an income of no less than $25,000 per month. Later, through the litigation process, it was discovered that Johnson lied about his income.

35. Johnson defaulted on the Loan starting in 2011. As a result, Mr. Joiner recorded a Notice of Default against the Property on June 16, 2011, after Johnson failed to make payments on his mortgage for six months.

36. Due to Mr. Joiner's efforts to reach a workout with Johnson through multiple forbearance agreements, a Notice of Trustee's Sale was not published until April 9, 2014, after Johnson once again failed to make payments on the Loan as agreed.

37. In order to stop the foreclosure sale, Johnson's then-wife, Shannon Johnson, filed two successive bankruptcy cases on the eve of scheduled foreclosure dates. The Bankruptcy Court found that the successive bankruptcy filings "were part of a scheme to hinder, delay, or defraud creditors" and granted Mr. Joiner relief from stay. The Property was then scheduled for a trustee's sale on March 20, 2015.

b. *Johnson and Mr. Joiner Execute a Settlement and Release Agreement*

38.     On March 18, 2015, Mr. Joiner and the Johnsons reached a settlement and release agreement ("Settlement Agreement"), whereby Mr. Joiner agreed to extend the foreclosure sale date, and Kelly Johnson agreed that the foreclosure was not improper in any respect.

39.     In the Settlement Agreement, the Johnsons admitted their defaults under the Loan and acknowledged the amounts owed.  The parties further agreed that unless Johnson reinstated the Loan on or before June 8, 2015, Mr. Joiner would have the right to proceed with the foreclosure sale under the pending Notice of Trustee's Sale on June 9, 2015.  Johnson did not reinstate the Loan.

c.     *The Foreclosure Sale and Unlawful Detainer Action*

40.     As agreed in the Settlement Agreement, and in accordance with California non-judicial foreclosure requirements, Mr. Joiner foreclosed on the Property on June 9, 2015.  After the Johnsons refused to vacate the Property, on June 25, 2015, Mr. Joiner commenced unlawful detainer proceedings against the Johnsons in Orange County Superior Court ("OCSC"), Case No. 30-2015-00795549-CL-UD-HNB ("UD Action").  The court in the UD Action granted Mr. Joiner's motion for summary judgment and entered judgment in favor on Mr. Joiner on September 22, 2015 ("UD Judgment").

d.     *Johnson's Multiple Failed Appeals in the UD Action*

41.     Johnson immediately appealed the UD Judgment to the Appellate Division of the OCSC, Case No. 30-2015-00812401-CL-UD-CJC (the "First UD Appeal").  Johnson then sought and was granted a stay of enforcement of the UD Judgment pending appeal, on the condition that he make monthly payments of the reasonable rental value for the home.

42.     After Johnson failed to make the required payments, the court in the UD Action lifted the stay and ordered final lockout to occur no earlier than October 15, 2016.  Johnson appealed that order as well, commencing Case No. 30-2016-00881714 ("Second UD Appeal").  To prevent eviction, however, Johnson again filed for bankruptcy protection, forcing Joiner to obtain relief from stay to proceed.

Murphey & Murphey
A Professional Corporation

FIRST AMENDED COMPLAINT

43.     Thereafter, in December 2016, Johnson applied once again for an order staying the eviction pending his appeals.  On January 4, 2017, the court in the UD Action granted a stay of eviction until January 29, 2017, but stated in the order that no further stays would be granted.  Johnson appealed that order as well, commencing Case No. 30-2017-00898514 ("Third UD Appeal").

44.     After extensive briefing and oral argument, the appellate division of the Orange County Superior Court issued an opinion in the First UD Appeal on November 6, 2017, affirming the UD Judgment in full.  The Second UD Appeal was dismissed as moot and the Third UD Appeal was dismissed for Johnson's failure to prosecute the case.

e.     *Johnson's Relentless Litigation and Delay Tactics*

i.     Wrongful Foreclosure Action

45.     On June 8, 2015, the day before the foreclosure sale, Johnson filed an unlimited civil action in OCSC against Mr. Joiner, among others (the "Wrongful Foreclosure Action"), making many of the same allegations he made in the UD Action and continues to make to this day.

46.     After years of dragging out the litigation, Johnson dismissed the Wrongful Foreclosure Action without prejudice.  Johnson's request for dismissal was filed on the last business day before the February, 2019 trial was to commence, and on the eve of the court's consideration of Joiner's motion for terminating sanctions and motion in limine seeking to bar relitigation of the issues decided in the UD Judgment.

ii.     Unfair Competition Action

47.     Johnson filed a second action in OCSC in 2016, Case No. 30-2016-00870569 ("Unfair Competition Action"), in which he named not only Mr. Joiner as a defendant but his wife and his attorneys as well.

48.     In the Unfair Competition Action, Johnson alleged that Mr. Joiner and his attorneys had engaged in unfair competition, including allegations that can be found verbatim in many of the other actions and pleadings filed by Johnson.

49.     Judgment was also entered in the Unfair Competition Action in favor of Mr. Joiner and his counsel, and against Johnson, in March 2017.

iii.     Third Bankruptcy Filing and Related Adversary Proceeding

50.     After the court in the UD Action lifted the stay of enforcement in September 2016, the Johnsons filed bankruptcy for a third time, on the eve of the October 15, 2016 lockout, in order to block their eviction and remain in the home rent-free.  The Trust moved for and obtained relief from stay to proceed with eviction in December 2016.  Johnson appealed the relief from stay order to the United States District Court for the Central District of California ("Relief From Stay Appeal"), and his appeal was denied in an order issued November 15, 2017.

