JONATHAN L. SEGAL (State Bar No. 264238)
 jonathansegal@dwt.com
SAMANTHA LACHMAN (State Bar No. 331969)
 samlachman@dwt.com
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, California  90071-2566
Telephone:  (213) 633-6800
Fax:  (213) 633-6899

ABIGAIL EVERDELL (*Pro hac vice*)
 abigaileverdell@dwt.com
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 42nd Floor
New York, NY 10020
Telephone:  (212) 489-8230
Fax:  (212) 379-5244

Attorneys for Defendants
ANDREW CALLAGHAN, CHANNEL 5 LLC,
EVAN GILBERT-KATZ, AND NICOLAS
MOSHER

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM JOINER, an individual,<br><br>               Plaintiff,<br><br>    vs.<br><br>ANDREW CALLAGHAN, an Individual; CHANNEL 5 LLC, a Washington Limited Liability Company; EVAN GILBERT-KATZ, an Individual; NICOLAS MOSHER, an Individual; KELLY SCOTT JOHNSON, an Individual; and DOES 1 through 200, Inclusive,<br><br>               Defendant. | Case No. 8:24-cv-01160-CBM-KS<br><br>**C5 DEFENDANTS' OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION**<br><br>Action Filed:  May 30, 2024<br>Discovery cutoff:   April 30, 2026 |

OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION

# TABLE OF CONTENTS

**PAGE**

I.  INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................. 2

    A.  The C5 Defendants Have Diligently Produced All Relevant Documents to the Federal Wiretap Claims, and More .......................... 2

    B.  Plaintiff Makes Additional Discovery Demands For Materials Beyond What Rule 26 Requires ............................................................. 6

III.  ARGUMENT ..................................................................................................... 7

    A.  Plaintiff Is Not Entitled to *Ex Parte* Relief ......................................... 8

    B.  Plaintiff Has No Good Cause to Extend the Fact Discovery Deadline .................................................................................................. 11

IV.  CONCLUSION ................................................................................................ 15

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Brewer v. BNSF Railway Co.*,
2018 WL 3079499 (D. Mont. Feb. 27, 2018) ...................................................... 12

*Clark v. City of Los Angeles*,
2021 WL 4731353 (C.D. Cal. Aug. 23, 2021) ..................................................... 14

*Cornwell v. Electra Cent. Credit Union*,
439 F.3d 1018 (9th Cir. 2006) ............................................................................ 11

*Gilead Scis., Inc. v. Merck & Co, Inc.*,
2016 WL 146574 (N.D. Cal. Jan. 13, 2016) ....................................................... 13

*Johnson v. Mammoth Recreations, Inc.*,
975 F.2d 604 (9th Cir. 1992) ................................................................... 11, 12, 14

*Kim v. BMW of N. Am., LLC*,
2020 WL 13064697 (C.D. Cal. June 24, 2020) ..................................................... 9

*Mission Power Eng'g v. Continental Cas. Co.*,
883 F. Supp. 488 (C.D. Cal. 1995) ........................................................................ 9

*Mondares v. Kaiser Found. Hosp.*,
2011 WL 5374613 (S.D. Cal. Nov. 7, 2011) ...................................................... 11

*Rivera v. NIBCO, Inc.*,
364 F.3d 1057 (9th Cir. 2004) ............................................................................ 13

*Sadowski v. Hollywood Unlocked, Inc.*,
2020 WL 10506032 (C.D. Cal. Dec. 8, 2020) ....................................................... 9

*Stone v. Signode Indus. Grp. LLC*,
2022 WL 3574287 (C.D. Cal. May 25, 2022) ....................................................... 9

*Valadez v. County of Los Angeles*,
2022 WL 19914191 (C.D. Cal. Nov. 18, 2022) ..................................................... 9

*Zivkovic v. S. Cal. Edison Co.*,
302 F.3d 1080 (9th Cir. 2002) ............................................................................ 11

**Statutes**

18 U.S.C.

§ 2510 ............................................................................................................... 1
§ 2511 ............................................................................................................... 1
§ 2520(a) .......................................................................................................... 1
§ 2520(a) .......................................................................................................... 2

**Rules**

Fed. R. Civ. P. 16(b)(4) ................................................................................ 11

L.R. 7-19 ......................................................................................................... 8

**Other**

Judge Consuelo B. Marshall's Standing Order, Section 10 ........................... 8

OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION

Defendants Andrew Callaghan, Channel 5 LLC ("Channel 5"), Evan Gilbert-Katz, and Nicolas Mosher (collectively "C5 Defendants") submit this opposition to plaintiff William Joiner's *ex parte* application ("Application" or "App.") for a 60-day extension of the discovery period.