51.     In an adversary proceeding in the third bankruptcy case, after the Johnsons disregarded multiple court orders, the bankruptcy court struck their answer and entered their default, noting that "[n]oncompliance with these Court orders occurred because of neglect, obstinacy and anger at [Mr. Joiner]…."  The Court further found: "What occurred here, in a very brief summary, is the flouting and disregard of four separate and very explicit oral and written warnings given by the Court coupled with material noncompliance with the Court's Scheduling Order and Third Warning and Continuance Order and Fourth Warning over a period of about three months."

52.     The bankruptcy court thereafter entered a non-dischargeable judgment against the Johnsons in the amount of $364,424.11.  Johnson unsuccessfully appealed that judgment to the District Court.

53.     Despite his absolute right to do so, Mr. Joiner has never taken any steps to attempt to enforce that judgment.

f.     *Johnson Is Finally Evicted and the Property Sold*

54.     After the bankruptcy court granted relief from stay, the Johnsons filed numerous additional ex parte applications to stay enforcement of the UD Judgment, and the court in the UD Action allowed the Johnsons additional time to vacate the Property.

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

55.     The court ultimately ordered a final lockout date of February 1, 2017, and after years of delay tactics and use of the Property legally belonging to Mr. Joiner, the Johnsons were finally evicted by the sheriff and Mr. Joiner was able to gain possession of the Property.  More than a year later, Joiner sold the Property to unrelated purchasers, who were reportedly harassed by Johnson at the Property soon thereafter.

g.     *Joiner Obtains a Restraining Order Against Johnson and Johnson Unsuccessfully Appeals.*

56.     After enduring years of threats and harassment by Johnson, Mr. Joiner sought and obtained a restraining order against Johnson on October 17, 2017.

57.     Mr. Joiner detailed in his declarations the numerous threats he had received from Johnson over the course of years, Johnson's activity in posting derogatory flyers about Joiner all over Joiner's community, Johnson's attempts to contact Mr. Joiner's children, and the video footage from his security cameras that showed Johnson peering into his home at 1:30 a.m., among other things.  Joiner's counsel also submitted a declaration demonstrating further threats and harassment by Johnson, including Johnson's email statements set forth in paragraph 2 above.

58.     Based on these declarations, and the testimony of Mr. Joiner at the hearing, the court entered a Civil Harassment Restraining Order requiring Johnson to remain at least 500 feet away from Mr. Joiner and his family.

59.     Johnson appealed the entry of the restraining order against him in Case No. G055764, and the Court of Appeals issued an unpublished decision affirming the restraining order in full.  The appellate court noted in its decision:

> Johnson's hostile behavior would cause a reasonable person to suffer substantial emotional distress. Johnson started with e-mails to Joiner and Joiner's counsel, accusing Joiner of fraud and perjury. In his e-mails, he stated Joiner was going to get "all that he deserves" and regret what he had done to Johnson's family. He posted flyers with derogatory statements about Joiner, accusing him of being a financial predator, recording fraudulent documents, violating state and federal laws, and trying to steal Johnson's home. On two occasions, he accessed Joiner's private community without permission and posted these flyers. In one instance, he

FIRST AMENDED COMPLAINT

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

came onto Joiner's property and was seen on video surveillance walking up to and around Joiner's house, attempting to look over the gates and into the house in the middle of the night. Even after the temporary restraining order was issued, Johnson returned to Joiner's home and videoed Joiner's back fence, pausing at the access points. . . . The totality of Johnson's conduct would cause a reasonable person nontrivial distress and mental anguish that should not have to be endured.[1]

h.    *Johnson Files Another Lawsuit against Mr. Joiner and Others and Is Declared a Vexatious Litigant*

60.    On June 10, 2019, Johnson filed another lawsuit against Joiner in OCSC, Case No. 30-2019-01075365-CU-BT-CJC ("2019 Case"), repeating the same allegations contained in his previous lawsuits, and this time including the bona fide purchasers of the Property, in addition to Mr. Joiner's attorneys.

61.    As a gesture of goodwill, Mr. Joiner agreed to cover all legal expenses for the bona fide purchasers of the Property, and his counsel filed demurrers on behalf of all parties, which resulted in dismissal of the action. Mr. Joiner also filed a motion for an order declaring Johnson to be a vexatious litigant and for a pre-filing order requiring that Johnson seek permission of the presiding judge before instituting any court proceedings in the State of California.  Mr. Joiner's motion was granted in its entirety.

i.    *Despite Having Been Declared a Vexatious Litigant, Johnson Files Three Unsuccessful Appeals without Permission of the Presiding Judge and Another Lawsuit in the Name of His Daughter*

62.    Following the court's finding that Johnson is a vexatious litigant, Johnson commenced three separate appeals from orders entered in the 2019 Case, all of which were summarily dismissed.

63.    On May 19, 2022, Johnson once again sued Mr. Joiner, again alleging fraud and wrongful foreclosure, among other things, but this time Johnson used his daughter Kaylee Johnson as the named plaintiff.

---

[1] See *Joiner v. Johnson*, Case No. G055764, 2019 Cal. App. Unpub. LEXIS 7607 at *13 (Nov. 18, 2019), also found at: https://casetext.com/case/joiner-v-johnson-5

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

FIRST AMENDED COMPLAINT

64.    The court found that the use of his daughter's name as plaintiff was a ruse to attempt to evade the vexatious litigant pre-filing order and dismissed the lawsuit based on that order.

DEFENDANT ANDREW CALLAGHAN

65.    Callaghan claims to be a documentarian who started YouTube's Channel 5 and directed the HBO documentary known as "This Place Rules."  Callaghan has publicly identified himself as a "guerilla journalist."