## I.    INTRODUCTION

Fact discovery on Plaintiff's federal claims is complete.  In the preceding year, the C5 Defendants diligently collected and searched the repositories of relevant evidence and produced 400 raw audiovisual files and hundreds documents and communications comprising everything conceivably relevant to Plaintiff's two federal claims under the Wiretap Act and Electronic Communications Privacy Act. 18 U.S.C. §§ 2510, 2511, 2520(a) (the "Federal Wiretap Claims").  These records make plain that no violations of these laws ever occurred.  In an abundance of good faith, the C5 Defendants also agreed to produce numerous categories of irrelevant documents, commissioned forensic comparisons at Plaintiff's insistence, and have sat for a 30(b)(6) deposition at which Channel 5's owner Andrew Callaghan testified clearly and without rebuttal that the C5 Defendants never recorded Plaintiff or intercepted his communications in any manner.

Plaintiff, for his part, has proceeded with a marked lack of diligence.  He has not produced a single document in support of his claims.  He failed to even look at the C5 Defendants' initial production of documents for over six weeks.  He waited four months to raise concerns about that production.  Then, only 35 days before the close of discovery—nearly *ten months* after receiving them—he raised concerns for the very first time about the C5 Defendants' written discovery responses.  And now, defying this Court's Standing Order, he has made an emergency Application without proper notice, making numerous misrepresentations and trying to paint the C5 Defendants as the cause of his own delays.  This conduct is the polar opposite of the diligence required to justify any continuance, much less an *ex parte* one. Moreover, the discovery Plaintiff seeks is not of critical evidence, but of duplicative

1
OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION

and irrelevant information he hopes *might* lead to evidence that evidence *might* exist.  This is a fishing expedition, and smacks of bad faith.  In short, the occasion for Plaintiff's *ex parte* Application is a fake emergency of his own creation.  The C5 Defendants ask the Court to deny the Application, so they can proceed with moving for summary judgment on the baseless Federal Wiretap Claims.

## II.   FACTUAL BACKGROUND

**A.   The C5 Defendants Have Diligently Produced All Relevant Documents to the Federal Wiretap Claims, and More**

Discovery on Plaintiff's Federal Wiretap Claims commenced over a year ago, approximately two weeks after the Court denied Defendants' Motion to Dismiss those claims.  Declaration of Abigail Everdell ("Everdell Decl.") ¶¶ 4-5.[1]  On April 14, 2025, the C5 Defendants served interrogatories and requests for production.  *Id*. ¶¶ 8-9.  Plaintiff served Responses and Objections on May 21, 2025.  *Id*.  Plaintiff has not produced a single document in discovery.  *Id*. ¶ 10.

Plaintiff did not serve his own Requests for Production until April 30, 2025.  *Id*. ¶ 11.  The C5 Defendants served their Responses & Objections to the Requests for Production on June 9, 2025.  *Id*., Ex. 3.  In these responses, the C5 Defendants made a number of objections and made clear they would agree to produce all recordings of Plaintiff or documents evidencing recordings of him (if any), all recordings made within 1000 feet of his home or business, and any documents evidencing recordings made in that radius.  *See generally*, *id*.  Because Plaintiff's Federal Wiretap Claims require his communications to have actually been intercepted or recorded, *see* 18 U.S.C. § 2520(a), these production parameters not

---

[1] Plaintiff misleadingly claims there were "eight months of delay" in scheduling a Rule 26(f) conference.  App. at 10.  Plaintiff is referring to the period during which the C5 Defendant's Motion to Dismiss was pending.  The C5 Defendants engaged promptly on scheduling a conference as soon as that motion was denied, and it was held a little over two weeks after.  *See* Canty Decl. Ex. B at 8.

OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION

only met but exceeded what is relevant to those claims.  Plaintiff did not raise any concerns about these parameters.