66.    Callaghan resides in Phoenix, Arizona and is a principal/member of three entities, including Andrew Callaghan LLC, Social Studies, LLC, and Channel 5, LLC.

67.    Callaghan traveled from his residence in Arizona to California and other states to create the video recordings that are collectively intended to harass and intimidate Mr. Joiner, his spouse and his minor children.

68.    Callaghan traveled from Arizona to California to surveille Mr. Joiner at his home and his place of business.  Callaghan is also depicted in a ghillie suit with Johnson on private property that adjoins Mr. Joiner's property and residence.

COORDINATED CONDUCT BY JOHNSON AND CALLAGHAN

69.    On May 6, 2024, Callaghan and Channel 5 released a video entitled "Tour & Movie Announcement," in which they broadcast the impending release of a new documentary stemming from a "secret project" Callaghan has been working on for years, dedicated to "locating and confronting the arch nemesis" of an interview subject he reveals later in the video.

70.    The video reveals the interview subject to be defendant Johnson, and the "arch nemesis" for whom Callaghan and Johnson hunted to be Mr. Joiner.  In this video, Callaghan allows Johnson to rail unfettered against Mr. Joiner, repeating the same unfounded assertions Johnson alleged in each of his legal pleadings, all of which were found to be unsupported by every court that has touched this controversy.  Johnson is also pictured wearing Channel 5 merchandise and in front of a Channel 5 marked van brandishing a firearm.

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

FIRST AMENDED COMPLAINT

71. Johnson holds up a sign at multiple times in the video that states in bold letters "Bill Joiner Stole Our Home" and includes the name of the city and community in which Mr. Joiner resides. The video also shows Johnson outside the gates of that community, clearly identifying the community in which Mr. Joiner and his family reside.

72. Callaghan is also shown inside Mr. Joiner's office, with depictions of areas in the office that are accessible only with an authorized key card.

73. The latter half of the video is dedicated to Callaghan's announcement of a North American Tour, in which the untitled documentary will be shown in theaters in 38 different locations, accompanied by live questions and answers with Callaghan at the screening.

74. According to third parties that attended Callaghan's Channel 5 live show tour in November and December 2022, a preview of the upcoming allegedly untitled documentary was shown to the live audience, and it was revealed that the film was to be titled "Finding Bill Joiner." Callaghan also confirmed this title in a statement online in November 2022.

75. After a friend contacted Mr. Joiner and told him about the Tour & Movie Announcement video the friend saw advertised on social media, Mr. Joiner's investigation began. Further online research revealed that Callaghan and Johnson have had an ongoing personal and professional relationship since at least April 11, 2021, when Callaghan claims to have met Johnson at a White Lives Matter Rally that Callaghan filmed and later released footage from on Channel 5.

76. From that time forward, Johnson takes on the name "Kelly J. Patriot" and appears in several Channel 5 videos, including "Hollywood Antivax Rally" and "Q Shaman Comes Home," in which it is claimed that Johnson arranged for Callaghan to have the first interview with Jacob Chansley, aka the Q-Anon Shaman, after Chansley's release from prison.

77. This claim is belied, however, by another of Callaghan's Channel 5 videos, "Q Shaman Prison Interview," in which Callaghan states to Chansley while he is still in

- 17 -

prison: "I have this friend named Kelly [Johnson] who I was telling you about that we're making a documentary on and yeah, I kind of want you to meet him."  It is clear that Callaghan had a relationship with Chansley before he left prison and before Chansley was introduced to Johnson.

78.    In Callaghan's video of the White Lives Matter Rally in April 2021, Johnson is shown spouting the same unfounded claims he alleged in multiple courts, asserting that Bill Joiner "stole" his home and ruined his life by "falsifying a trustee's deed" and committing multiple violations of law, all of which was decisively rejected by every court that analyzed the records in the various cases litigated between Johnson and Mr. Joiner.

79.    Since that time, Johnson and his obsession with Mr. Joiner, who Johnson scapegoats as having destroyed his life, have garnered substantial attention and internet traffic from viewers of Channel 5.

80.    Comments on Callaghan's "White Lives Matter Rally" video seek to vilify Mr. Joiner, and attendees at a previous live show put on by Callaghan are shown enthusiastically chanting "Fuck Bill Joiner!" for a lengthy segment of the show.  The videos of the live show reveal that defendant Johnson is actually one of the performers on the stage, as he joins in with the crowd chants.

81.    While it at first appeared that Callaghan was simply reporting on the story of Kelly Johnson, it is clear that at some point the two became close and Callaghan has taken on Johnson's crusade against Mr. Joiner as his own.

82.    Callaghan himself is shown reciting the same mantra at a show in Portland in November, 2022, promising the crowd that he will return "after we get that home back from Bill Joiner, we're gonna FUCK BILL JOINER!" The crowd then chants in response: "Fuck Bill Joiner!"

83.    Callaghan goes on: "Nobody should steal a home, it's not right."  An audience member then asks a clarifying question, and in response, Callaghan states:  "We know some things about Bill Joiner, that's for sure. [H]e didn't actually steal the home if

that's what you're asking, but he gave an unfair loan. I think. We'll figure more out in time. We've staked out his corporate office, we've gone to psychotic lengths to identify and find him but uh yeah, no Bill yet. We'll get him. It's a work in progress."

84.    Later in the same live segment, Callaghan confirmed his inability to separate himself from his work:

Audience member: "As y'all are getting more and more popular, do you find it harder to stay like in character, is that line getting blurred?"