At the outset of discovery, the C5 Defendants' counsel had commissioned a forensic image of the OWC ThunderBay solid-state hard drive "rack" (the "OWC Server") in Channel 5's custody where all raw footage for the Documentary had been placed and stored long before Plaintiff initiated this dispute.  Everdell Decl. ¶ 12.  Channel 5 later confirmed in sworn testimony that while footage for the Documentary had been originally been transferred from recording devices to smaller portable hard drives when first recorded, the contents of all of these drives had been transferred wholesale to the OWC Server in 2023, without exception.  *Id.* ¶ 16 and Ex. 5 at 22:8-15, 23:17-20, 23:25-24:2, 26:13-16, 30:1-2, 38:1-5, 42:2-23.  The C5 Defendants' counsel diligently searched the imaged drive for recordings of Plaintiff, his family members, or any of his employees and found that no such recordings existed.  *Id.* ¶ 12.  They found no evidence to support that Plaintiff ever was or even could have been wiretapped from where the C5 Defendants filmed.  *Id.* ¶ 13.  On October 21, 2025, Defendants produced over 300 recordings made within 1000 feet of Plaintiff's home or business, which documented all conduct within that radius.  *Id.*  None of this footage captures Plaintiff, nor does any of it support an inference that he was ever recorded or that any of his communications were ever intercepted.  *Id.*  Additionally, none of this footage supports any theory that the C5 Defendants ever trespassed on Plaintiff's property.  *Id.*

After serving their first production on October 21, the C5 Defendants initiated a meet and confer with Plaintiff's counsel, which occurred on December 5, 2025.  *Id.* ¶ 14.  The C5 Defendants asked Plaintiff's counsel to dismiss the Federal Wiretap Claims as they had found no evidence of any recording of Plaintiff, and Plaintiff had produced no evidence that any such recording ever occurred.  *Id.*  Contrary to Plaintiff's counsel's sworn claim that they began reviewing the first production in "November" of 2025, Canty Decl. ¶ 13, Plaintiff's counsel told the C5

3

Defendants' counsel on this December call that they had not yet reviewed any of the contents of the first production and estimated that it would take until January 2026 to do so. Everdell Decl. ¶ 14. The C5 Defendants' counsel followed up twice in December and in January to schedule a call to discuss their production. *Id*., Ex. 4 at 3-4. On January 6, 2026, rather than agreeing to discuss the lack of evidence in support of their Federal Wiretap Claims, Plaintiff's counsel responded that they had "determined we need to depose the person most knowledgeable at Channel 5 regarding the filming, storage, maintenance, copying, and production of the videos." *Id*. at 3. The C5 Defendants had to follow-up repeatedly to get this deposition scheduled promptly. *Id*. at 1-3.

The C5 Defendants made their second production, which included emails and text messages, on February 9, 2026. *Id*. ¶ 15. That production included other documents showing or referring to C5 Defendants' presence within 1000 feet of Plaintiff's home and office. *Id*. Again, that production contained no evidence that the C5 Defendants wiretapped Plaintiff or eavesdropped on his confidential communications. *Id*.

Plaintiff's counsel deposed defendant Channel 5's 30(b)(6) designee, defendant Andrew Callaghan, on February 12, 2026. *Id*. ¶ 16. At Mr. Callaghan's deposition Plaintiff's counsel raised questions for the first time about purported gaps in the first production, which could easily have been raised in discussions between counsel. *Id*. ¶ 17. Following this deposition, the C5 Defendants investigated the questions Plaintiff's counsel had raised and made a third production of documents on March 9, 2026, along with a cover letter explaining the purported "gaps" Plaintiff's counsel had identified were the result of improperly processed files, or that counsel had reviewed the underlying video files and determined they did not contain any responsive information. *Id*., Ex. 6 at 1-3; Ex. 7 at 3. The footage produced with the Third Production was either duplicative of footage already produced, or showed the same events. Everdell Decl. ¶ 17. It included no

4
OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION

evidence that the C5 Defendants ever wiretapped Plaintiff or eavesdropped on his confidential communications. *Id*. The C5 Defendants again asked Plaintiffs to confer on dismissing their Federal Wiretap Claims. *Id*.