Callaghan: "I think the line between character and me is the one that's getting blurred, you know what I mean? I'm just becoming the guy, you know, but whereas before I was like 'Suit Man / Regular Guy,' now it's all just one blend. It's why I don't wear the suit anymore and why the mic is so small. So yeah, it was hard for a bit and then you just become that guy. You become a magnet for people you necessarily wouldn't want to talk to in a previous life."

85.    In December 2021, Callaghan was quoted as saying:

This one guy that we document a lot is named Kelly Johnson, aka SoCal Kelly, aka Kelly J Patriot. He was at January 6th, and he's the most hardcore Trump soldier there is. He fell down the rabbit hole because he took a predatory loan from a shitty mortgage company prior to the 2008 financial crisis. I'm sure there are people who are just fucked in the head. But a lot of these people, they did get done wrong by someone."

86.    Callaghan has even had Johnson act in a promotional video he released to advertise his Channel 5 merchandise.   In another Channel 5 video, entitled "Patriotism, Tattoos, and being a Shaman," Callaghan states in the video description "Special thank you to Bert and Kelly J. Patriot for making this possibly [*sic*] – they're great people and excellent sources. Check them out:  https://Forbiddentruthpodcast.com https://t.me/forbiddentruth."

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

FIRST AMENDED COMPLAINT

87.    The close connection between Callaghan and Johnson is great cause for concern, given Callaghan's substantial YouTube and social media audience, his apparent willingness to stalk Mr. Joiner and trespass on private property in search of him, and his intent to release a film dedicated almost entirely to Johnson's crusade to destroy Mr. Joiner without cause.

88.    Johnson once promised in various emails to Mr. Joiner: "you are going down and the only question is when and how hard," "I hope [Joiner] is happy as he will pay dearly for what he has wrongfully put our family through," and "you will pay in a big way Bill .... I guarantee it!"  Callaghan has now provided Johnson the platform to make his threats a reality, and to incite further aggression against Mr. Joiner and his family.

89.    As the Callaghan Film got closer to premiere and Mr. Joiner's name was further broadcast on the World Wide Web, more individuals returned to stalk his residence and his family. Mr. Joiner has security video footage of at least two individuals stalking his residence from the rear of the property and using binoculars to observe the residence before sunrise within the week prior to the filing of this action.

90.    In his home and in his place of business, Mr. Joiner had reasonable expectations of privacy.  His home is not open to the public and is indeed situated within a gated community that restricts access to non-invitee third parties.  There is also perimeter fencing along the back of the property on which his residence is placed.  Similarly, Mr. Joiner's place of business has a secured entrance that can only be opened by a key card system, or by a release function that allows the doors to be unlocked from a distance by only authorized employees.

CHANNEL 5 DEFENDANTS HIRE A LAWYER TO THREATEN MR. JOINER

91.    On May 30, 2024, Mr. Joiner's counsel received a letter from a lawyer named "Abigail B. Everdell" that is in "response" to Mr. Joiner's demand letter of May 23 to the various venues that have advertised showing of the Callaghan Film.

92.    In her letter, Ms. Everdell admits that "[w]hile the film has not yet been finalized," she wished to explain that the Callaghan Film is actually *not* a threat to Mr.

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

- 20 -

FIRST AMENDED COMPLAINT

Joiner, and that Mr. Joiner had completely missed the point of what the "not yet . . . finalized" film is about.

93.     According to Ms. Everdell, "[i]n the [Callaghan] Film, Mr. Callaghan probes Mr. Johnson's vendetta against Mr. Joiner . . ."  Again, according to Ms. Everdell, " . . . the [Callaghan] Film does *not* adopt or encourage Mr. Johnson's beliefs about Mr. Joiner.  In fact, the Film does the opposite." [Emphasis in original].

94.     With respect to Callaghan's recorded and broadcast statements to a crowd of people at a theater in Portland, Oregon, including Callaghan's statement: "after we get that home back from Bill Joiner, we're gonna FUCK BILL JOINER!" with the crowd chanting in response: "Fuck Bill Joiner!," Ms. Everdell explains that "[T]hese chants shown in these videos were not sincerely directed at Mr. Joiner . . ."

95.     Rather, according to Ms. Everdell, the chants merely "reflected the audience's affection for a unique character – Mr. Johnson – who figured in some of Mr. Callaghan's prior videos."  Ms. Everdell does not identify any portion of the "not yet . . . finalized" Callaghan Film that shows the audience's chants of "Fuck Bill Joiner!" were not a threat toward Mr. Joiner, but simply a display of "affection" to a person not named in the chants.  Ms. Everdell also refers to the chants directed and encouraged by Callaghan as "off-the-cuff statements."

96.     With respect to the video evidence of Callaghan and Johnson surveilling Mr. Joiner's property shown in the preview for the Callaghan Film, which Johnson's stalking and surveilling has previously been adjudicated by the California Court of Appeals as "hostile behavior [that] would cause a reasonable person to suffer substantial emotional distress . . . [,]" according to Ms. Everdell, ". . . the reality [of the surveillance] was hardly cause for concern[.]"

97.     Again, according to Ms. Everdell, in "reality," Callaghan "pantomimed 'surveillance' with Mr. Johnson dressed in a ghillie suit."

MURPHEY & MURPHEY
A PROFESSIONAL
CORPORATION

FIRST AMENDED COMPLAINT

98.    Moreover, according to Ms. Everdell, Callaghan and Johnson were in the vicinity of Mr. Joiner's house when they "pantomimed" surveillance in ghillie suits, but did not film "Mr. Joiner's house specifically, to Mr. Callaghan's knowledge[.]"