Instead of dismissing their claims, only 35 days before the scheduled close of discovery, Plaintiff's counsel sent an email on March 25, 2026 raising, **for the first time**, purported deficiencies in the C5 Defendants' June 9, 2025 Responses and Objections to Plaintiff's First Set of Requests for Production. Everdell Decl., Ex. 7 at 1-2. Prior to this, Plaintiff had not sent a single deficiency letter or made any requests for additional information from the C5 Defendants' counsel. The parties conducted a meet and confer call on April 3, 2026, at which the C5 Defendants agreed, in an abundance of good faith and notwithstanding the limited time left in discovery, to produce *additional* documents and take *additional* collection measures. *Id*., Ex. 8. As of April 30, the close of discovery in this matter, the C5 Defendants has completed every measure agreed to. *See id*.[2]

Unsatisfied with the C5 Defendants' concessions, counsel for Plaintiff continued to assert that there were "disputes" over what the C5 Defendants had agreed to produce. *Id*., Ex. 7 at 5. The C5 Defendants repeatedly tried to engage with Plaintiff to reach reasonable agreements on the scope of discovery, to no avail. *Id*. at 4. For example, counsel for the C5 Defendants asked Plaintiff for the basis for his request that they revise their written Responses and Objections to Plaintiff's First Set of Requests for Production; Plaintiff did not provide any. *Id*., Ex. 9 at 7.

---

[2] These measures included searching for the "original" portable hard drives the C5 Defendants had used to store footage before it was all transferred over to the OWC Server. Everdell Decl. Ex. 9 at 7. The C5 Defendants searched their offices and found only two pre-transfer drives, each containing the same set of footage recorded in October 2021 near Plaintiff's home. *Id*. at 4-5. Both were provided to the C5 Defendants' discovery vendor, but one was damaged in shipping and could not be imaged. *Id*. Plaintiff's Application suggests the C5 Defendants' story on this drive changed, see App at 3, 7, which is false: Counsel informed Plaintiff when they discovered the drive was faulty, and then informed Plaintiff when they were told the likely cause of the damage. *Id*. The duplicate drive of footage was then examined, and the vendor confirmed that all footage from this filming session had indeed been copied to the OWC Server. *Id*., Ex. 12.

OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION

And on April 15, counsel for the C5 Defendants asked what written discovery responses Plaintiff sought clarity on. Ex. 9 at 7. Plaintiff's counsel never responded.

Similarly, counsel for the C5 Defendants offered to meet and confer as to the scope of Plaintiff's request for Adobe Premiere project files and media cache files, as they had identified at least 1500 such files (possibly far more as Adobe Premiere autosaves at set intervals), had determined review of these files would be unduly onerous, and Plaintiff had not articulated any plausible theory for how these files would be relevant. *Id*. at 5. Plaintiff did not engage in this discussion and failed to offer dates or times to discuss before the close of discovery. *Id*. at 1-2.

Meanwhile, the C5 Defendants made yet another production of documents on April 25, 2026, of 46 additional footage and audio files and 321 additional emails and text messages including discussions or other evidence of attempts to find Plaintiff or the purpose of the C5 Defendants' presence near his home or business—despite these documents having no relevance to the Federal Wiretap Claims as they neither contained nor in provided any direct or indirect evidence of Plaintiff's communications having been intercepted or recorded. Everdell Decl. ¶ 22. On April 30, 2026, the C5 Defendants produced all published versions of the Documentary at issue. *Id*. ¶ 25. They also produced a letter from their third-party eDiscovery vendor Lighthouse, confirming that they had analyzed the key drive where the footage recorded near Plaintiff's home had been originally stored and that all of this footage had been transferred to the OWC Server. *Id*., Ex. 12; *supra* n. 2.

**B.    Plaintiff Makes Additional Discovery Demands For Materials Beyond What Rule 26 Requires**

On April 23, 2026, counsel for Plaintiff attempted to schedule a telephonic discussion with the Magistrate Judge assigned to this matter on their purported ongoing discovery "disputes" regarding the C5 Defendants' written discovery responses, their refusal to produce every single Adobe Premiere Pro project file

6

without prior review, and their refusal to produce a handful of footage files they had repeatedly told Plaintiffs were not relevant because they were not recorded within 1000 feet of Plaintiff's home or business, did not include any recordings of Plaintiff, and did not include discussion of recordings of Plaintiff or any intent to record Plaintiff. Everdell Decl. ¶ 21. The parties submitted a joint statement regarding these disputes. *Id*., Ex. 10. The Magistrate Judge did not respond to Plaintiff's request for a telephonic conference. *Id*. ¶ 21.