99.    Here, however, is where Ms. Everdell's emendations of the "not yet . . . finalized" Callaghan Film stop and the threats begin.

100.    Apparently unaware of California Civil Code section 47(b) and the common law litigation privilege, Ms. Everdell claims that Mr. Joiner's demand letter to the venues that advertised upcoming broadcast of the Callaghan Film, is a "threatening letter[ ] citing inaccurate facts and baseless legal claims in an intentional attempt to cause the Venues to stop performance of their obligations . . ."

101.    Ms. Everdell then states "[t]o the extent your client is successful in his efforts to induce the Venues to violate their contracts, he will be liable for the financial consequences."

102.    While certainly not the most egregious threat (of the innumerable threats already made by Callaghan and Johnson to Mr. Joiner, and admittedly not an actionable threat, but included here solely for context and background), the continuing threats issued by Callaghan and Johnson demonstrate that defendants have no intention of desisting from broadcasting and selling the Callaghan Film.

PUBLICATION OF THE CALLAGHAN FILM

103.    Beginning on June 9, 2024 and continuing through at least July 30, 2024, the Channel 5 Defendants published the Callaghan Film in various venues throughout North America and sold admission to see the Callaghan Film to the public.

104.    On January 15, 2025, the Channel 5 Defendants published the Callaghan Film, in an altered state as compared to the Callaghan Film shown in venues over the summer of 2024, on a website owned and/or controlled by the Channel 5 Defendants – www.dearkellyfilm.com – where it was and continues to be available to rent for $5.55 or to purchase for $15.55.  According to Callaghan, sales and rentals of the Callaghan Film grossed $100,000 just in the opening weekend.

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

FIRST AMENDED COMPLAINT

105.    The Channel 5 Defendants also showed the Callaghan Film to live audiences once again, in January and February 2025, in at least Huntington Beach, CA, New York, NY, and Tijuana, Mexico.

106.    Despite their awareness of the damages the Callaghan Film and the Tour & Movie Announcement caused Mr. Joiner in 2024, the version of the Callaghan Film released to the public on January 15, 2025 continues to not only portray Mr. Joiner in a false light and elicit and publish false and misleading statements about Mr. Joiner, it also has a new ending designed to incite further public vitriol towards this private individual who multiple state and federal courts have found committed no wrongdoing.  The last audible words of the 2025 Callaghan Film, shouted by one of Channel 5's star characters, are "Fuck Bill Joiner!" followed by text explaining to the audience the existence of this lawsuit, that Mr. Joiner promised to dismiss the lawsuit if the Channel 5 Defendants refrained from publishing the Callaghan Film, and that the Channel 5 Defendants defiantly "dropped it anyway."

107.    The 2025 Callaghan Film incited renewed interest in Mr. Joiner's personal life and renewed public discourse online about his character and threats to his safety.  In addition to the countless comments and posts online containing the words "Fuck Bill Joiner" or #fuckbilljoiner, viewers of the film have published statements such as: "I'd smoke Bill on sight;" "Bill Joiner I'm coming for you even if Kelly isn't;" "Bill Joiner needs to be taken down;" and "Bill Joiner (domestic terrorist)".

108.    Mr. Joiner and his family have been harassed and mocked by peers as a result of the 2025 Callaghan Film and continue to live in fear for their safety.

## FIRST CLAIM FOR RELIEF

(VIOLATION OF THE WIRETAP ACT [18 U.S.C. §§ 2511, 2520])

(Against All Defendants)

109.    Plaintiff realleges and incorporates all facts stated above in this claim for relief.

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

FIRST AMENDED COMPLAINT

110.   Defendants' surreptitious recordings of Plaintiff as alleged herein violate Title 18, United States Code, section 2511, subsection (1), subparts (a), (c), (d) and/or (e).

111.   Defendants DOES 1-50, by publicizing and broadcasting the Callaghan Film, after being fully informed of the facts surrounding the Callaghan Film, continued to publicize and broadcast the Callaghan Film, despite previous demand, and thereby aided and abetted their co-defendants' unlawful actions.

112.   Pursuant to Title 18, United States Code, section 2520, subsection (a), Plaintiff may bring a private civil action for violation of section 2511, subsection (1), subparts (a), (c), (d) and/or (e), entitling Plaintiff to equitable relief, declaratory relief, damages pursuant to section 2520, including actual damages and/or statutory damages of $100 per day that each violation occurs and continues to occur, or $10,000.

113.   Plaintiff is also entitled to an award of reasonable attorney's fees pursuant to section 2520, subsection (b), subpart (3).

## SECOND CLAIM FOR RELIEF

(VIOLATION OF FEDERAL ELECTRONIC COMMUNICATIONS PRIVACY ACT

[18 U.S.C. §§ 2510, 2520])

(Against All Defendants)

114.   Plaintiff realleges and incorporates all facts stated above in this claim for relief.

115.   Defendants' surreptitious recordings of Plaintiff, Plaintiff's family members, and/or Plaintiff's employee at his residence and/or private office are prohibited by the Electronic Communications Privacy Act, Title 18, United States Code section 2510, *et seq*.

116.   Specifically, Title 18, United States Code, section 2510, subsection (2), (4), (5) and (18) prohibit defendants' intentional interceptions and/or attempts to intercept Plaintiff's and/or his employee's oral communications.

117.   Defendants DOES 1-50, by publicizing and broadcasting the Callaghan Film, after being fully informed of the facts surrounding the Callaghan Film, continued to

publicize and broadcast the Callaghan Film, despite previous demand, and thereby aided and abetted their co-defendants' unlawful actions.