On April 28, 2026, counsel for Plaintiff wrote that they would be moving to continue the discovery cutoff by 30 days, to June 1, to provide additional time to compel the additional materials they seek. *Id*. ¶ 23, Ex. 11. Counsel for Plaintiff claims that they complied with the Local Rule because they "advised Ms. Everdell on April 28 that plaintiff would seek a continuance of the discovery cutoff." Canty Decl. ¶ 21. But, in that email, counsel for Plaintiff did not inform the C5 Defendants they would seek *ex parte* relief, did not inform the C5 Defendants of the date they would file the Application, did not inform the C5 Defendants that the Application would focus on "two continuing discovery disputes" regarding the C5 Defendants' document collection and written discovery responses, and did not inform the C5 Defendants that they would be seeking a 60-day extension. Everdell Decl. ¶ 24.

### III.   ARGUMENT

The C5 Defendants have made every attempt to move discovery on Plaintiff's Federal Wiretap Claims forward, while Plaintiff has responded with delays and dilatory conduct. Plaintiff has not produced any documents in discovery. He did not begin review of the C5 Defendants' first production of footage for over six weeks (a fact his counsel misrepresents in his declaration). He did not raise any concerns about that production until four months after it was served. He did not raise any concerns with the C5 Defendants' written discovery responses until nearly ten months after they had been served. Indeed, every one of the matters he seeks

7

OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION

additional time for discovery on was raised for the first time only *35 days* from the close of discovery, insufficient time for any discovery motion practice.  Yet Plaintiff only makes his Application now, on the eve of discovery closing.  Plaintiff's conduct does not show the diligence his extraordinary relief requires.  Instead, it shows a party trying to put off the inevitable—the dismissal of his utterly baseless claims—through delay and obfuscation.

Plaintiff's Application fulfills neither the procedural nor substantive requirements for *ex parte* relief.  Plaintiff did not provide adequate notice of his Application under L.R. 7-19.1, nor is he entitled to this extraordinary relief because his purported "emergency" is a matter of his own making.  Moreover, Plaintiff cannot show good cause to extend the discovery deadline because the documents he seeks are neither relevant to his Federal Wiretap Claims nor proportional to the needs of the case.

## A.    **Plaintiff Is Not Entitled to *Ex Parte* Relief**

As this Court's procedures make clear, "ex parte applications are solely for extraordinary relief."  *See* Judge Consuelo B. Marshall's Standing Order, Section 10.  "Applications that do not meet the requirements set forth in Local Rules 7-19 will not be considered."  *Id*.  Plaintiff's Application should be denied because he did not comply with pre-filing notice requirements, and cannot meet the standard required for *ex parte* relief in any event.

First, Local Rule 7-19 imposes upon counsel a duty "to make reasonable, good faith efforts orally to advice counsel for all other parties … of the date and substance of the proposed ex parte application."  L.R. 7-19.1.  Contrary to counsel's claims that they "advised counsel for the Channel 5 defendants of the date and substance of this application," App. at 2, Plaintiff's counsel only provided notice that Plaintiff intended to make a motion, did not provided notice of when, and indicated the motion would be for a 30-day extension of discovery.  Everdell Decl. ¶¶ 23-24.  This does not comply with Local Rule 7-19.1.

OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION

Second, Plaintiff makes no effort to justify the *ex parte* nature of his request. The law on *ex parte* applications in this Circuit imposes a demanding standard.  In order to bypass the normal motion process, the moving party must establish both (a) that he will be "irreparably prejudiced if the underlying motion is heard according to regular noticed motion procedures" and (b) "[(i)] that [he] is without fault in creating the crisis that requires ex parte relief, or [(ii)] that the crisis occurred as a result of excusable neglect."  *Mission Power Eng'g v. Continental Cas. Co.*, 883 F. Supp. 488, 492 (C.D. Cal. 1995) (denying *ex parte* motion to shorten time to hear discovery motion).  "Lawyers must understand that filing an *ex parte* motion . . . is the forensic equivalent of standing in a crowded theater and shouting, 'Fire!' There had better be a fire."  *Id*.