118.   Pursuant to Title 18, United States Code, section 2520, subsection (a), Plaintiff may bring a private civil action for violation of section 2510, entitling Plaintiff to equitable relief, declaratory relief, damages pursuant to section 2520, including actual damages and/or statutory damages of $100 per day that each violation occurs and continues to occur, or $10,000.

119.   Plaintiff is also entitled to an award of reasonable attorney's fees pursuant to section 2520, subsection (b), subpart (3).

## THIRD CLAIM FOR RELIEF

(VIOLATION OF CALIFORNIA CIVIL CODE § 1708.7 [CIVIL STALKING])

(Against All Defendants)

120.   Plaintiff realleges and incorporates all facts stated above in this claim for relief.

121.   Defendants' actions as herein alleged demonstrate a pattern of conduct by defendants and their intent to follow, alarm, place under surveillance and/or harass Mr. Joiner.

122.   The result of defendants' actions have caused Mr. Joiner to reasonably fear for his safety and the safety of his immediate family members.  Based on the impending release of the Callaghan Film, Mr. Joiner continues to reasonably fear for his safety and the safety of his immediate family

123.   Mr. Joiner has suffered and continues to suffer substantial emotional distress as a result of defendants' pattern of conduct, defendants' conduct would cause a reasonable person to suffer substantial emotional distress.

124.   Defendants, as part of their pattern of conduct, have made a credible threat to Mr. Joiner's safety and/or the safety of at least one of his immediate family members through their intentional creation and publication of the Callaghan Film and/or parts

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

- 25 -

thereof, and/or in reckless disregard for Mr. Joiner's and/or his spouse's or children's safety.

125. Plaintiff has demanded by written correspondence dated May 23, 2024 and thereafter, served by overnight courier, that clearly and definitely demanded that defendants, and each of them, cease their actions in stalking Mr. Joiner and his immediate family, to not use the recordings and other information on Mr. Joiner and his family that was the product of defendants' stalking, and to cease publication of the Callaghan Film.

126. Defendants DOES 1-50, by publicizing and broadcasting the Callaghan Film, after being fully informed of the facts surrounding the Callaghan Film, continued to publicize and broadcast the Callaghan Film, despite previous demand, and thereby aided and abetted their co-defendants' unlawful actions.

127. As a result of defendants' unlawful actions, Mr. Joiner is entitled to an award of general damages, special damages, and punitive damages pursuant to California Penal Code section 1708.7, subsection (c), as well as equitable relief that includes provisional and permanent injunctive orders.

### FOURTH CLAIM FOR RELIEF

(VIOLATION OF CALIFORNIA CODE OF CIVIL PROCEDURE § 527.6 [HARASSMENT])

(Against All Defendants)

128. Plaintiff realleges and incorporates all facts stated above in this claim for relief.

129. Defendants' conduct as alleged herein constitutes a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following and/or stalking Mr. Joiner.

130. Defendants' course of conduct was and is knowing and willful, and specifically directed at Mr. Joiner and his immediate family.

131. Defendants' course of conduct has and will continue to seriously alarm, annoy and harass Mr. Joiner and his family.

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

FIRST AMENDED COMPLAINT

132.    Defendants DOES 1-50, by publicizing and broadcasting the Callaghan Film, after being fully informed of the facts surrounding the Callaghan Film, continued to publicize and broadcast the Callaghan Film, despite previous demand, and thereby aided and abetted their co-defendants' unlawful actions.

133.    Defendants' actions have caused Mr. Joiner to suffer substantial emotional distress, as a reasonable person would reasonably suffer under the same circumstances.

134.    Mr. Joiner has actually suffered substantial emotional distress because of defendants' actions, and continues to suffer emotional distress due to the release of the Callaghan Film.

135.    Mr. Joiner is therefore entitled to injunctive relief from this Court that enjoins and restrains defendants from further committing acts of harassment toward Mr. Joiner, in addition to an award of reasonable attorney's fees pursuant to Code of Civil Procedure section 527.6, subsection (s).

### FIFTH CLAIM FOR RELIEF

(VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT [CALIFORNIA PENAL CODE §§ 632, 637.2])

(Against All Defendants)

136.    Plaintiff realleges and incorporates all facts stated above in this claim for relief.

137.    Defendants, and each of them, on multiple occasions eavesdropped on confidential communications that were had within Mr. Joiner's residence and place of business by, among other things, video and audio recording the curtilage and the interior of the home and the persons within it, and Mr. Joiner's place of business.

138.    The communications Mr. Joiner had with family members and others were private, confidential, and not intended for others who were not within the residence or the curtilage of the residence and place of business to hear.

139.    Mr. Joiner and those within his residence, his place of business, and/or the curtilage thereof had an objectively reasonable expectation that the communications were

not being recorded or eavesdropped upon by third parties outside the residence and place of business.

140. As a direct and proximate result of defendants' actions alleged herein, Plaintiff is entitled to $5,000 per violation committed by the defendants and each of them, and/or three times the amount of actual damages suffered by Plaintiff, which is an amount that is to be proved at trial. Plaintiff is also entitled to provisional and permanent injunctive relief against defendants to enjoin and restrain them from committing further violations of Penal Code section 632.

## SIXTH CLAIM FOR RELIEF

### (DEFAMATION)

### (Against All Defendants)

141. Plaintiff realleges and incorporates all facts stated above in this claim for relief.

142. Defendants have elicited and published through the "preview" of the Callaghan Film and the Callaghan film itself false information about Plaintiff.