Courts routinely deny *ex parte* applications to extend or continue discovery cutoffs where, like here, a party has waited until the last minute to pursue discovery. For example, in *Valadez v. County of Los Angeles*, the court denied the plaintiffs' *ex parte* application to amend the scheduling order where they "ha[d] not been diligent in pursuing discovery" and failed to notice depositions until the very last minute prior to the discovery cutoff.  2022 WL 19914191, at *2 (C.D. Cal. Nov. 18, 2022). And in *Sadowski v. Hollywood Unlocked, Inc.*, the court denied dueling *ex parte* requests to continue discovery deadlines where the plaintiff waited to notice depositions until just before the close of fact discovery and the defendants likewise delayed and "waited to seek discovery until the eve of discovery cutoff, even though they had ample time to do so beforehand."  2020 WL 10506032, at *2 (C.D. Cal. Dec. 8, 2020).  *See also Stone v. Signode Indus. Grp. LLC*, 2022 WL 3574287, at *2 (C.D. Cal. May 25, 2022) (denying *ex parte* application to modify scheduling order where plaintiff simply "failed to complete discovery in the allotted time"); *Kim v. BMW of N. Am., LLC*, 2020 WL 13064697, at *1 (C.D. Cal. June 24, 2020) ("The moving party must also show that it used the entire discovery period efficiently and could not have, with due diligence, sought to obtain the discovery

earlier in the discovery period . . . Ex parte applications are not intended to save the day for parties who have failed to present requests when they should have.") (citation omitted).

Here, Plaintiff has not shown that he would be "irreparably prejudiced," or even that good cause supports extending the discovery deadline (as set out further *infra*). More importantly, Plaintiff cannot establish that he was without fault because the purported "crisis" here is the result of his own neglect in pursing discovery till the eve of its conclusion. Plaintiff has wound down his own clock by delaying months upon months in raising his concerns. In the meantime, the C5 Defendants have taken every affirmative step, followed up repeatedly, and have undertaken measure after measure to address Plaintiff's concerns and produce additional categories of documents.

For example, the C5 Defendants made their first production of documents in October 2025. Everdell Decl. ¶ 13. When the C5 Defendants initiated a meet and confer in December 2025, six weeks later, counsel for Plaintiff stated that they had not yet begun to review the production and that it would take them until January 2026 to do so. *Id*. ¶ 14. The C5 Defendants had to follow up multiple times to set a meeting in January. *Id*., Ex. 4 at 3-4. And when Plaintiffs finally responded, they did not raise their questions and concerns about the production with counsel, who could have promptly addressed them, but instead noticed a 30(b)(6) deposition of Channel 5. *Id*. at 3. It was only at this deposition, *four months after the C5 Defendants' production*, that they raised concerns with purported "gaps" in the first production. Everdell Decl. ¶ 17. The C5 Defendants affirmatively investigated and provided a detailed explanation and supplemental production three weeks later. *Id*., Ex. 6. Yet Plaintiff waited another *six weeks* to bring this Application.

Similarly, the C5 Defendants served their Responses and Objections to Plaintiff's First Set of Requests for Production in June 2025, but Plaintiffs waited until March 2026—nearly *ten months later*—to cite purported deficiencies in those

10

responses.  Everdell Decl. ¶¶ 11, 19.  Notwithstanding this inexcusable delay, and the irrelevance of the documents Plaintiff demanded, the C5 Defendants agreed to nearly all of Plaintiff's additional demands and produced hundreds of additional documents within one month.  *Id*. ¶ 22.

Last, notwithstanding the C5 Defendants' clear and consistent position on what they would and would not produce, Plaintiff waited until a week before the discovery cutoff to attempt to schedule a telephonic discussion with the Magistrate Judge.  *Id*. ¶ 21.  In short, Plaintiff has failed to diligently pursue the discovery seeks within the timeline set by this Court.  He is not entitled to *ex parte* relief from the Court's discovery deadline.