143. The false statements that Defendants have published and intend to continue to publish are defamatory in that they accuse Mr. Joiner of having committed crimes and civil wrongs, which themselves have been finally adjudicated by both state and federal courts in Mr. Joiner's favor.

144. None of the statements Defendants have published and intend to publish are privileged.

145. The statements Defendants have published and intend to publish have a natural tendency to injure or cause special damage to Mr. Joiner, in that they are intended to show that Mr. Joiner has engaged in crime(s) and/or civil wrongs.

146. As a direct and proximate result of Defendants' actions as alleged, Plaintiff has suffered economic and reputational damages, in an amount to be proved at trial.

/ / /

/ / /

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

- 28 -

FIRST AMENDED COMPLAINT

## SEVENTH CLAIM FOR RELIEF

### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

#### (Against All Defendants except DOES 1-50)

147.   Plaintiff realleges and incorporates all facts stated above in this claim for relief.

148.   Defendants' actions as alleged herein were and are outrageous.  Defendants intend the Callaghan Film, which is made up of, among other things, unlawfully obtained video and audio recordings, to expose Mr. Joiner and his family to public opprobrium for actions defendants attribute to Mr. Joiner that are false and defamatory, and in attempts to intimidate and coerce Mr. Joiner.

149.   Defendants have undertaken the actions herein alleged with the intention to cause or in reckless disregard of the probability of causing Plaintiff substantial emotional distress.

150.   As a result of defendants' unlawful actions as alleged herein, Plaintiff has suffered will continue to suffer severe emotional distress.

151.   As a further, direct and proximate result of defendants' actions, Plaintiff has been damaged in an amount to be proved at trial.

## EIGHTH CLAIM FOR RELIEF

### (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

#### (Against All Defendants)

152.   Plaintiff realleges and incorporates all facts stated above in this claim for relief.

153.   The defendants, and each of them, were and are under duties to not expose Mr. Joiner to damages and/or future damages that have resulted and will result as a consequence of defendants' unlawful actions alleged in this Complaint.

154.   As a result of what has been published by defendants to date and what will be published should defendants broadcast the Callaghan Film, Plaintiff has suffered substantial emotional distress, and will continue to suffer substantial emotional distress.

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

FIRST AMENDED COMPLAINT

155.   Defendants DOES 1-50, by publicizing and broadcasting the Callaghan Film, after being fully informed of the facts surrounding the Callaghan Film, continued to publicize and broadcast the Callaghan Film, despite previous demand, and thereby aided and abetted their co-defendants' unlawful actions and engaged in negligent actions themselves.

156.   Defendants' negligence was a substantial factor in causing Plaintiff's emotional distress and will be a substantial factor in further causing emotional distress to Plaintiff as the Callaghan Film continues to be publicly broadcast.

157.   As a direct and proximate result of defendants' actions as alleged herein, Plaintiff has been damaged in an amount to be proved at trial.

## NINTH CLAIM FOR RELIEF

### (COMMON LAW INVASION OF PRIVACY)

### (Against All Defendants)

158.   Plaintiff realleges and incorporates all facts stated above in this claim for relief.

159.   Mr. Joiner's residence and place of business are legally protected privacy interests of Mr. Joiner.

160.   In his home and place of business, Mr. Joiner had and has a reasonable expectation of privacy.

161.   By their unlawful actions alleged in this Complaint, defendants, and each of them, engaged in conduct that is intended to invade Plaintiff's privacy.

162.   Defendants DOES 1-50, by publicizing and broadcasting the Callaghan Film, after being fully informed of the facts surrounding the Callaghan Film, continued to publicize and broadcast the Callaghan Film, despite previous demand, and thereby aided and abetted their co-defendants' unlawful actions.

163.   As a direct and proximate result of defendants' invasion of Plaintiff's privacy, Plaintiff has been damaged in an amount to be proved at trial.

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

FIRST AMENDED COMPLAINT

## TENTH CLAIM FOR RELIEF

### (INVASION OF PRIVACY – FALSE LIGHT)

### (Against All Defendants)

164. Plaintiff realleges and incorporates all facts stated above in this claim for relief.

165. Defendants have publicly disclosed and intend to continue to publicly disclose private facts about Mr. Joiner through the "preview" of the Callaghan Film, as well as the Callaghan Film itself.

166. Defendants' disclosure of private facts about Mr. Joiner would be offensive and objectionable to a reasonable person. Defendants accuse Mr. Joiner of false "crimes" and civil wrongs against defendant Johnson and his family that have already been adjudicated in Mr. Joiner's favor by both state and federal courts.

167. Defendants obtained a substantial portion of the disclosures they have made and intend to make by trespassing and unlawfully recording Mr. Joiner, his family members, and his employee at his residence and place of business, respectively. Defendants' disclosure portrays Mr. Joiner in a false light.

168. Defendants' public disclosure of these private facts are not a legitimate public concern. Mr. Joiner is a private person, as are his family members and his employee.

169. Defendants DOES 1-50, by publicizing and broadcasting the Callaghan Film, after being fully informed of the facts surrounding the Callaghan Film, continued to publicize and broadcast the Callaghan Film, despite previous demand, and thereby aided and abetted their co-defendants' unlawful actions.

170. As a direct and proximate result, Mr. Joiner has been damaged in an amount to be proved at trial.

/ / /

/ / /

/ / /

MURPHEY & MURPHEY
A PROFESSIONAL CORPORATION

FIRST AMENDED COMPLAINT

## ELEVENTH CLAIM FOR RELIEF

### (INTRUSION UPON SECLUSION)

### (Against All Defendants)

171.    Plaintiff realleges and incorporates all facts stated above in this claim for relief.

172.    Defendants, and each of them, surreptitiously and without Plaintiff's consent video and audio recorded Mr. Joiner and others within his residence and place of business, places in which Mr. Joiner had and has a reasonable expectation of privacy.