**B.     Plaintiff Has No Good Cause to Extend the Fact Discovery Deadline**

Even if Plaintiff had brought his Application by normal motion, he would still not be entitled to the relief sought.  "A scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992) (internal citation and quotations omitted).  "The use of orders setting a firm discovery cutoff date is commonplace, and has impacts generally helpful to the orderly progress of litigation, so that the enforcement of such an order should come as a surprise to no one." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1027 (9th Cir. 2006).

A court may modify its case schedule "for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  *See also Mondares v. Kaiser Found. Hosp.*, 2011 WL 5374613, at *1 (S.D. Cal. Nov. 7, 2011) ("The party seeking to continue or extend the deadlines bears the burden of proving good cause"); *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002) (good cause required).  "Good cause" looks to the moving party's diligence, and "[t]he district court may modify the pretrial schedule 'if it cannot reasonably be met despite the diligence of the party seeking the extension.'" *Johnson*, 975 F.2d at 609 (citation omitted).  The

OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION

inquiry focuses on "the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end." *Id.*

As set out above, Plaintiff's lack of diligence on its own forecloses any good cause finding. Moreover, closer scrutiny of the purported "continuing discovery disputes" Plaintiff cites to justify his Application reveals that they are, at best, fishing expeditions without any colorable basis to believe additional relevant evidence exists. This is also not good cause to keep discovery open beyond the Court-ordered deadline—much less for two extra months.

*First*, Plaintiff's Application attempts to characterize the C5 Defendants' collection as inadequate and their statements about that collection as confusing. This is false. As set out above, the C5 Defendants identified the central repository where *all* footage created for the Documentary was transferred and stored before this dispute arose—the OWC Server. Everdell Decl. ¶ 12. Channel 5's designee has also testified under oath that everything for the Documentary was moved to this drive, that the Documentary was created and edited using footage from this drive, and that nothing was ever deleted. *Id.* ¶ 16, Ex. 5 at 22:8-15, 23:17-20, 23:25-24:2, 26:13-16, 30:1-2, 38:1-5, 42:2-23. Despite this, when Plaintiff's counsel complained that they wanted to see the original drives where the footage was first stored before being transferred, the C5 Defendants performed a search and managed to find one functional original drive containing the footage from the October 2021 filming sessions that is central to this case, and performed a forensic analysis of it to confirm all this footage had been transferred. It had. *Id.*, Exs. 9, 12. *See also* n. 2, *supra*. There are no more steps needed to confirm that the C5 Defendants' collection was entirely adequate, and Plaintiff has no grounds to demand more. *See Brewer v. BNSF Railway Co.*, 2018 WL 3079499, at *4 (D. Mont. Feb. 27, 2018) ("Brewer is speculating that there must be something on the BlackBerry which did not transfer over. However, … Brewer has not shown how the ESI he presumes is missing will prevent him from going to trial or threaten to interfere with the rightful

outcome of the case"). Finally, while Plaintiff speculates that the C5 Defendants' production could be "incomplete" and that "responsive media" may not have been produced, App. at 7, he has not actually identified any evidence that could be missing from the productions to date. This Court "need not condone the use of discovery to engage in 'fishing expedition[s],'" *Rivera v. NIBCO, Inc*., 364 F.3d 1057, 1072 (9th Cir. 2004), which is precisely what Plaintiff is trying to do here.

**Second**, Plaintiff argues that he is entitled to Adobe Premiere Pro project files and media cache databases that, again, are not themselves relevant evidence but "would help plaintiff assess whether defendants' production is complete." App. at 4. The files Plaintiff seeks are records created by the editing software Adobe Premiere Pro, which allows a user to edit footage files together with other elements to create a final audiovisual product. Everdell Decl. ¶ 20. They record information about what raw files were used in what order and manner—but do *not* include the audiovisual files themselves. *Id*. These records are also automatically created at intervals, meaning there are 1500 of them *at minimum* for the final Documentary film. *Id*. And they are large files that cannot be reviewed through an e-discovery platform; rather, they must be manually reviewed in a native application through an examination of numerous elements, which may include editorial comments. *Id*. In short, the files would need to be sufficiently relevant to justify the massive burden of reviewing them. *See Gilead Scis., Inc. v. Merck & Co, Inc*., 2016 WL 146574, at *1 (N.D. Cal. Jan. 13, 2016) ("No longer is it good enough to hope that the information sought might lead to the discovery of admissible evidence. In fact, the old language to that effect is gone. Instead, a party seeking discovery of relevant, non-privileged information must show, before anything else, that the discovery sought is proportional to the needs of the case."). They are not sufficiently relevant. Plaintiff admits that his sole hope is that these files will show that some footage files for the Documentary may have been changed or deleted. App. at 7. This is categorically not grounds to compel production. *See Clark v. City of Los Angeles*,