173.    These intrusions occurred in a manner highly offensive to a reasonable person.

174.    The video and audio recording of Mr. Joiner's residence was conducted by defendants who had camouflaged themselves in ghillie suits, trespassed and infiltrated private property, crept to an area that provided a clear view of the residence, and lurked in the bushes while making the recordings.

175.    Defendants now intend to unlawfully use the video and audio footage they illicitly recorded and publish it to the public in the Callaghan Film.

176.    As a direct and proximate result of defendants' unlawful intrusion, Plaintiff has been damaged in an amount to be proved at trial.

## TWELFTH CLAIM FOR RELIEF

### (VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200, *et seq*.)

### (Against All Defendants)

177.    Plaintiff realleges and incorporates all facts stated above in this claim for relief.

178.    Defendants' violations of statutes as alleged herein, including but not limited to 18 U.S.C. § 2511, 18 U.S.C. § 2510; California Penal Code § 1708.7; California Code of Civil Procedure § 527.6; and/or California Penal Code § 632, constitute unfair and fraudulent business practices and unfair competition.

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

FIRST AMENDED COMPLAINT

179.    As a result for the foregoing violations, Plaintiff was required to invest in hundreds of thousands of dollars in security equipment, including but not limited to high speed, infrared cameras for the perimeter of his home and for views of the curtilage.  In addition, Plaintiff was required to terminate his affiliation with a company he founded and decline at least two years of continued remuneration to avoid further damage to the company's reputation.

180.    Plaintiff is entitled to preliminary and permanent injunctive relief to enjoin and restrain defendants from engaging in such unfair and fraudulent business practices and unfair competition, as well as to disgorgement of monies and/or profits made by defendants as a result of their violations of section 17200, in addition to other remedies.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against defendants, and each of them, as follows:

181.    On the First and Second Claims for Relief, for an award of damages against defendants, and each of them, in an amount to be proved at trial, or for the statutory damages remedy of $100 per day or $10,000, whichever is greater, and for an award of reasonable attorney's fees and costs of suit;

182.    On the First and Second Claims for Relief, for provisional and permanent injunctive orders that enjoin and restrain defendants, and each of them, from further violations of the Wiretap Act, including orders that provisionally and permanently enjoin and restrain defendants, and each of them, from publishing and/or otherwise releasing the Callaghan Film, and for an award of reasonable attorney's fees and costs of suit;

183.    On the Third Claim for Relief, for judgment against defendants, and each of them, for an award of general damages, special damages, and punitive damages pursuant to California Penal Code section 1708.7, subsection (c) and according to proof at trial, as well as equitable relief that includes injunctive orders against defendants, and each of them, that enjoin and restrain defendants from further stalking Plaintiff and/or his immediate family;

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

- 33 -

FIRST AMENDED COMPLAINT

184.   On the Fourth Claim for Relief, for provisional and permanent injunctive orders that enjoin and restrain defendants, and each of them, from committing further acts of harassment toward Mr. Joiner, and for an award of reasonable attorney's fees and costs of suit;

185.   On the Fifth Claim for Relief, for judgment against defendants, and each of them, for $5,000 per violation by the defendants of California Penal Code section 632, and/or three times the amount of actual damages suffered by Plaintiff, in an amount that is to be proved at trial, as well as provisional and permanent injunctive order that enjoin and restrain defendants, and each of them, from committing further violations of Penal Code section 632;

186.   On the Sixth Claim for Relief, for judgment of damages against defendants, and each of them, in an amount to be proved at trial;

187.   On the Seventh Claim for Relief, for judgment of compensatory and punitive damages against defendants, and each of them, in an amount to be proved at trial;

188.   On the Eighth Claim for Relief, for judgment of compensatory and punitive damages against defendants, and each of them, in an amount to be proved at trial;

189.   On the Ninth Claim for Relief, for judgment of compensatory and punitive damages against defendants, and each of them, in an amount to be proved at trial;

190.   On the Tenth Claim for Relief, for judgment of compensatory and punitive damages against defendants, and each of them, in an amount to be proved at trial;

191.   On the Eleventh Claim for Relief, for judgment of compensatory and punitive damages against defendants, and each of them, in an amount to be proved at trial;

192.   On the Twelfth Claim for Relief, for provisional and permanent injunctive orders that enjoin and restrain defendants, and each of them, from further violations of California Business and Professions Code section 17200, et seq., and for judgment against defendants, and each of them, that orders disgorgement of all monies and/or profits defendants receive as a result of the Callaghan Film and its public display;

193.   Interest at the legal rate; and,

MURPHEY & MURPHEY
A PROFESSIONAL CORPORATION

FIRST AMENDED COMPLAINT

194.   For such other and further relief as the Court deems just and proper.


Dated: March 12, 2025                    MURPHEY & MURPHEY, A.P.C.


By: _____
    Meghan C. Murphey
    Matthew D. Murphey
    Dennis J. Canty
    Kerry Moynihan
    Attorneys for Plaintiff,
    WILLIAM JOINER


DEMAND FOR JURY TRIAL

Plaintiff William Joiner hereby demands trial by jury on all issues and claims appropriate for a jury to decide.

MURPHEY &
MURPHEY
A PROFESSIONAL
CORPORATION

- 35 -

FIRST AMENDED COMPLAINT