13

OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION

2021 WL 4731353, at *6 (C.D. Cal. Aug. 23, 2021) ("A mere suspicion that additional documents must exist is an insufficient basis to grant a motion to compel … Rather, the moving party must have a colorable basis for its belief that relevant, responsive documents exist and are being improperly withheld").

Even more damning, Plaintiff has not identified any Channel 5 publication including any recording of him (because none were made), so there is no basis to believe that any footage used in editing the Documentary would contain such a recording.  Thus, even if he did identify missing footage files through the Adobe Premiere records, that would not be evidence of anything.

Finally, the C5 Defendants have *already reviewed and produced all relevant raw footage*.  Everdell Decl. ¶¶ 13-14, 17.  How this footage was edited together has no bearing at all on the Federal Wiretap Claims.

***Third***, Plaintiff claims that there is a dispute "concerning the clarity and completeness of defendants' discovery responses," and asks for more time to compel the C5 Defendants to revise their June 9, 2025 Responses and Objections to Plaintiff's Requests for Production.  App. at 4.  Plaintiff has inexcusably delayed nearly ten months in seeking this relief, which is reason alone to deny the Application.  *See Johnson*, 975 F.2d at 610 ("The burden was upon Johnson to prosecute his case properly.  He cannot blame Mammoth Recreations for his failure to do so.  The simple fact is that his attorneys filed pleadings and conducted discovery but failed to pay attention to the responses they received.  That is precisely the kind of case management that Rule 16 is designed to eliminate.").  Moreover, the relief itself is meaningless.  The C5 Defendants' responses clearly laid out what they would produce and what they objected to producing, and the C5 Defendants proceeded consistent with those responses for nearly ten months without complaint from Plaintiff.  Everdell Decl. ¶¶ 11, 19.  When Plaintiff claimed a list of deficiencies on March 25, 2026, the C5 Defendants responded promptly, clearly laying out additional categories of documents they would agree to produce

and ones they would not. *Id*., Ex. 8 at 2. And when Plaintiff again protested about a lack clarity, the C5 Defendants once again laid out their position in detail. *Id*., Ex. 9 at 4-5. The C5 Defendants have followed through on those agreements and completed their production of documents by the April 30 deadline. Everdell Decl. ¶ 25. Plaintiff, for his part, has not specified what particular discovery responses he believes are unclear or incomplete, and has failed to cite any legal basis for his demand that the C5 Defendants revise their responses and objections. In short, Plaintiff is asking to reopen discovery for the sake of clarity he *already has*, on written responses he has failed to specify, and without any cited legal basis. This is not good cause.

In sum, though Plaintiff claims that he has been "diligent" in discovery, the record establishes the opposite. The fact discovery cutoff is today, April 30, 2026, and discovery on all relevant matters is complete. If Plaintiff anticipated that there were discovery disputes that would necessitate an extension of the discovery deadline, he could have sought a stipulated extension of the discovery cutoff much earlier. Plaintiff's counsel has not been diligent in prosecuting this action to date, and his actions do not rise to the level of "good cause" meriting a continuance in this matter.

## IV.    CONCLUSION

The C5 Defendants respectfully request that Plaintiff's *ex parte* application for an extension of the discovery cutoff by 60 days be denied, and that the Schedule (ECF No. 48) remain in effect.

OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION

DATED: April 30, 2026

DAVIS WRIGHT TREMAINE LLP
JONATHAN L. SEGAL
ABIGAIL EVERDELL
SAMANTHA LACHMAN


By: */s/ Jonathan Segal*

Jonathan Segal

Attorneys for the C5 Defendants
ANDREW CALLAGHAN, CHANNEL
5 LLC, EVAN GILBERT-KATZ, AND
NICOLAS MOSHER

16

OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION